24

United States District Court
Southern District of Texas
FILED

JUL 0 6 2001

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| NOEL ESPINOZA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | NO. B-00-142 |
| | ) | |
| THE LAREDO COCA-COLA BOTTLING | ) | |
| COMPANY, INC., CONTINENTAL | ) | |
| CASUALTY COMPANY and | ) | |
| CONSTITUTION STATE SERVICE | ) | |
| COMPANY, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LAREDO COCA-COLA BOTTLING COMPANY'S MOTION FOR SUMMARY JUDGMENT

Comes now Defendant, The Laredo Coca-Cola Bottling Company, Inc. ("Laredo Coke") and,

in support of its Motion for Summary Judgment, states the following:

### I. Statement of the Case

The instant action was filed on August 4, 2000. With respect to Laredo Coke, Plaintiff

claims that he was discharged for filing a workers' compensation claim in violation of § 451.001 of

the *Texas Labor Code*. He also claims that his rights under the Family and Medical Leave Act

("FMLA") were somehow violated. (See Plaintiff's Second Amended Petition ¶¶ III., VII. and

VIII.). Laredo Coke denies all such allegations. (See Defendant The Laredo Coca-Cola Bottling

Company, Inc.'s Answer).

## II.  **Statement of Facts**

Plaintiff was employed by Laredo Coke at its San Benito, Texas facility.  (Espinoza Depo., p. 25 and Exhs. 1 and 3;  Carreon Aff., ¶ 3).[1]  On April 10, 1999, during the course of his employment, Plaintiff injured his back. (Espinoza Depo., pp. 10-11 and Exh. 3).  As a result of that injury, Plaintiff was placed on a medical leave of absence, commencing April 15, 1999.  (Espinoza Depo., p. 51).  During his leave, Plaintiff was treated by an array of medical specialists, culminating in spinal surgery on March 2, 2000.  (Espinoza Depo., pp 41-42, 179-81, 191-94, 198, 201, 217).  In connection with this surgical procedure and the post-operative therapy and rehabilitation he underwent, Plaintiff was not medically released to return to work by his treating physician until September 11, 2000.  (Espinoza Depo., Exh. 2).

At the time of Plaintiff's injury (and at all relevant times thereafter), Laredo Coke's medical leave policy provided its employees with up to twelve **months** of medical leave for both work-related and non-work-related injuries and illnesses.  (Carreon Aff., ¶ 5 and Exh. 2).  In accordance with federal law, employees are also eligible for up to twelve **weeks** of family and medical leave; the same to run concurrently with their twelve months of company-provided medical leave. (Carreon Aff., ¶¶ 7 and 9 and Exhs. 1, 3 and 5).  If an employee is not able or otherwise does not return to work at the end of this one-year absence, he or she is terminated, regardless of the reason for which he/she took the leave.  (Carreon Aff., ¶¶ 5 and 11).

---

[1]      All references to Plaintiff, Noel Espinoza's, deposition, which was taken on March 14, 2001, will be to "Espinoza Depo." along with the respective page or exhibit number applicable.  The excerpts containing all pages of this deposition transcript which are referenced in this Memorandum are attached as **Exhibit A** to Defendant's Motion for Summary Judgment.   All citations to "Carreon Aff." refer to the affidavit of Defendant's Human Resources Manager, Pete Carreon III.   A copy of this affidavit is attached as **Exhibit B** to Defendant's Motion for Summary Judgment.

Pursuant to Laredo Coke's medical leave policy, Plaintiff's medical leave of absence expired on April 15, 2000, one year after its commencement. (Carreon Aff., ¶ 5). As noted above, Plaintiff was not medically released to return to work until September 11, 2000, nearly seventeen months after his leave began. (Espinoza Depo., Exh. 2). Consequently, and in full accordance with Laredo Coke's medical leave policy, Plaintiff's employment was terminated effective April 28, 2000. (Espinoza Depo., Exh. 1;  Carreon Aff. ¶¶ 5 and 6).

### III.  **Argument**

A.    **There Is No Genuine Issue of Material Fact Regarding Plaintiff's Claim of Retaliatory Discharge Based upon His Workers' Compensation Claim, and Laredo Coke Is Entitled to a Judgment as a Matter of Law on this Issue.**

1.    **Plaintiff Cannot Show that Without the Filing of His Workers' Compensation Claim He Would Not Have Been Terminated in April of 2000.**

Plaintiff has alleged a violation of § 451.001 of the *Texas Labor Code*, which provides, in pertinent part:

> No person may discharge or in any other manner discriminate against any employee because the employee has in good faith filed a claim, hired a lawyer to represent him in a claim, instituted or caused to be instituted, in good faith, any proceeding under the Texas Workers' Compensation Act, or has testified or is about to testify in any such proceeding.

TEX. LAB. CODE ANN. § 451.001 (Vernon 2000).

In order to establish a cause of action pursuant to § 451.001, the employee/plaintiff has the burden to prove that "without the employee's protected conduct [i.e., filing a workers' compensation claim], the employer's prohibited conduct would not have occurred when it did." See Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996);  Holmes v. Head Start of Greater

3

<u>Dallas, Inc.</u>, 2000 Tex. App. LEXIS 8392 *2 (Tex. App., Fifth Dist., Dallas, Dec. 18, 2000)(copy attached).

In the present action, there is no dispute that Plaintiff was injured on the job during the course of his employment with Laredo Coke, and that he did file or cause to be instituted a claim for workers' compensation benefits in connection with this injury. There is also no dispute that Plaintiff was discharged from his employment with Laredo Coke in April of 2000. There is also, however, no dispute that Plaintiff cannot establish any causal link between his workers' compensation claim and his termination, let alone make any showing that "but for" his filing of such a claim he would not have been terminated upon the expiration of his twelve-month medical leave.

Plaintiff admitted during his deposition that he is not aware of any connection between his workers' compensation claim and his discharge, aside from the mere fact that he was discharged after filing his claim.

> Q:   What fact, information or evidence do you have to support your claim that the company fired you because you filed a claim for worker's compensation?
>
> A:   The fact that they let me go.
>
> Q:   Other than that fact, that your employment was terminated, do you have any other information, evidence or facts which would support your claim that the company fired you because you filed a claim for worker's compensation?
>
> A:   No, sir.

(Espinoza Depo., p. 122, l. 19 - p.123, l. 4).

Both Texas state and federal courts have held that the mere fact an employee is discharged after filing a workers' compensation claim is <u>not</u> sufficient to support a retaliation claim when such a discharge decision is made pursuant to a uniformly-applied absence control policy.  <u>See</u>  <u>Parham</u>

v. Carrier Corp., 9 F.3d 383, 387 (5th Cir. 1993); Swearingen v. Owens-Corning Fiberglass Corp.,

968 F.2d 559, 563 (5th Cir. 1992); Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d at 452;

Texas Division-Tranter, Inc. v. Carrozza, 876 S.W.2d 312, 313 (Tex. 1994); Holmes v. Head Start

of Greater Dallas, Inc., 2000 Tex. App. LEXIS 8392 * 6; Baptist Memorial Healthcare Sys. v.

Casanova, 2 S.W.3d 306, 309 (Tex. App. – San Antonio, 1999, no writ); Agency Rent-A-Car v.

Hughes, 1997 Tex. App. LEXIS 5195 **9, 13 (Tex. App. -- Houston, Oct. 2, 1997, no writ)(copy

attached); and Randolph v. Texarkana Memorial Hosp., Inc., 1997 Tex. App. LEXIS 2709 ** 4, 5

(Tex. App. – Texarkana, May 22, 1997, no writ)(copy attached). These same courts have also held

that when an employee is discharged pursuant to a leave of absence or an attendance control policy

which is uniformly applied to employees, regardless of whether or not they are injured on the job,

such a discharge cannot be deemed retaliatory, as a matter of law. See Parham v. Carrier Corp., 9

F.3d at 389; Swearingen v. Owens-Corning Fiberglass Corp., 968 F.2d at 563; Continental Coffee

Prods. Co. v. Cazarez, 937 S.W.2d at 451; Texas Division-Tranter, Inc. v. Carrozza, 876 S.W.2d

at 313; Holmes v. Head Start of Greater Dallas, Inc., 2000 Tex. App. LEXIS 8392 * 10; Baptist

Memorial Healthcare Sys. v. Casanova, 2 S.W.3d at 309; Agency Rent-A-Car v. Hughes, 1997 Tex.

App. LEXIS 5195 *16; and Randolph v. Texarkana Memorial Hosp., Inc., 1997 Tex. App. LEXIS

2709 *5.

For example, in Randolph v. Texarkana Memorial Hosp., Inc., 1997 Tex. App. LEXIS 2709

(Tex.App. – Texarkana, May 22, 1997, no writ), the trial court dismissed the plaintiff/employee's

retaliatory discharge claim on summary judgment. 1997 Tex. App. LEXIS 2709 *2. This decision

was upheld by the Texas Court of Appeals. Id. at **4, 5. There was no dispute in Randolph that the

plaintiff/employee was not medically able to return to work at the end of the defendant/employer's

six-month uniformly-applied leave of absence period. Id. at *1. The plaintiff/employee's only "evidence" supporting her claim of retaliation was her subjective belief that she had been terminated in connection with filing a workers' compensation claim. Id. at *4. The Texas Court of Appeals held that the "plaintiff's subjective belief that the plaintiff has been fired in retaliation for filing a workers' compensation claim is no more than a conclusion, and is not competent summary judgment evidence. . . ." Id. The Court further held that "an employer is entitled to summary judgment in a retaliatory discharge action when the employer demonstrates that the employee was terminated pursuant to the enforcement of a reasonable absence control policy, as long as the policy is uniformly enforced." Id. at *5.

In Baptist Memorial Healthcare System v. Casanova, 2 S.W.3d 306 (Tex. App. – San Antonio, 1999, no writ), the Texas Court of Appeals reversed a jury's determination that the plaintiff/employee had been retaliated against when he was terminated after not being medically released to return to work within the defendant/employer's six-month maximum leave of absence period. Casanoza, 2 S.W.3d at 308. As in Randolph, the Texas appellate court held that where an employer applies its leave of absence policy uniformly, the application of such a policy to an employee who has filed a workers' compensation claim does not constitute probative evidence of retaliation. Id. at 311.

Likewise, in Agency Rent-A-Car v. Hughes, 1997 Tex. App. LEXIS 5195 (Tex. App. – Houston, Oct. 2, 1997, no writ), the plaintiff/employee was discharged because she was not medically released to return to work until over a year after she became unable to work in connection with an on-the-job injury. 1997 Tex. App. LEXIS 5195 at *2. The defendant/employer's uniformly-applied leave of absence policy provided that an employee could not remain off from work for more

than six (6) months, regardless of the reason for the employee's leave. Id. at *3. In light of this policy, the Texas Court of Appeals reversed a jury's conclusion that the plaintiff had been retaliated against when she was terminated from her employment after missing work for over six (6) months. Id. at *16. In so doing, the Texas Court of Appeals held that "the application of [the employer's] six-month rule does not constitute evidence of a retaliatory motive. Instead, it amounts to evidence that [the employer] would have discharged Hughes because she was on leave, even if she had not filed her workers' compensation claim." Id.

Similarly, in Swearingen v. Owens-Corning Fiberglass Corp., 968 F.2d 559 (5th Cir. 1992), the plaintiff/employee was terminated after she was medically unable to return to work within the two-year maximum leave of absence period provided by the defendant/employer to all employees, regardless of their reason for taking the leave. 968 F.2d at 560. In Swearingen, the U.S. Court of Appeals for the Fifth Circuit upheld the district court's grant of summary judgment, stating that "[v]iolation of a neutrally-applied absence control policy is not one of the circumstances safeguarded by article 8307c [which was re-codified at §451.001 of the *Texas Labor Code* without any substantive changes].[2] Unless one of the four specific circumstances listed in article 8307c motivated the employer in discharging or discriminating against an employee, that employee cannot prevail in an action based on article 8307c." Id. at 563.

The Fifth Circuit later reversed a jury decision in favor of another plaintiff/employee based on a similar two-year maximum leave policy in Parham v. Carrier Corp., 9 F.3d 383 (5th Cir. 1993). In so doing, the Court meticulously reviewed each type of evidence presented at trial by the

---

[2]     See Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d at 445.

plaintiff/employee, and held that the fact that one, or even numerous employees, who had filed a workers' compensation claim, were discharged for violating a uniformly-applied absence control policy did not demonstrate "some invidious retaliatory motive." Id. at 388. In Parham, there was no dispute that the plaintiff/employee, as well as the other workers' compensation claimants who had been discharged pursuant to the defendant/employer's leave of absence policy, had been off from work in excess of the two-year maximum provided by this policy. Id. Accordingly, the Fifth Circuit found that "because all of these employees were discharged pursuant to the same written policy, the evidence demonstrates nothing more than that [the defendant] was applying the terms of the [leave policy] as it understood them." Id.

The facts presented in the pending action are similar to those presented in these state and federal cases. At the time of Plaintiff's termination, Laredo Coke had in place a twelve-month leave of absence policy which was applied to all of its employees, regardless of the reason for their leave of absence. (Carreon Aff. ¶¶ 5 and 11). As demonstrated by the Randolph, Casanova and Hughes decisions summarized above, policies providing a leave of absence for only six-months have been deemed reasonable on their face, as long as they are applied to workers' compensation and non-workers' compensation claimants alike. See Randolph, 1997 Tex. App. LEXIS 2709 *5; Casanova, 2 S.W.3d at 309; Hughes, 1997 Tex. App. LEXIS 5195 *3. There is no dispute that Plaintiff was medically unable to return to work within twelve months of beginning his leave of absence in April of 2000. (Espinoza Depo., pp. 70-71, Exh. 2). Accordingly, Plaintiff's termination pursuant to Laredo Coke's uniformly-applied leave of absence policy does not constitute evidence of a retaliatory motive. "Instead, it amounts to evidence that [Laredo Coke] would have discharged

[Plaintiff] because [he] was on leave, even if [he] had not filed [his] workers' compensation claim."

Hughes, 1997 Tex. App. LEXIS 5195 *16.

> ### 2. There Is No Evidence in the Record which Contradicts Laredo Coke's Stated Reason for Terminating Plaintiff Pursuant to Its Uniformly-Applied Twelve-Month Leave of Absence Policy.

Plaintiff has asserted no direct or circumstantial evidence which contradicts Laredo Coke's position that he was terminated pursuant to the company's twelve-month leave of absence policy and not based upon any retaliatory motive. (Espinoza Depo., pp. 122-123, 126). In fact, excepting his termination, Plaintiff had no complaint regarding Laredo Coke's response to or handling of his injury or the medical treatment he received in connection therewith. (Espinoza Dep., pp. 33-37, 44-46, 54, 57-58, 59-66).

In his Second Amended Petition, however, Plaintiff does imply that Laredo Coke somehow played a role in "delaying" his release to return to work until after the expiration of his medical leave in order to be able to discharge him at the end of his leave. (See Second Amended Petition, ¶ VII.). Aside from this one allegation in the Petition regarding Laredo Coke's "stealth wait" while Plaintiff was "bandied about" until his twelve months of leave expired, there is no indication in the record of any such conduct. Specifically, Defendant's Human Resources Manager, Mr. Carreon, denies that Laredo Coke had any role whatsoever in the processing of Plaintiff's or any other employee's workers' compensation claims after such claims were/are reported to the carrier. (Carreon Aff. ¶ 12). Moreover, Plaintiff admitted during his deposition that he is not aware of any role Laredo Coke played in the administration of his workers' compensation claim or what, if anything, Laredo Coke could have done to alter the way his claim was handled, i.e., the scheduling of doctor visits,

obtaining faster approval for various treatment options, etc. (Espinoza Depo., p. 126). Accordingly,

Plaintiff's allegation regarding Laredo Coke's "stealth" is no more than unsupported conjecture,

which is insufficient to create a genuine issue of material fact in this case. See <u>Texas Division-</u>

<u>Tranter, Inc. v. Carrozza</u>, 876 S.W.2d at 314.

Plaintiff also alleges in his Petition that Laredo Coke's one-year leave of absence policy had

not been uniformly applied. (<u>See</u> Second Amended Petition, ¶ VII.). However, when specifically

asked to support this allegation during his deposition, Plaintiff was unable to do so, saying instead

that <u>he was not aware of any instances wherein employees who were not injured on the job were</u>

<u>permitted to remain on a medical leave of absence for more than one year without being terminated</u>.

(Espinoza Depo., p. 128). Accordingly, Plaintiff's allegation regarding the non-uniform application

of Laredo Coke's twelve-month leave of absence policy is also no more than a conclusory assertion,

which is insufficient to create a genuine issue of material fact in this case. See <u>Carrozza</u>, 876 S.W.2d

at 314.

Finally, regarding its stated reason for terminating Plaintiff, Laredo Coke has provided proof

of the twelve-month leave of absence policy under which Plaintiff was discharged. (<u>See</u> Carreon

Aff. ¶ 5, Exh. 2). Laredo Coke has also provided the affidavit of its Human Resources Manager, Mr.

Carreon, to confirm the uniform application of this policy to employees who are injured on the job,

as well as those who request medical leave in connection with non-work-related injuries or illnesses.

(Carreon Aff. ¶¶ 5 and 11). Plaintiff has not contended that such a policy does not exist or should

not have been applied to him. He simply maintains that he was somehow unaware of this policy at

the time of his termination, despite the written notice of this policy of which he has acknowledged

receipt in writing. (Espinoza Depo., pp. 127, 129 and 131; Carreon Aff., ¶¶ 8-9 and Exhs.2 and 4).

Plaintiff thus has not provided any contradiction in the record to Laredo Coke's position. The application of a uniformly-applied leave of absence policy to an employee who has initiated a workers' compensation claim, again, does not, as a matter of law, provide support for a retaliatory discharge claim. <u>See e.g., Continental Coffee Prods. Co. v. Cazarez</u>, 937 S.W.2d at 451. Accordingly, there is no genuine issue of material fact concerning Plaintiff's allegation of retaliatory discharge, and Laredo Coke is entitled to a judgment as a matter of law regarding this claim.

> **B.     <u>Plaintiff Has No Claim Regarding Any Violation of His FMLA Rights as a Matter of Fact or Law.</u>**

Plaintiff's only claim under the FMLA appears to be that he did not receive notice from Laredo Coke of his right to medical leave. (<u>See</u> Second Amended Petition, ¶ VIII.). Plaintiff's Petition asserts that this alleged lack of notice caused him to "unwittingly forfeit the protections offered him by the FMLA." <u>Id.</u>  However, there is no dispute in the record that Plaintiff received all of the medical leave to which he was entitled pursuant the FMLA, as he remained off of work for over **twelve months** before being terminated. His last day working at Laredo Coke's San Benito facility was April 14, 1999. (Espinoza Depo., pp. 47, 50, 141). He was not discharged from his employment until April 28, 2000. (Espinoza Depo., Exh. 1). Any "protections" provided by the FMLA (i.e., continuation of insurance, reinstatement to an equivalent position) would have ended at the end of the first twelve (12) weeks of Plaintiff's leave. <u>See</u> 29 *U.S.C.* § 2614(a)(1). Plaintiff was not deprived of any of these protections during this period. (Carreon Aff., ¶ 13).[3]

---

[3]     Plaintiff stated during his deposition that he believes the FMLA provides twelve **months** of job-protected leave. (Espinoza Depo., pp. 119-120). Accordingly, Plaintiff's claim that he has been deprived of any rights provided by the FMLA may be no more than a misunderstanding based on his incorrect impression of the rights provided by this federal law.

Despite Plaintiff's allegation in his Petition, it is not entirely clear that there are actually any factual disputes regarding the notice Plaintiff received of his medical leave rights in this case. During his deposition, Plaintiff simply asserted that he *did not know* how long his leave of absence was until he received his discharge notice. (Espinoza Depo., pp. 116). However, Plaintiff cannot sincerely argue that he *was not provided* with this information. In this regard, it is undisputed that Laredo Coke posted a notice of employee rights under the FMLA on its employee bulletin board while Plaintiff was still working at its San Benito facility. (Espinoza Depo., p. 122; Carreon Aff., ¶ 7 and Exh. 1). A summary of these rights was also provided to Plaintiff when the FMLA went into effect. (Carreon Aff., ¶ 8 and Exh. 3). Finally, Plaintiff was sent a letter near the beginning of his leave explaining the fact that his twelve (12) weeks of FMLA leave would run concurrently with his twelve months of medical leave pursuant to company policy. (Carreon Aff., ¶ 9 and Exh.5). Accordingly, there is not a genuine dispute as to whether Plaintiff *was provided* with notice of his medical leave rights – he just contends that, for whatever reason, the three different forms of notice he was provided were not successful in *making him aware* of these rights.

Employers are obviously not responsible for installing information into employee memories. They are merely required to provide information regarding employee medical leave rights pursuant to the FMLA. <u>See</u> 29 U.S.C. § 2619(a). If such information is ignored, unread or forgotten, employers are not responsible, as a matter of law, for "failing to give notice" pursuant to the FMLA.

Moreover, even if Plaintiff does contend that he did not *receive* notice of his rights under the FMLA despite all of the sources of such notice which Laredo Coke has demonstrated were provided to him, numerous courts have held that a mere failure to give notice is not an actionable offense under the FMLA. <u>See</u> <u>Antoine-Tubbs v. Local 513, Air Transport Div., Transport Workers Union</u>

of America, AFL-CIO, 50 F. Supp.2d 601, 618 (N.D.Tex. 1998), *aff'd*, 190 F.3d 537 (5th Cir. 1999);

see also Ragsdale v. Wolverine Worldwide, Inc., 218 F.3d 933, 940  (8th Cir. 2000);   Sarno v.

Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 158 (2nd Cir. 1999);  McGregor v. Autozone,

Inc., 180 F.3d 1305, 1308 (11th Cir. 1999);  and Gilbert v. Star Building Systems, 1997 U.S. App.

LEXIS 30034 *1 (10th Cir., Oct. 30, 1997)(copy attached).

　　　The most recent of these cases, Ragsdale v. Wolverine Worldwide, Inc., 218 F.3d 933  (8th

Cir. 2000), indeed dealt with a set of circumstances very similar to those alleged in the present

action.  Specifically, in Ragsdale, the defendant/employer had a more generous leave of absence

policy (seven months) than the twelve weeks provided by the FMLA.  Ragsdale, 218 F.3d at 395.

The plaintiff/employee was diagnosed with cancer and did not return to work at the end of the seven-

month leave period provided by her employer.  Id.  Accordingly, the defendant terminated her

employment pursuant to the terms of its leave of absence policy.  Id.

　　　Three months (twelve weeks) after her termination, the plaintiff's cancer treatment was

complete, and she was released to return to work by her treating physician.  Id.  She then sued her

former employer, asserting a violation of the FMLA for her former employer's failure to notify her

that her seven-month leave of absence had been designated as FMLA leave.  Id.  The plaintiff

maintained that, because her former employer failed to designate her medical leave as FMLA-

qualifying, she should have been given twelve weeks of additional leave after the seven months of

leave she took pursuant to her former employer's medical leave policy expired.  Id.  She contended

that, if she had been given these additional weeks of leave, she would have been able to return to her

job with defendant, as this job would have remained protected during the additional twelve weeks,

pursuant to the FMLA, and she was released to return to work by the end of this additional period. Id.

The trial court dismissed the plaintiff's arguments, and her case, by granting summary judgment in favor of her former employer. Id. The Eighth Circuit Court of Appeals also rejected the plaintiff's position, even though she relied on 29 C.F.R. § 825.208(a), which provides that "in all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee as provided in this section. . . ." The Court of Appeals held that construing this federal regulation to mean that an employee is entitled to twelve additional weeks of leave if an employer fails to designate a company-provided leave of absence as FMLA-qualifying would violate the express provisions of the FMLA. Id. at 938. The Court relied on the fact that 29 U.S.C. § 2612(a)(1) of the FMLA provides that "an employee shall be entitled to a **total** of 12 workweeks of leave during any 12-month period" and explained that the FMLA represented a compromise reached by Congress to provide benefits to employees for a limited period of time while not over-burdening employers. Id. Under this rationale, the Court held that penalizing an employer, whose company leave policy already provides twelve weeks or more of leave to its employees, for not notifying an employee that his/her leave has been designated as FMLA-qualifying, by having to give an employee additional leave beyond the twelve weeks required by the FMLA, is not a permissible interpretation of the FMLA or 29 C.F.R. § 825.208(a). Accordingly, the Court upheld the district court's grant of summary judgment in favor of the defendant employer on this issue.

In Ragsdale, the Eighth Circuit Court of Appeals did concede that there were circumstances in which a failure to provide an employee with notice that his/her leave has been designated as

FMLA- qualifying would be deemed a violation of the FMLA. Id. at 939. The example the Court cited to illustrate this proposition was if an employee was not notified that his/her FMLA leave would expire in twelve weeks and, as a result of not having this information, did not return to work within twelve weeks even though he/she was medically able to do so. Id. at 939. However, this is not the situation presented in the case at bar. Plaintiff was not released to return to work until nearly **seventeen months** after he stopped working for Laredo Coke. (Espinoza Depo., Exh. 2). He did not even have the surgery which resolved his herniated disk until **eleven months** after he stopped working for Laredo Coke. (Espinoza Depo., pp. 179, 217). Surgery was not even discussed with Plaintiff until almost **five months** after he had begun his leave of absence. (Espinoza Depo., pp.189-190 and Exh. 4).

Accordingly, even if Plaintiff contends that he somehow did not receive notice that the first twelve weeks of his twelve-month company-provided medical leave would also be designated as FMLA-qualifying, he could not have physically returned to work during this twelve-week period, such that any alleged failure to designate or notify Plaintiff that his leave was FMLA-qualifying was clearly not the reason he did not return to work within the first twelve weeks of his leave and did not constitute a violation of the FMLA.[4] See Sarno v. Douglas-Gibbons & Ives, Inc., 183 F.3d at 162 - 163 (". . . [I]t is undisputed that [plaintiff's] inability [to perform the functions of his position] continued for some two months after the end of his 12-week FMLA leave period. Any lack of notice

---

[4]     Even if Plaintiff should contend, as the plaintiff employee in Ragsdale attempted to argue, that an additional twelve weeks of leave should have been added to the end of the year of leave provided by Laredo Coke's leave of absence policy, Plaintiff was not released to return to work until **five months** after the end of his one-year leave of absence. (Espinoza Depo., Exh. 2). Plaintiff also, unlike the plaintiff in Ragsdale, did not request such leave at the end of the one-year leave of absence. Ragsdale, 218 F.3d at 935. Accordingly, Plaintiff neither invoked any additional leave, nor would twelve weeks of additional leave have made a difference in his ability to remain employed with Laredo Coke in this case.

of the statutory 12-week limitation on FMLA leave could not rationally be found to have impeded [plaintiff's] return to work. . . . We decline to interpret the FMLA as giving an employee a right to sue the employer for failing to give notice of the terms of the Act where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act.").

## IV. <u>Conclusion</u>

For all of the reasons stated herein, Laredo Coke respectfully requests that its Motion for Summary Judgment be granted in its entirety, with costs assessed against Plaintiff as appropriate.

Respectfully submitted,

**RODRIGUEZ, COLVIN & CHANEY, LLP**

By: _Teri L. Danish_

      Raymond A. Cowley
      Attorney-in-Charge
      State Bar I.D. No. 04932400
      Federal I.D. No. 8642
      Teri L. Danish
      State Bar I.D. No. 05375320
      Federal I.D. No. 12862

      1201 East Van Buren
      Brownsville, Texas  78520
      Telephone:  (956) 542-7441
      Telefax:  (956) 541-2170

      --and--

**MILLER & MARTIN LLP**

      John R. Bode
      TN BPR No. 11415
      *Admitted Pro Hac Vice*
      Carolyne S. Beaty
      TN BPR No. 19737
      *Admitted Pro Hac Vice*

      Suite 1000, Volunteer Building
      832 Georgia Avenue
      Chattanooga, TN  37402
      Telephone:  (423) 756-6600
      Telefax:  (423) 785-8480

ATTORNEYS FOR DEFENDANT,
THE LAREDO COCA-COLA BOTTLING
COMPANY, INC.

17

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that an exact copy of this pleading has been served upon counsel for all parties in this action, or upon said parties themselves as required by law, by delivering a copy thereof, or by depositing a copy of the same in the United States Mail, with sufficient postage affixed thereto to ensure delivery to the following on this _____ day of July, 2001:

Miguel A. Saldaña, Esq.
Corporate Plaza, Suite 109
302 Kings Highway
Brownsville, TX  78521

David N. Kitner, Esq.
Strasburger & Price, LLP
901 Main Street, Suite 4300
Dallas, TX  75202

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| NOEL ESPINOZA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **NO. B-00-142** |
| | ) | |
| THE LAREDO COCA-COLA BOTTLING | ) | |
| COMPANY, INC., CONTINENTAL | ) | |
| CASUALTY COMPANY and | ) | |
| CONSTITUTION STATE SERVICE | ) | |
| COMPANY, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER GRANTING DEFENDANT LAREDO COCA-COLA
## BOTTLING COMPANY'S MOTION FOR SUMMARY JUDGMENT

Upon submission by Defendant, The Laredo Coca-Cola Bottling Company, Inc., of an

opposed Motion for Summary Judgment, and after review of the parties' briefs of fact and law filed

in connection therewith, the parties' oral argument (if requested) and the record as a whole in this

matter, this Court hereby finds that good cause exists to **GRANT** Defendant's Motion.  It is

therefore,

**ORDERED, ADJUDGED and DECREED,** that Defendant The Laredo Coca-Cola Bottling

Company, Inc., is dismissed as a party to this action and that all claims pending against it as alleged

in the same are hereby dismissed with prejudice as a matter of law; it is further

**ORDERED, ADJUDGED and DECREED,** that the parties shall each be responsible for their respective attorneys' fees incurred to date in the above-referenced matter, and that costs incurred to date in this case shall be allocated among the remaining parties hereto.

It is so **ORDERED**.

**ENTERED** this _____ day of _____, 2001.

_____

U.S. DISTRICT COURT JUDGE
SOUTHERN DISTRICT OF TEXAS

Submitted for Approval By:

**RODRIGUEZ, COLVIN & CHANEY, LLP**

By: _____

     Raymond A. Cowley
     Attorney-in-Charge
     State Bar I.D. No. 04932400
     Federal I.D. No. 8642
     Teri L. Danish
     State Bar I.D. No. 05375320
     Federal I.D. No. 12862

     1201 East Van Buren
     Brownsville, Texas  78520
     Telephone:  (956) 542-7441
     Telefax:  (956) 541-2170

       --and--

**MILLER & MARTIN LLP**

     John R. Bode
     TN BPR No. 11415
     *Admitted Pro Hac Vice*
     Carolyne S. Beaty
     TN BPR No. 19737
     *Admitted Pro Hac Vice*

     Suite 1000, Volunteer Building
     832 Georgia Avenue
     Chattanooga, TN  37402
     Telephone:  (423) 756-6600
     Telefax:  (423) 785-8480

ATTORNEYS FOR DEFENDANT,
THE LAREDO COCA-COLA BOTTLING
COMPANY, INC.

3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that an exact copy of this pleading has been served upon counsel for all parties in this action, or upon said parties themselves as required by law, by delivering a copy thereof, or by depositing a copy of the same in the United States Mail, with sufficient postage affixed thereto to ensure delivery to the following on this ___ day of July, 2001:

> Miguel A. Saldaña, Esq.
> Corporate Plaza, Suite 109
> 302 Kings Highway
> Brownsville, TX 78521
>
> David N. Kitner, Esq.
> Strasburger & Price, LLP
> 901 Main Street, Suite 4300
> Dallas, TX 75202

APPENDIX

CitePDF – www.fastio.com

# APPENDIX CONTENTS

A.  <u>Agency Rent-A-Car v. Hughes</u>, 1997 Tex. App. LEXIS 5195 (Tex. App., Fourteenth Dist., Houston, Oct. 2, 1997)

B.  <u>Gilbert v. Star Building Systems</u>, 1997 U.S. App. LEXIS 30034 (10th Cir., Oct. 30, 1997)

C.  <u>Holmes v. Head Start of Greater Dallas, Inc.</u>, 2000 Tex. App. LEXIS 8392 (Tex. App., Fifth Dist., Dallas, Dec. 18, 2000)

D.  <u>Randolph v. Texarkana Memorial Hosp., Inc.</u>, 1997 Tex. App. LEXIS 2709 (Tex. App., Sixth Dist., Texarkana, May 22, 1997)

**A**

CVisPDF – www.fenito.com

Case 1:00-cv-00142   Document 24   Filed in TXSD on 07/06/2001   Page 26 of 142

Source: All Sources : States Legal - U.S. : Texas : Cases and Court Rules : By Court : **TX Cases, Combined** 🛈
Terms: **"workers compensation" /15 denied /100 retaliat!** (Edit Search)

*1997 Tex. App. LEXIS 5195,* *

AGENCY RENT-A-CAR, Appellant v. BRENDA C. HUGHES, Appellee

NO. 14-96-00232-CV

COURT OF APPEALS OF TEXAS, FOURTEENTH DISTRICT, HOUSTON

1997 Tex. App. LEXIS 5195

October 2, 1997, Rendered
October 2, 1997, Opinion filed

**NOTICE: [*1]** PURSUANT TO THE TEXAS RULES OF APPELLATE PROCEDURE,
UNPUBLISHED OPINIONS SHALL NOT BE CITED AS AUTHORITY BY COUNSEL OR BY A
COURT.

**SUBSEQUENT HISTORY:** Motion for Rehearing of Petition for Review Overruled May 8,
1998.

**PRIOR HISTORY:** On Appeal from the 149th Judicial District. Brazoria County, Texas. Trial
Court Cause No. 92M2386.

**DISPOSITION:** Reversed and Rendered.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant employer appealed from a decision by the 149th
Judicial District of Brazoria County (Texas) that found defendant discharged plaintiff
employee in violation of the anti-retaliation provision of the Texas Workers'
Compensation Act, 1971 Tex. Gen. Laws 884-85, and awarded plaintiff actual damages
and punitive damages.

**OVERVIEW:** Plaintiff employee filed a wrongful discharge action against defendant
employer, claiming defendant discharged plaintiff in retaliation for a workers'
compensation claim. The jury found defendant discharged plaintiff in violation of the
anti-retaliation provision of the Texas Workers' Compensation Act, 1971 Tex. Gen. Laws
884-85, and awarded damages. Defendant appealed, contending a company policy of
discharging employees who exceeded a six-month absence limit did not constitute legally
sufficient evidence of retaliation. Plaintiff argued defendant was aware plaintiff had been
injured and had filed a workers' compensation claim when defendant discharged plaintiff.
However, the reviewing court stated that awareness of a workers' compensation claim
alone could not constitute legally sufficient evidence. The application of defendant's six-
month rule did not constitute evidence of a retaliatory motive. Instead, it amounted to
evidence that defendant would have discharged plaintiff because she was on leave, even
if she had not filed her workers' compensation claim. Therefore, the application of the
policy did not establish a retaliatory motive, and the court reversed the decision.

**OUTCOME:** The decision that found defendant employer wrongfully discharged plaintiff
employee was reversed. Application of a six-month rule of absenteeism did not
constitute evidence of a retaliatory motive, and defendant's awareness of a workers'
compensation claim alone could not constitute legally sufficient evidence.

## CORE CONCEPTS - ◆ Hide Concepts

▤ Civil Procedure : Appeals : Standards of Review : Substantial Evidence Rule

⚓ When deciding a no evidence point, an appellate court considers only the evidence and inferences tending to support a jury's finding and disregards all contrary evidence and inferences. If more than a scintilla of evidence exists to support a finding, the finding is sufficient as a matter of law. Circumstantial evidence may be used to establish a material fact as long as it constitutes more than mere suspicion.

▤ Evidence : Procedural Considerations : Burdens of Proof, Presumptions & Inferences

▤ Workers' Compensation & SSDI : Coverage : Actions Against Employers : Retaliatory Discharge

⚓ No person may discharge or in any other manner discriminate against any employee because the employee has in good faith filed a claim, hired a lawyer to represent him in a claim, instituted, or caused to be instituted, in good faith, any proceeding under the Texas Workmen's Compensation Act, or has testified or is about to testify in any such proceeding. 1971 Tex. Gen. Laws 884-85. The employee has the burden to present legally sufficient evidence on the issue of causation. The standard requires proof that the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did.

▤ Workers' Compensation & SSDI : Coverage : Actions Against Employers : Retaliatory Discharge

⚓ Evidence that an employee was discharged in accordance with the uniform enforcement of a reasonable absence control policy does not amount to evidence of retaliation. If an employee's termination is required by the uniform enforcement of a reasonable absentee policy, then it cannot be the case that termination would not have occurred when it did but for the employee's assertion of a compensation claim or other conduct protected by the anti-retaliation law, 1971 Tex. Gen. Laws 884-85.

▤ Civil Procedure : Appeals : Standards of Review : Substantial Evidence Rule

⚓ When the appellate court sustains a no evidence challenge, not only must it reverse the judgment of the trial court, it is compelled to render judgment in favor of the challenging party.

**JUDGES:** Panel consists of Justices Yates, Hudson, and Fowler.

**OPINIONBY:** Leslie Brock Yates

**OPINION:** OPINION

This is a wrongful discharge case. Brenda C. Hughes filed suit against Agency Rent-A-Car ("Agency"), claiming Agency discharged her in retaliation for filing a workers' compensation claim. The jury found in her favor, and Agency appeals, bringing ten points of error. Because the record does not support the jury's finding that Agency discharged Hughes in retaliation for filing her workers' compensation claim, we reverse the judgment of the trial court and render judgment in favor of Agency.

Agency hired Hughes as a customer service representative in 1989, and the company promoted her to manager the following year. On April 30, 1991, she injured herself while attempting to clean one of the rental vehicles. She filed an injury report with **[*2]** Agency and later filed a workers' compensation claim. Her doctor did not release her to return to work until July 14, 1992.

Before Hughes was released to return to work, she received a letter from the Manager of Human Resources at Agency dated February 17, 1992. The letter informed Hughes that Agency was terminating her employment. The relevant portion of the letter stated:

According to our records, you have been on leave of absence since May 1, 1991. Since you have been unable to return to work for a period in excess of nine months, it has become necessary to officially terminate your employment with Agency Rent-A-Car, Inc. Accordingly, please consider this letter your official notification that effective Saturday, February 29, 1992, your status will be changed from medical leave of absence to discharged for medical reasons.

This letter was generated in accordance with Agency's "six-month rule," a written company policy enacted on September 1, 1990. The policy stated:

Employees who are temporarily unable to perform their usual and customary work due to a personal illness or injury, including a pregnancy-related disability, will be granted a medical leave of absence.

. **[*3]** . . .

*The maximum length of leave that will be granted for any medical disability is six (6)* Employees returning to work after any disability leave must have a written release from a physician verifying that they are able to return to work and safely perform their duties.

(emphasis added). Agency estimated that it had discharged twenty-four to thirty-six people in a single year for violating the six month rule.

Hughes filed suit against Agency in September 1992. The jury found Agency discharged Hughes in violation of the Texas Workers' Compensation Act and awarded Hughes $ 217,300 in actual damages and $ 180,000 in punitive damages.

In the first point of error, Agency contends the record contains "no evidence" to support the jury's finding that Hughes's discharge was in retaliation for filing a workers' compensation claim. �釆When deciding a "no evidence" point, we consider only the evidence and inferences tending to support the jury's finding and disregard all contrary evidence and inferences. *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 667 (Tex. 1996). If more than a scintilla of evidence exists to support the finding, the finding is sufficient as a **[*4]** matter of law. *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). Circumstantial evidence may be used to establish the material fact as long as it constitutes more than mere suspicion. *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995).

It was unlawful for Agency to discharge Hughes, if it did so in retaliation for filing a workers' compensation claim. The law in effect at the time of Hughes's suit specifically provided the following:
釆
No person may discharge or in any other manner discriminate against any employee because the employee has in good faith filed a claim, hired a lawyer to represent him in a claim, instituted, or caused to be instituted, in good faith, any proceeding under the Texas Workmen's Compensation Act, or has testified or is about to testify in any such proceeding.

Act of May 7, 1971, 62nd Leg., R.S., ch. 115, § 1, 1971 Tex. Gen. Laws 884-85 (originally codified at TEX. REV. CIV. STAT. ANN. art. 8307c) (current version at TEX. LAB. CODE ANN. § 451.001 (Vernon 1996)) (hereinafter the anti-retaliation law). The employee has the burden to present legally sufficient evidence on the issue of causation. *Id.* § 2 (current version **[*5]** at TEX. LAB. CODE ANN. § 451.002 (Vernon 1996)) ("The burden of proof

Search - 32 Results - workers compensation / to convict / con oc 300 ...

Case 1:00-cv-00142    Document 24    Filed in TXSD on 07/06/2001    Page 29 of 142

shall be upon the employee").

The Texas Supreme Court recently discussed the standard for causation under the anti-retaliation law. *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). The standard requires proof that "the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did." *Id*. Thus, Hughes had the burden to show that her filing of a workers' compensation claim was such that, without it, Agency's discharge would not have occurred when it did.

🖎Evidence that an employee was discharged in accordance with the uniform enforcement of a reasonable absence control policy does not amount to evidence of retaliation. As the *Continental Coffee* Court stated, "If an employee's termination is required by the uniform enforcement of a reasonable absentee policy, then it cannot be the case that termination would not have occurred when it did but for the employee's assertion of a compensation claim or other conduct protected by [the anti-retaliation law]." *Id. at 451*. Thus, Hughes could not rely on evidence **[*6]** that she was discharged in accordance with the uniform enforcement of a reasonable absence control policy established by Agency.

Ultimately, the *Continental Coffee* Court concluded that the evidence of retaliation in that case was sufficient. *Id. at 452*. It relied on evidence indicating the enforcement of the rule was not uniform. The employer claimed the employee was discharged for violating the "three day rule," which mandated discharge if the employee was absent three consecutive days without receiving permission or without special circumstances. *Id. at 451; see also Texas Division-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 313 (Tex. 1994). The record contained some evidence that the employer discharged the employee on the second day, rather than the third day. *Continental Coffee*, 937 S.W.2d at 452. Because the record included some evidence that the employee did not violate the three day rule, the Court found the evidence was legally sufficient to support the jury's verdict because the employer's only explanation for the discharge was false. *Id. at 452*.

In contrast, the Texas Supreme Court, in an earlier case, *Texas Division-Tranter, Inc. v. Carrozza* **[*7]** , affirmed an order granting summary judgment in favor of the employer when the evidence established that the employee was discharged solely for violating a three day rule. *Carrozza*, 876 S.W.2d at 313. The Court held, "Uniform enforcement of a reasonable absence-control provision, like the three-day rule in this case, does not constitute retaliatory discharge." *Id*.

Hughes argues that the application of this policy was evidence of a retaliatory motive. Distinguishing *Carrozza*, she notes that the *Carrozza* three day rule applied only *after* the employee returned to work. *Id. at 313*. She argues the policy in this case differs because it applied to Hughes while she was on a workers' compensation-related leave. In essence, she appears to argue that *this* policy is not a reasonable policy and that the application of the policy amounts to proof of a retaliatory motive.

We disagree. *Carrozza* cited the following decisions as approved examples of reasonable absence-control provisions: *Palmer v. Miller Brewing Co.*, 852 S.W.2d 57 (Tex. App.--Fort Worth 1993, writ denied); *Parham v. Carrier Corp.*, 9 F.3d 383 (5th Cir. 1993); *Unida v. Levi Strauss & Co.* **[*8]** , 986 F.2d 970 (5th Cir. 1993); *Swearingen v. Owens-Corning Fiberglas Corp.*, 968 F.2d 559 (5th Cir. 1992). The Supreme Court's reference to these decisions, particularly *Palmer*, suggests that it does not perceive a difference between an absence control policy applying to employees not on leave of any type, such as in *Carrozza*, and an absence control policy applying to employees on leave, even if the leave is related to workers' compensation.

In *Palmer*, the employee had been placed under a "Final Notice Procedure." *Palmer*, 852 S.W.2d at 59. The procedure mandated discharge if the employee's absences, except for his

vacation, holidays, and hospitalized absences, exceeded an amount determined by a certain formula. *Id.* The employee missed several days due to an on the job injury and was discharged. *Id.* The employee filed suit, and the trial court found in favor of the employer. *Id at 60.* On appeal, the employee claimed the causal link between his discharge and the employer's retaliation was established by the absence policy because it made no allowance for absences based on job related injuries. *Id.* at 61. The Fort Worth Court of Appeals held that **[*9]** "the use of an absence control policy which does not excuse compensation related injuries does not per se violate [the anti-retaliation law]." *Id.* at 62.

As in *Palmer*, Agency's policy had the effect of discharging employees because the employee's leave, due to a job related injury, exceeded the policy absence limit. Thus, we conclude that the application of Agency's six month rule does not constitute legally sufficient evidence of retaliation in violation of the anti-retaliation law. *See also Parham, 9 F.3d at 385-89* (finding the application of a twenty-four month leave of absence policy, whether job related or not, was not evidence of **retaliatory** motive); *Unida, 986 F.2d at 972-79* (concluding that an employer's decision to close a factory because of high costs, including workers' compensation costs, and to discharge all employees, including employees that filed workers' compensation claims, does not violate the anti-**retaliation** law); *Swearingen, 986 F.2d at 560-64* (affirming summary judgment in favor of employer that applied a twenty-four month leave of absence rule).

Hughes points to a decision from the El Paso Court of Appeals, which found the six month **[*10]** rule applied by that employer was evidence of **retaliation**. *Trevino v. Corrections Corp. of Am., 850 S.W.2d 806* (Tex. App.--El Paso 1993, writ **denied**). In *Trevino*, the employee was discharged for violating the employer's six month rule, which required termination of any employee whose **workers' compensation** period extended beyond six months. *Id.* at 808. Noting that the policy was directed, not towards all employees, but only to employees on leave because of workers' compensation, the court found a causal connection was established between the employee's discharge and **retaliation** by the employer. *Id.* at 809. The court then stated the following:

The fact that the policy applies to all employees with compensation claims of longer than six months duration does not make it any the less discriminatory. It penalizes the employee who has a serious injury and files a claim by telling him that if he draws compensation for longer than six months, he is out of a job. It is not the six month period that makes the policy bad (it could be for a much shorter period and pass muster). It is bad because the termination is tied directly to maintaining a compensation claim for longer **[*11]** than six months (or whatever the period), contrary to the provision of [the anti-retaliation law].

*Id.*

Trevino is both legally and factually distinguishable. First, *Trevino* applies the casual connection/burden shift framework which was disapproved by the Texas Supreme Court in *Continental Coffee*. In other words, *Trevino* only determined that a causal connection existed between the employee's discharge and termination. *See id.* at 808-09 ("[The employee] need only show a causal connection . . . . This letter clearly establishes the causal link between [the employee's] compensation claim and her termination."). Under *Continental Coffee*, the employee must show more than a "causal connection"--the employee must show that Hughes's filing of a workers' compensation claim was such that, without having filed the claim, Agency still would have discharged Hughes. *See Continental Coffee, 937 S.W.2d at 450.*

Second, the company policies in the two cases are very different. The *Trevino* policy applied *only* to employees who filed a workers' compensation claim. Agency's policy applied to *all* employees, regardless of whether they had filed a workers' **[*12]** compensation claim. According to the policy, Agency would have discharged Hughes because she was on leave for

Case 1:00-cv-00142   Document 24   Filed in TXSD on 07/06/2001   Page 31 of 142

her injury, even if she had not filed a workers compensation claim. The same is not true of the policy in *Trevino*. n1 Thus, the Agency policy is not "tied directly to maintaining a compensation claim for longer than six months." *Trevino, 850 S.W.2d at 809.*

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Hughes also points to an opinion of the Attorney General in support of her position. Op. Tex. Att'y Gen. No. JM-227 (1984). The Texas Department of Mental Health and Mental Retardation (MHMR) queried whether it could terminate an employee on medical leave for violating its across the board policy requiring termination of any employee on leave without pay for more than six weeks. *Id.* The Attorney General concluded that the termination of the injured employee "would appear to be based on his having filed a good faith workers' compensation claim." *Id.* We consider the opinion for its persuasive authority, but choose not to follow it for reasons similar to the reasons we do not follow *Trevino*. *See generally Swearingen, 968 F.2d at 546* ("Even the Attorney General, with all his wisdom and sagacity, can be in error. We cannot condone his broad interpretation of [the anti-retaliation law], a plainly-worded statute."). Furthermore, the Attorney General opinion pre-dates the more recent authority, such as *Palmer*, *Carrozza*, and *Continental Coffee*.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[*13]**

Hughes also points to other pieces of evidence to support the sufficiency of the verdict. First, she points to Agency's admission that it was aware she had been injured and had filed a workers' compensation claim. However, awareness of a workers' compensation claim alone cannot constitute legally sufficient evidence. *See Continental Coffee, 937 S.W.2d at 452* ("Under the Texas Workers' Compensation Act, an employer is authorized to obtain information about an applicant's prior injuries upon written authorization from the applicant . . .").

Second, Hughes points to two documents that she suggests prove that she had been discharged immediately after her injury because she filed a workers' compensation claim. The first of the documents, entitled "Employee Change Notice," includes a section describing the reason for separation. This section includes choices for both voluntary termination and discharge. The form reflected Hughes's "termination" in May 1991 (as opposed to February 29, 1992, the termination date contained in the February 17, 1992 letter). The form had "Other" checked under the voluntary termination column and "Workman's Comp. claim" typed on the line below "Other." **[*14]** The other document is an "Inactive Notice" form. It reflected Hughes's "inactive date" as May 1991. The stated reason was "on workers' comp medical leave."

The testimony at trial established that these forms were for the purpose of notifying the payroll department of Hughes's inactive status. The testimony also established that "virtually any change" in an employee's status generates these forms. The Employee Notice Change is, perhaps, suspicious, but it is nothing more than that. Where the parties rely on circumstantial evidence and the circumstances are equally consistent with either of two facts, no more than a scintilla of evidence exists to support the finding, and the no evidence point must be sustained. *Continental Coffee, 937 S.W.2d at 450.* A jury cannot infer an ultimate fact from testimony comprising only "meager circumstantial evidence" that could give rise to any number of inferences, none more probative than another. *Blount v. Bordens, Inc., 910 S.W.2d 931, 933 (Tex. 1995)* (per curium).

Finally, Hughes relies upon her testimony about a letter she received from Myrtie Logsdon from the Brazoria County Child Support Office, explaining that Agency reported her **[*15]** status as discharged from May 15, 1991. The letter from Myrtie Logsdon was never admitted into evidence. However, Hughes provided some testimony about the letter at trial on redirect examination.

Case 1:00-cv-00142   Document 24   Filed in TXSD on 07/06/2001   Page 32 of 142

[Q]: Ms. Hughes, [Agency's attorney] asked you a couple of questions; and I think we need to clear them up with the Court. He asked you if the letter that you received from Agency in February. . . was the only letter that you had from Agency at the time that you came to my office and we filed a lawsuit. Is that as you understood his question?

[A]: Yes.

[Q]: . . . . Prior to the time you came to my office on September 29th, had you received a letter from Myrtie Logsdon?

[A]: Yes, I did.

[Q]: Do you remember the date of that letter?

[A]: September the 20th.

[Q]: All right. And without going into the contents of the letter, did you form an impression at that time of your employment status with Agency based upon what she told you?

[A]: Yes, I did.

[Q]: What was that impression?

[A]: That I was terminated on May 15th for filing workers' compensation.

Hughes's impression of the letter received from Myrtie Logsdon is not sufficient **[*16]** evidence. An employee's subjective beliefs "are no more than conclusions" and cannot constitute legally sufficient evidence. _Continental Coffee_, 937 S.W.2d at 452.

In conclusion, the application of Agency's six month rule does not constitute evidence of a retaliatory motive. Instead, it amounts to evidence that Agency would have discharged Hughes because she was on leave, even if she had not filed her workers' compensation claim. _See Continental Coffee_, 937 S.W.2d at 450. That being the case, the application of the policy does not establish a retaliatory motive. _Id._ at 451. The other evidence relied upon by Hughes does not constitute legally sufficient evidence. We sustain appellant's first point of error.

Because we are sustaining the first point of error, we need not address Agency's other points of error. ☫When we sustain a no evidence challenge, not only must we reverse the judgment of the trial court, we are compelled to render judgment in favor of the challenging party. _Horrocks v. Texas Dept. of Transp._, 852 S.W.2d 498, 499 (Tex. App. 1993) (per curiam). Accordingly, we reverse the judgment of the trial court, and render judgment in favor of Agency.

/s/ **[*17]** Leslie Brock Yates

Justice

Judgment rendered and Opinion filed October 2, 1997.

Panel consists of Justices Yates, Hudson, and Fowler.

---

Source: <u>All Sources</u> : <u>States Legal - U.S.</u> : <u>Texas</u> : <u>Cases and Court Rules</u> : <u>By Court</u> : **TX Cases, Combined** ⓘ
Terms: **"workers compensation" /15 denied /100 retaliat!** (<u>Edit Search</u>)
View: Full

http://www.lexis.com/research/retrieve?_m=3ebc9df412b9c38efe313537118e07d7&docnum 05/16/2001

**B**

CVisPDF - www.fastio.com

LEXSEE 1997 u.s. app. lexis 30034

**RUTH E. GILBERT, Plaintiff–Appellant, v. STAR BUILDING SYSTEMS, Defendant–Appellee.**

No. 97–6021

**UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

*1997 U.S. App. LEXIS 30034; 1997 Colo. J. C.A.R. 2565*

**October 30, 1997, Filed**

**NOTICE:**
[*1] RULES OF THE TENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**
Reported in Table Case Format at: *1997 U.S. App. LEXIS 41331.*

**PRIOR HISTORY:**
(W.D. Okla.). (D.C. No. 95–CV–1932).

**DISPOSITION:**
Judgment of the United States District Court for the Western District of Oklahoma AFFIRMED. Plaintiff's motion to expedite appeal DENIED as moot. Plaintiff's other pending appellate motions and her request for appointment of counsel DENIED.

**COUNSEL:**
For RUTH E. GILBERT, Plaintiff – Appellant: Ruth E. Gilbert, Moore, OK.

For STAR BUILDING SYSTEMS, Defendant – Appellee: John J. Love, The Law Office of Robert H. Alexander, Jr., Oklahoma City, OK. Kathryn T. Ditmars, McDermott, Will & Emery, Chicago, IL.

**JUDGES:**
Before BALDOCK, BARRETT, and MURPHY, Circuit Judges.

**OPINIONBY:**
MICHAEL R. MURPHY

**OPINION:**

ORDER AND JUDGMENT *

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[*2]

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Plaintiff appeals the district court's decision granting defendant summary judgment on plaintiff's claims that defendant violated the Family and Medical Leave Act (FMLA), see *29 U.S.C. §§ 2601–2654,* Title VII, see *42 U.S.C. §§ 2000e to 2000e-17,* and Oklahoma public policy when it terminated plaintiff's employment. n1 This court reviews a summary judgment decision de novo, viewing the record in the light most favorable to the nonmoving party. See *Dye v. United States, 121 F.3d 1399, 1403–04 (10th Cir. 1997).* Summary judgment is appropriate only if there are no genuinely disputed issues of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

n1 Plaintiff filed a Fed. R. Civ. P. 60 motion for reconsideration after she filed her notice of appeal from the district court's summary judgment decision. Because she did not file a separate notice of appeal from the district court's denial of her motion for reconsideration, however, this court does not have jurisdiction to review that decision. See *Williams v. Chater, 87 F.3d 702, 705 and n.1 (5th Cir. 1996).*

[*3]

We affirm the district court's decision for substan-

Case 1:00-cv-00142   Document 24   Filed in TXSD on 07/06/2001   Page 35 of 142

Page 2

1997 U.S. App. LEXIS 30034, *3; 1997 Colo. J. C.A.R. 2565

tially the reasons stated in its order dated November 15, 1996. Although the district court did not specifically address plaintiff's claim that defendant had violated its duty to post notice of FMLA rights, see *29 U.S.C. § 2619*(a), summary judgment was appropriate on that claim as well. See *Blumenthal v. Murray, 946 F. Supp. 623, 626-27 (N.D. Ill. 1996)* (private litigant has no basis to seek relief for employer's violation of FMLA's requirements for posting notice), and cases cited therein.

The judgment of the United States District Court for the Western District of Oklahoma is AFFIRMED. Plaintiff's motion to expedite this appeal is DENIED as moot. Plaintiff's other pending appellate motions and her request for appointment of counsel are DENIED.

Entered for the Court

Michael R. Murphy

Circuit Judge

C

LEXSEE 2000 Tex.app. lexis 8392

**JANICE HOLMES, Appellant v. HEAD START OF GREATER DALLAS, INC.,**
**Appellee**

No. 05-99-01934-CV

**COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS**

*2000 Tex. App. LEXIS 8392*

December 18, 2000, Opinion Issued

**NOTICE:**
[*1]   PURSUANT TO THE TEXAS RULES
OF APPELLATE PROCEDURE, UNPUBLISHED
OPINIONS SHALL NOT BE CITED AS AUTHORITY
BY COUNSEL OR BY A COURT.

**PRIOR HISTORY:**
On Appeal from the 134th Judicial District Court.
Dallas County, Texas. Trial Court Cause No. 97-08312-
G.

**DISPOSITION:**
AFFIRMED.

**JUDGES:**
Before Justices Lagarde, FitzGerald and Richter.
Opinion By Justice Richter.

**OPINIONBY:**
MARTIN RICHTER

**OPINION:**

Opinion By Justice Richter

Appellant, Janice Homes, filed suit against appellee,
Head Start of Greater Dallas, Inc. ("Head Start"), assert-
ing wrongful termination. Specifically, Holmes alleged
she was terminated in violation of section 451.001 of
the labor code because she filed a worker's compensa-
tion claim. Holmes contends in a single issue that the
trial court erred in granting Head Start's no-evidence
summary judgment because a genuine issue of material
fact exists. Holmes failed to present evidence that es-
tablishes a genuine issue of material fact exists on each
essential element of her claim; therefore, we affirm the
trial court's summary judgment in favor of Head Start.

*Factual and Procedural Background*

Holmes was employed by Head Start of Greater
Dallas as a cooking assistant. While working [*2] for

Head Start, Holmes slipped and fell injuring her neck,
back, arm and knee. Holmes sought medical treat-
ment and filed a worker's compensation claim. Holmes
received uncontested worker's compensation benefits
while unable to work due to her injury. On August 29,
1995, Holmes met with the physician caring for her, who
released her to return to work immediately. Holmes con-
veyed this information to Head Start's personnel direc-
tor by telephone the same day. Immediately thereafter,
Holmes went on vacation. Sometime later, Head Start
received a written copy of the medical release. Upon
receipt, Head Start telephoned Holmes and left a mes-
sage on her answering machine informing her to report
to work immediately. Holmes did not report to work for
more than three days following her release and Head
Start began termination procedures against her.

Head Start has a three-day absence control policy in
place. The absence control policy states that if an em-
ployee does not report to work within three days of the
expiration of leave, or release to work by the attending
health care provider, that employee will be considered to
have abandoned their position. It is undisputed Holmes'
health care provider [*3] released her to return to work
on August 29, 1995, nor is it in dispute that Holmes
failed to return to work within three days of that date.
On September 7, 1995, Head Start's personnel director
wrote Holmes a letter informing her that her employment
file would reflect her abandonment of her position.

Holmes filed suit alleging wrongful termination in
retaliation for her filing of a worker's compensation
claim. Head Start answered and affirmatively pleaded
that termination was in accordance with a written ab-
sence control policy. Fourteen months after filing its
answer, Head Start filed a no-evidence motion for sum-
mary judgment pursuant to Texas rule of civil pro-
cedure 166a(i). Head Start alleged Holmes provided
no evidence to establish a prima facie showing of
worker's compensation retaliation. Specifically, Head
Start complained Holmes failed to present any evidence
to establish a causal connection between the filing of

her worker's compensation claim and her termination. Holmes answered by attaching exhibits to her response but failed to allege any facts to support her contentions that she was fired because she filed a worker's compensation claim. The trial court granted Head Start's [*4] no-evidence motion for summary judgment. Holmes appeals claiming a genuine issue of material fact exists.

## Standard of Review

A no-evidence motion for summary judgment is essentially the same as a pre-trial motion for instructed verdict; therefore, we apply the same standard of review. *Vallance v. Irving C.A.R.E.S., Inc.*, 14 S.W.3d 833, 836 (Tex. App.-Dallas 2000, no pet.). The granting of a no-evidence summary judgment is improper if the party against whom the summary judgment was granted produced more than a scintilla of evidence raising a genuine issue of material fact as to each element of a claim. *Id. at 837* (citing *Roth v. FFP Operating Partners, L.P.*, 994 S.W.2d 190, 195 (Tex. App.-Amarillo 1999, pet. denied)). More than a scintilla of evidence exists if the evidence is such that reasonable and fair-minded people could differ in their conclusions. *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997), cert. denied 523 U.S. 1119, 140 L. Ed. 2d 939, 118 S. Ct. 1799 (1998).

After adequate time for discovery, a party may move for summary judgment without presenting evidence [*5] on the ground that there is no evidence of one or more of the essential elements of a claim on which the adverse party has the burden of proof. TEX. R. CIV. P. 166a(i). Unless the respondent produces summary judgment evidence raising a genuine issue of material fact, the court must grant the summary judgment motion. *Id.*

## Wrongful Termination

An employer is prohibited from discharging an employee for filing a worker's compensation claim in good faith. TEX. LAB. CODE ANN. § 451.001 (Vernon Supp. 2000). To prevail under section 451.001 of the labor code, Holmes does not have to establish her termination was solely because she filed a worker's compensation claim, but rather, that her termination would not have occurred when it did absent such a filing. *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). Circumstantial evidence and reasonable inferences from that evidence can establish the connection between termination and the filing of the worker's compensation claim. *Id. at 451.* Circumstantial evidence sufficient to establish the required causal link includes: (1) knowledge of the compensation [*6] claim by the person terminating employee; (2) expression of a negative attitude toward the

employee's condition; (3) failure of the employer to adhere to established company policies; (4) discriminatory treatment of the employee compared to other similarly situated employees; (5) evidence the reason provided for the discharge was false. *Id. at 451.*

Holmes established that Head Start's personnel director and site supervisor knew she filed a worker's compensation claim. Both parties presented deposition testimony establishing that Holmes informed both the site supervisor and personnel director of her worker's compensation filing. Both the site supervisor and personnel director also knew of appellant's injury. After appellant failed to report to work, it was the site supervisor who recommended abandonment proceedings be initiated. The personnel director followed through on those proceedings and ultimately wrote appellant's letter of termination.

Knowledge of appellant's workers compensation filing alone, however, is not enough to raise a fact issue as to whether appellant was wrongfully terminated due to the filing of a worker's compensation claim. *Vallance, 14 S.W.3d at 837.* [*7] This factor must be considered in conjunction with the remaining evidence presented by appellant. *Id.* In this regard, Holmes asserts Head Start displayed a negative attitude toward her condition. Specifically, Holmes contends the statement that "I could not see how it could have been that involved of an accident" made by the Head Start site supervisor demonstrates a negative attitude toward her condition. However, Holmes states that on several occasions the site supervisor told her, "I really want you to get to feeling better. Just make sure you get yourself feeling better." Holmes does not present any other evidence Head Start displayed a negative attitude toward her. On the contrary, Holmes stated in deposition testimony that Head Start employees continually encouraged her to get well and to come back to work when she was able. Further, in her deposition testimony Holmes stated that on several occasions, Head Start informed her of its need for her to return to work. Moreover, Holmes presented no evidence Head Start contested the payment of her worker's compensation benefits in any way. We conclude the site supervisor's isolated statement questioning the severity of Holmes' accident [*8] is no evidence Head Start displayed a negative attitude toward her.

Holmes further asserts Head Start failed to follow its established company policies because violation of the three day absence policy does not require her termination and Head Start did not provide her with notice of appeal procedures in her letter of termination. Head Start's abandonment-of-position provision in its company policy demonstrates an intent to treat abandonment as a vol-

Case 1:00-cv-00142   Document 24   Filed in TXSD on 07/06/2001   Page 39 of 142

untary action on the part of the employee. If an employee abandons her position by failing to return to work, the employee, not the employer, is deemed to have terminated her employment. Therefore, no express termination provision is required. No evidence Head Start failed to follow its established polices is presented by Holmes' voluntary abandonment. Holmes correctly states her letter of termination failed to inform her of the appeals procedures provided by Head Start. Any violation of this policy is overcome be the fact that Holmes received notification of the appeal procedures when she read the company policy as indicated by her acknowledgment. Head Start's minimal violation relating to notice is no-evidence of Head Start's intent [*9] to terminate Holmes because of her filing of a worker's compensation claim.

Holmes presents no evidence contrasting her treatment to that of other similarly situated employees. In fact, Holmes presents no evidence of any treatment whatsoever she received following her injury or any treatment others received after filing worker's compensation claims.

Finally, Holmes asserts Head Start's reason for her discharge is false. Holmes points to a hand written memo by Head Start's site supervisor recommending abandonment proceedings around August 1, 1995. Holmes asserts because the site supervisor recommended commencement of proceedings prior to Holmes' release from worker's compensation leave, the reason for her termination proffered by Head Start is false. Holmes admits in her deposition testimony that her belief is based solely on speculation. The record shows Head Start terminated Holmes on September 7, 1995, some seven business days after she was released to return to work. Holmes' speculation is no evidence that Head Start's asserted reason for her termination is false.

In conclusion, Holmes failed to present any evidence to support a causal connection between her worker's compensation [*10] claim and her discharge, or to raise any genuine issue of material fact regarding her claim for retaliatory discharge.

*Absence Control Policy*

Moreover, Holmes' claim must fail because as a matter of law Holmes was not terminated for filing a worker's compensation claim. "Uniform enforcement of a reasonable absence control policy, like the three day rule in this case, does not constitute retaliatory discharge." *Texas Division-Tranter, Inc. v. Carrozza, 876 S.W.2d 312, 313 (Tex. 1994)* (per curiam). If an employee's termination is required *because of* violation of a uniformly enforced absence control policy, the termination cannot have occurred *because of* the filing of a worker's compensation claim. *Continental Coffee Prods., 937 S.W.2d at 451.* Under Head Start's policy, once an employee is released from medical treatment and the three day rule is applied, it is the responsibility of the employee to notify management about her absences. *Id.* It is not management's duty to contact the employee. *Id.* After Holmes' release on August 29, 1995, it was her duty to contact Head Start and to report to work within three days or notify [*11] them of her intent to take other leave permitted under Head Start's policy. Holmes did not do so. Instead, Holmes went on vacation while waiting for the written release to reach her employer. While, Head Start's policy provides various provisions permitting an employee to take leave, Holmes must notify Head Start of her intent to avail herself of such leave. She did not do so. Holmes' termination in accordance with the application of Head Start's three day absence policy precludes characterization of Holmes' termination as being in retaliation for filing a workers compensation claim.

We conclude Holmes has failed to establish the existence of an issue of material fact as to whether she was terminated for filing her worker's compensation claim. Further, Head Start has articulated a legitimate non-discriminatory reason for Holmes' termination that has not been shown to be false. The trial court correctly granted Head Start's motion for no-evidence summary judgment.

We affirm the trial court's judgment.

MARTIN RICHTER

JUSTICE

CMsPDF - www.texhs.com

**D**

CVAPDF - www.fastio.com

Case 1:00-cv-00142   Document 24   Filed in TXSD on 07/06/2001   Page 41 of 142

Source: All Sources : States Legal - U.S. : Texas : Cases and Court Rules : By Court : TX Federal and State Cases ⓘ
Terms: absentee! w/para neutral (Edit Search)

*1997 Tex. App. LEXIS 2709, ***

DARLENE MARIE RANDOLPH, Appellant v. TEXARKANA MEMORIAL HOSPITAL, INC., d/b/a WADLEY REGIONAL MEDICAL CENTER, Appellee

No. 06-96-00101-CV

COURT OF APPEALS OF TEXAS, SIXTH DISTRICT, TEXARKANA

1997 Tex. App. LEXIS 2709

May 21, 1997, Submitted
May 22, 1997, Decided

**NOTICE: [*1]** PURSUANT TO THE TEXAS RULES OF APPELLATE PROCEDURE, UNPUBLISHED OPINIONS SHALL NOT BE CITED AS AUTHORITY BY COUNSEL OR BY A COURT.

**PRIOR HISTORY:** On Appeal from the 202nd Judicial District Court. Bowie County, Texas. Trial Court No. 93C1114-202.

**DISPOSITION:** Affirmed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant employee sought review of an order of the 202nd Judicial District Court, Bowie County (Texas) that granted summary judgment in favor of appellee employer in a case alleging wrongful discharge under Tex. Lab. Code § 451.001.

**OVERVIEW:** Appellant employee alleged that she was terminated from her employment in violation of Tex. Lab. Code § 451.001, which prohibited an employer from discharging an employee who had filed a workers' compensation claim. The trial court granted summary judgment in favor of appellee employer after finding that appellant's termination the result of a legitimate absenteeism policy. Appellee was terminated pursuant to a personnel policy that stated that any employee who was absent from work for six months was automatically terminated. On appeal, the court affirmed the order granting summary judgment. The court held that appellant's subjective belief that she was fired in retaliation for filing a workers' compensation claim was no more than a conclusion and was not competent summary judgment evidence. The court held that appellee was entitled to summary judgment because appellee established a legitimate, nondiscriminatory reason for the discharge and appellant failed to produce evidence of a retaliatory motive. The court held that appellee was entitled to summary judgment because it established that appellant was terminated pursuant to a reasonable absence control policy.

**OUTCOME:** The court affirmed the order of the lower court granting summary judgment in favor of appellee employer because appellant employee was terminated for a legitimate, nondiscriminatory reason. She was terminated pursuant to a personnel policy that provided that any employee who was absent from work for six months was automatically terminated.

**CORE TERMS:** summary judgment, workers' compensation, termination, terminated,

CutPDF - www.fineto.com

Case 1:00-cv-00142   Document 24   Filed in TXSD on 07/06/2001   Page 42 of 142

nonmovant, movant, entitled to summary judgment, retaliatory discharge, decision to terminate, causal connection, leave of absence, return to work, twelve-month, conclusively, retaliation, absenteeism, six-month

**CORE CONCEPTS - ♦ Hide Concepts**

▤ Civil Procedure : Summary Judgment : Summary Judgment Standard
⚓A party moving for summary judgment has the burden of establishing both the absence of a genuine issue of material fact and the movant's entitlement to judgment as a matter of law. A defendant movant can prevail by establishing conclusively the plaintiff one factual element of each theory the plaintiff pleaded.

▢ Civil Procedure : Summary Judgment
▢ Civil Procedure : Appeals : Standards of Review
⚓In deciding whether there is a disputed issue of material fact precluding summary judgment, an appellate court views all the evidence in the light most favorable to the nonmovant and resolves all doubts in the nonmovant's favor. An appellate court will not consider evidence that favors the movant's position unless it is uncontroverted. If any theory advanced in a motion for summary judgment supports the granting of summary judgment, a court of appeals may affirm, regardless of whether the trial court specified the grounds on which it relied.

▤ Civil Procedure : Summary Judgment : Supporting Papers & Affidavits
▤ Torts : Business & Employment Torts : Wrongful Termination
▤ Workers' Compensation & SSDI : Coverage : Actions Against Employers : Retaliatory Discharge
⚓Under Texas law, a plaintiff's subjective belief that the plaintiff has been fired in retaliation for filing a workers' compensation claim is no more than a conclusion and is not competent summary judgment evidence, even if such belief is presented in affidavit form.

▤ Civil Procedure : Summary Judgment : Burdens of Production & Proof
▤ Torts : Business & Employment Torts : Wrongful Termination
▤ Workers' Compensation & SSDI : Coverage : Actions Against Employers : Retaliatory Discharge
⚓An employer is entitled to summary judgment in a retaliatory discharge suit brought by an employee who has filed a workers' compensation claim when the employer establishes a legitimate, nondiscriminatory reason for the discharge and the employee fails to produce any evidence of a retaliatory motive.

▤ Torts : Business & Employment Torts : Wrongful Termination
▤ Workers' Compensation & SSDI : Coverage : Actions Against Employers : Retaliatory Discharge
⚓Evidence of a retaliatory discharge of the plaintiff may be presented by evidence that includes knowledge of the claim by those making the decision to terminate, negative attitude toward the employee's injured condition, failure to follow company policy when disciplining an employee who has made a claim for workers' compensation benefits, and discriminatory treatment of the employee when compared to treatment of other employees with the same disciplinary problems.

▤ Torts : Business & Employment Torts : Wrongful Termination
▤ Workers' Compensation & SSDI : Coverage : Actions Against Employers : Retaliatory Discharge
⚓An employer is entitled to summary judgment in a retaliation discharge action when

Case 1:00-cv-00142  Document 24  Filed in TXSD on 07/06/2001  Page 43 of 142

the employer demonstrates that the employee was terminated pursuant to the enforcement of a reasonable absence control policy, as long as the policy is uniformly enforced.

📄 Workers' Compensation & SSDI : Coverage : Actions Against Employers : Retaliatory Discharge

⚓The nonmovant does not have to show that his or her quest for workers' compensation was the sole reason for discharge, but it must be shown that there was a causal connection.

**JUDGES:** Before Cornelius, C.J., Grant and Ross, JJ. Opinion by Justice Grant.

**OPINIONBY:** BEN Z. GRANT

**OPINION:** OPINION

Opinion by Justice Grant

This is a case about a suit for wrongful discharge under Section 451.001 of the Texas Labor Code. Darlene Marie Randolph, an employee at Wadley Regional Medical Center, suffered an on-the-job back injury on or about September 13, 1992. She was unable to work and went on an extended leave of absence and began receiving workers' compensation benefits. Six months after her injury, Randolph's doctor had not released her to return to work, and she was still on a leave of absence. Wadley advised her that because she was unable to return to work after six months, it was terminating her from her employment. Under the standard company policy, she was also advised that she could apply for reemployment.

Randolph filed suit alleging that Wadley terminated her in violation of Section 451.001 of [*2] the Texas Labor Code prohibiting an employer from discharging or discriminating against an employee who has in good faith filed a workers' compensation claim, hired an attorney to represent her in the claim, instituted a proceeding under the Texas Workers' Compensation Act, or testified or is about to testify in a workers' compensation proceeding.

Wadley moved for summary judgment on grounds that included that there was no fact issue that her termination was solely a result of her violation of a legitimate, nondiscriminatory absenteeism policy. The trial court granted the motion. Randolph appeals, contending that the trial court erred in granting Wadley's motion for summary judgment because the record shows that Randolph raised a fact issue on each element of her cause of action.

⚓A party moving for summary judgment has the burden of establishing both the absence of genuine issue of material fact and the movant's entitlement to judgment as a matter of law. n1 A defendant movant can prevail by establishing conclusively against the plaintiff one factual element of each theory the plaintiff pleaded. n2 ⚓In deciding whether there is a disputed issue of material fact precluding summary [*3] judgment, an appellate court views all the evidence in the light most favorable to the nonmovant and resolves all doubts in the nonmovant's favor. n3 An appellate court will not consider evidence that favors the movant's position unless it is uncontroverted. n4 If any theory advanced in a motion for summary judgment supports the granting of summary judgment, a court of appeals may affirm, regardless of whether the trial court specified the grounds on which it relied. n5

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 TEX. R. CIV. P. 166a(c); _Black v. Victoria Lloyds Ins. Co., 797 S.W.2d 20, 23 (Tex. 1990),_

Case 1:00-cv-00142   Document 24   Filed in TXSD on 07/06/2001   Page 44 of 142

n2 *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex. 1972).

n3 *Nixon v. Mr. Property Management,* 690 S.W.2d 546 (Tex. 1985).

n4 *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex. 1965).

n5 *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623 (Tex. 1996).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Randolph testified that she had never heard of, nor did she know of any comments linking the termination to her workers' compensation, **[*4]** but the fact that she was under workers' compensation was the reason she believed that she was terminated. ⨀Under Texas law, a plaintiff's subjective belief that the plaintiff has been fired in retaliation for filing a workers' compensation claim is no more than a conclusion and is not competent summary judgment evidence, even if such belief is presented in affidavit form. n6 ⨀An employer is entitled to summary judgment in a retaliatory discharge suit brought by an employee who has filed a workers' compensation claim when the employer establishes a legitimate, nondiscriminatory reason for the discharge and the employee fails to produce any evidence a retaliatory motive. n7

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n6 *Munoz v. H & M Wholesale,* 926 F. Supp. 596 (1966).

n7 *Id.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

⨀Evidence of a retaliatory discharge of the plaintiff may be presented by evidence that includes knowledge of the claim by those making the decision to terminate, negative attitude toward the employee's injured condition, failure to follow company policy when disciplining **[*5]** an employee who has made a claim for workers' compensation benefits, and discriminatory treatment of the employee when compared to treatment of other employees with the same disciplinary problems. n8

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n8 *Id.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

In the present case, Wadley attached summary judgment proof to its motion for summary judgment that cited a hospital personnel policy stating that any employee who was absent from work for six months was automatically terminated from employment. In *Texas Division-Tranter, Inc. v. Carrozza*, n9 the Texas Supreme Court held that ⨀an employer is entitled to summary judgment in a retaliation discharge action when the employer demonstrates that the employee was terminated pursuant to the enforcement of a reasonable absence control policy, as long as the policy is uniformly enforced. Wadley supported its motion for summary judgment with an affidavit stating that this **absentee** policy had been applied in a **neutral** manner without regard to whether or not the employee involved had been receiving workers' compensation **[*6]** benefits or had been absent for some other reason. The affidavit further stated that Randolph's termination was based solely on the absence control policy, and the fact that Randolph had filed a workers' compensation claim in no way contributed to the

decision to terminate her employment.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n9 *Texas Division-Tranter, Inc. v. Carrozza,* 876 S.W.2d 312 (Tex. 1994).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

At this point, Randolph had the burden of disputing the summary judgment proof that this was the sole basis for her termination. ✚The nonmovant does not have to show that his or her quest for workers' compensation was the sole reason for discharge, but it must be shown that there was a causal connection. n10 The only response offered by Randolph was that the six-month policy was not applicable to her because she was injured at a time when a twelve-month policy was in effect. She contends that the application of the six-month policy was adopted after she was injured, and thus this premature termination shows a discriminatory intent on the part of the **[*7]** employer. We have examined the summary judgment proof provided in the response by Randolph, and we find no evidence that indicates that a twelve-month policy was ever in effect and was applicable to Randolph.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n10 *Hunt v. Van Der Horst Corp.,* 711 S.W.2d 77 (Tex. App.-Dallas 1986, no writ).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Because Randolph did not raise a fact issue in response to Wadley's motion for summary judgment showing that there was some causal connection between the filing for workers' compensation and her discharge, we find no basis for overturning the summary judgment. The summary judgment proof shows that Wadley conclusively established that it terminated Randolph because of excessive absenteeism under the policy applied to all employees.

The judgment of the trial court is affirmed.

Ben Z. Grant

Justice

Date Submitted: May 21, 1997

Date Decided: May 22, 1997

Source: <u>All Sources</u> : <u>States Legal - U.S.</u> : <u>Texas</u> : <u>Cases and Court Rules</u> : <u>By Court</u> : **TX Federal and State Cases** 🛈
Terms: **absentee! w/para neutral** (Edit Search)
View: Full
Date/Time: Tuesday, March 13, 2001 - 8:44 AM EST

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2001 LEXIS-NEXIS Group. All rights reserved.

**A**

CVisPDF – www.fastio.com

# ORIGINAL    1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN OF TEXAS
2  BROWNSVILLE DIVISION

3  NOEL ESPINOZA                    )
                                    )
4  VS.                             )   NO. B-00-142
                                    )
5  THE LAREDO COCA COLA           )
   BOTTLING COMPANY, INC.,        )
6  CONTINENTAL CASUALTY           )
   COMPANY & CONSTITUTION         )
7  STATE SERVICE COMPANY          )

8

9  _____

10               ORAL DEPOSITION OF

11                 NOEL  ESPINOZA

12                MARCH 14, 2001

13  _____

14

15      ORAL DEPOSITION of NOEL ESPINOZA, produced as a

16  witness at the instance of Defendant Coca Cola, and

17  duly sworn, was taken in the above-styled and

18  numbered cause on the 14th day of March, 2001, from

19  8:58 a.m. to 3:24 p.m. before Eric Schwab, Certified

20  Shorthand Reporter in and for the State of Texas, at

21  the offices of Miguel A. Saldana, CARINHAS &

22  SALDANA, L.L.P., 302 Kings Highway, Suite 109,

23  Brownsville, Texas, pursuant to the Federal Rules of

24  Civil Procedure and the provisions stated on the

25  record or attached hereto.

1    under the Family and Medical Leave Act.  Is that

2    your understanding of the claims?

3        A    That's my understanding, you're right.

4        Q    Would your answer to my prior question

5    change with the knowledge of the specific claims to

6    which I'm referring?

7        A    No, sir, not at all.

8        Q    Have you ever recorded or attempted to

9    record any conversation with any current or former

10   employee of any of the defendants?

11       A    No, sir.

12       Q    Taking you back to the personal notes to

13   which you made reference to earlier in your

14   deposition, why did you begin preparing those notes?

15       A    I repeat it, there was no intention

16   whatsoever.  I wrote them down because I didn't know

17   what was going to happen with me and because I just

18   wanted to document the things that were happening to

19   me.

20       Q    And when did you first begin preparing the

21   notes?

22       A    Since the very first day I had the injury

23   that I couldn't, you know, really go back to work.

24       Q    And what injury or what date of injury are

25   you now referring to?

1     A    I'm referring to the date of April 10,

2  1999.

3     Q    For purposes of clarification, the notes

4  that were produced to me in advance of this

5  deposition also make reference to an earlier injury

6  that you experienced in 1998, I think relating to a

7  sprained ankle.

8     A    You're right, you're correct on that.

9     Q    Having given you that clarification, let

10  me ask the question again.  When did you first begin

11  preparing notes as it relates to anything that

12  occurred in your employment with Laredo Coca-Cola

13  Bottling Company?

14     A    That year, 1998, when I had my sprained

15  ankle, I documented it.

16     Q    And my question, I guess, is based upon

17  the fact -- so you've clarified that you actually

18  think you began preparing notes sometime in the fall

19  of 1998 when you first suffered a sprained ankle, is

20  that correct?

21     A    You're right.

22     Q    I want to make sure I understand, Mr.

23  Espinoza, your note-taking procedures.

24     A    Mm hm.

25     Q    Are you one that just generally likes to

1   event units, loading them up and driving them,

2   setting them up, everything concerning special

3   events.

4        Q    How many other individuals worked in the

5   special events department as of April of 1999?

6        A    You're looking at him.  Just myself.

7        Q    So with respect to the loading and

8   delivery process, you were the individual

9   responsible for doing that out of the San Benito

10  facility?

11       A    You're correct.

12       Q    Did you have anyone assisting you in that

13  process?

14       A    On big events, yes, sir.  Joe Perez will

15  grab somebody, will get somebody from a different

16  position, for instance -- can I call names?

17       Q    Well --

18       A    I mean, yes, they will assist me on big

19  events that I needed help with.  That day, other

20  than that delivery that I was making at the

21  Southmost College, we had the Rio Fest going on in

22  Harlingen so, yes, somebody will assist me on big

23  events.

24       Q    So with respect to the large events, the

25  company provided you assistance, but your day-to-day

1       A    Let me say to you again.  He went ahead

2  and told me not to do any lifting for the rest of

3  the day.  He said, "Just go ahead and take care of

4  the paperwork and we'll do the rest."

5       Q    Did you, in fact, do what he instructed

6  you to do, just take care of the paperwork?

7       A    You're right.

8       Q    And you refrained from any further lifting

9  that day?

10      A    Exactly.

11      Q    Were you okay or were you satisfied with

12 Mr. Perez' response to you?

13      A    Definitely.

14      Q    That is, you -- and did you, in fact,

15 continue to work, if only doing the paperwork?

16      A    Exactly, with pain and everything, but,

17 yes, I did.  I continued to work, to finish the day.

18      Q    And what time did you begin -- what time

19 did you arrive at the Rio Fest on that day if, in

20 fact, your injury had occurred at or about 11:00

21 o'clock that morning?

22      A    I'm not quite sure.  It could have been

23 between 1:30 and 2:00 o'clock in the afternoon.

24      Q    So would it have been 1:30 or 2:00 o'clock

25 in the afternoon when you first had your

1   conversation with Mr. Perez?

2        A    You're right.

3        Q    Did you discuss your injury with anyone

4   other than Mr. Perez on that day?

5        A    No, sir.

6        Q    You said that, in complying with Mr.

7   Perez' instruction, you, in fact, didn't do any

8   further lifting and just did the paperwork, is that

9   correct?

10        A    You're right.

11        Q    And when did you finish those

12   responsibilities at the --

13        A    It was at end of the day.

14        Q    And what time did you leave the Rio Fest

15   then?

16        A    I don't remember exactly, sir.  It could

17   have been 10:30 or 11:00.

18        Q    That evening?

19        A    That night.

20        Q    And again, as I understand your reaction

21   to Mr. Perez' instruction, you were okay with what

22   he was telling you to do, is that correct?

23        A    That's correct.

24        Q    And at the end of that work day, did you

25   go home?

1        A     I sure did.

2        Q     Again, at any point in time during the

3    work day, other than the one discussion you had with

4    Mr. Perez, did you have any further discussion with

5    any other employee at Laredo Coca-Cola?

6        A     No, sir, he was the only one.

7        Q     Did you have any further discussions with

8    Mr. Perez regarding your injury or your back pain or

9    any other circumstances surrounding those events

10   during the remainder of the day?

11       A     Concerning my back pain?

12       Q     Yes.

13       A     Yes, because I was complaining to him that

14   I was really hurting, to which he replied, "Well,

15   Monday when we go to the plant we'll give you a pass

16   so you can go see the doctor."

17       Q     You mentioned the conversation you had

18   with Mr. Perez at or about 1:30 or 2:00 when you

19   first arrived at the Rio Fest.

20       A     Yes, sir.

21       Q     How many additional conversations did you

22   have with Mr. Perez thereafter regarding your back

23   pain?

24       A     I don't remember, sir.

25       Q     You do recall the one additional

1    conversation where you indicated to Mr. Perez that

2    your back was still really hurting, correct?

3         A    You're correct.

4         Q    And in that conservation you indicated

5    that Mr. Perez said, "Well, if it continues, on

6    Monday you can go to the doctor"?

7         A    Yes, that's right.

8         Q    Were you satisfied with what Mr. Perez was

9    telling you at that point in time?

10        A    Yes, sir.

11        Q    Do you recall anything else that Mr. Perez

12   said to you on that day, that being April 10th,

13   other than what you have described in detail to us?

14        A    No, sir.

15        Q    The next day was Sunday, April 11th.  Did

16   you perform any work on Sunday, April 11th?

17        A    No, sir.

18        Q    Did your back continue to hurt during that

19   day?

20        A    Yes, sir.

21        Q    Did you have any discussion with any

22   employee of Laredo Coca-Cola regarding your injury

23   or your continued back pain?

24        A    No, sir.

25        Q    Let me take you to the following day,

1    which would have been Monday, April 12th.  Did you,

2    in fact, report to work on that day?

3         A    I sure did, sir.

4         Q    What time did you report to work?

5         A    8:00 o'clock.

6         Q    Was that your regular start time?

7         A    Yes, sir.

8         Q    And what happened then?

9         A    I just went to the front desk, reported to

10   work, and went to the front desk to Yolanda Soto,

11   our receptionist, and she gave me the form to go see

12   the doctor.

13        Q    So, based upon your discussion with Mr.

14   Perez, as of that Monday morning it was your

15   intention to go see a doctor first thing?

16        A    Yes.

17        Q    And you indicated that you went to who to

18   get the form?

19        A    To Yolanda Soto, our receptionist.

20        Q    Did you know from prior dealings that it

21   was Ms. Soto who would have the forms?

22        A    You're correct.

23        Q    And did she cooperate, was she helpful in

24   assisting you?

25        A    Definitely, yes.

1  who you would see when you arrived?

2       A    No, sir, I didn't know.

3       Q    Is there a group of doctors at the San

4  Benito Medical Association?

5       A    Yes, sir, there are a group of doctors,

6  yes.  You just register and they'll choose whoever.

7       Q    But upon your arrival that morning, they,

8  as you understood, selected Dr. Atkinson to see you,

9  is that correct?

10      A    I did not select him.  They chose him for

11  me.

12      Q    But you knew who Dr. Atkinson was because

13  you had worked with him in the fall with respect to

14  your ankle?

15      A    Yes, sir.

16      Q    Do you know whether anybody at Laredo

17  Coca-Cola, either be it Ms. Soto or anybody else,

18  had called the San Benito Medical Association before

19  your arrival to let them know that you were coming?

20      A    I'm not aware of that, sir.

21      Q    You met with Dr. Atkinson, and did you

22  describe for him as you have described for us today

23  how your injury --

24      A    Exactly the same thing, yes, sir.

25      Q    With respect to your workings, your

1  dealings with Dr. Atkinson, had you been satisfied

2  with his treatment prior to that day?

3       A    Yes, sir.

4       Q    So you didn't have any complaints or

5  problems with Dr. Atkinson as it relates to any

6  prior treatments that you had received from him, is

7  that correct?

8       A    That's correct.

9       Q    That day how did Dr. Atkinson -- what did

10 he do for you?

11      A    He went ahead and checked me physically,

12 and at the beginning -- at that point he thought it

13 was just a muscle spasm.

14      Q    And did he prescribe any medication for

15 you?

16      A    Yes, sir, Tylenol.

17      Q    After that examination and the diagnosis

18 and the treatment that he provided to you, what did

19 you do next?

20      A    He sent me back to work.  He said that --

21 we had light duty.  He sent me to light duty and to

22 see him on Thursday.

23      Q    Did you, in fact, return to the San Benito

24 facility after your visit with Dr. Atkinson that

25 morning, April 12th?

1      A      I understood that was the procedure.

2      Q      And did you have any conversation with Ms.

3  Soto regarding anything or did you just simply hand

4  her the paperwork?

5      A      I handed her the paperwork and told her I

6  was returning to work light duty and I told her that

7  I had to go back to the doctor on Thursday.

8      Q      What, if anything, did Ms. Soto say to you

9  in response?

10     A      Nothing at all.

11     Q      Did she continue to be cooperative and

12  courteous?

13     A      Yes, sir.

14     Q      After finishing that discussion or

15  transaction with Ms. Soto, with whom did you next

16  speak?

17     A      Mr. Perez.

18     Q      And take me to that point.  What did you

19  tell Mr. Perez?

20     A      I told him what the doctor had said and to

21  which he said, "Fine, just sit down on your desk and

22  do whatever you can on paperwork, whatever you

23  have," because I was behind on it.

24     Q      Did you continue to work that full day?

25     A      Yes, sir.

1   Q And did you -- did Mr. Perez say anything

2 else to you other than just catch up with your

3 paperwork, that that was fine?

4   A No, sir.

5   Q Did you have any further discussions with

6 Mr. Perez that day regarding your status?

7   A No, sir.

8   Q Did you have any discussions with any

9 other member of the company's management that day

10 regarding your status?

11   A No, sir.

12   Q Did you have any discussions with anyone

13 in human resources, including Ms. Olmos, that day

14 regarding your status?

15   A No, sir.

16   Q At the time that Mr. Perez indicated for

17 you to just sit down and do your paperwork, were you

18 okay with that instruction?

19   A I was okay with the instruction, yes.

20   Q Did you, in fact, do paperwork for the

21 rest of the day?

22   A I did.

23   Q Did anybody ask you to do anything that

24 you felt was beyond the restrictions that had been

25 given to you by Dr. Atkinson for that day?

```
1        A     No, sir.

2        Q     Let me -- and from my understanding, you

3   didn't have any discussions with -- did you have any

4   discussions with anybody else on that day regarding

5   your injury or your work status?

6        A     I don't remember.

7        Q     Let me take you, then, to the next day,

8   Tuesday, April 13th.  Did you report to work at 8:00

9   o'clock that day?

10       A     As scheduled, yes.

11       Q     Did you continue to do paperwork or light

12  duty activities on that day?

13       A     You're right.

14       Q     Did you have any discussion with Mr. Perez

15  regarding your work status or your injury on that

16  day?

17       A     No, sir.

18       Q     Did you have any discussion with any

19  member of the company's management on Tuesday, April

20  13th, regarding your injury or your work status?

21       A     No, sir.

22       Q     Did you work a full day on Tuesday, the

23  13th?

24       A     I sure did.

25       Q     Did you continue that day working only
```

1   light duty tasks?

2      A   You're right.

3      Q   Did you have any discussion on Tuesday,

4   April 13th, with anyone from the company's human

5   resources department, including Ms. Olmos?

6      A   No, sir.

7      Q   Did you have any further discussions with

8   Ms. Soto on Tuesday, the 13th of April?

9      A   No, sir.

10      Q   Wednesday, April 14th, did you report to

11   work as scheduled at or about 8:00 o'clock that day?

12      A   I sure did.

13      Q   Did you continue to perform light duty

14   assignments that day?

15      A   You're right.

16      Q   Did anybody ask you to do anything that

17   you felt was outside of your light duty limitations

18   on that day?

19      A   No, sir.

20      Q   Did you have any discussions with Mr.

21   Perez on that day, being Wednesday, April 14th,

22   regarding your status or your injury?

23      A   No, sir.

24      Q   Did you have any further -- did you have

25   any discussions with any member of the company's

1    Tylenol treatment didn't seem to be helping very

2    much?

3        A    You're right.

4        Q    And that you continued to be in pain even

5    doing the light duty tasks that he had restricted

6    you to?

7        A    You're correct.

8        Q    And it was at that point in time he

9    decided he needed to perform more tests?

10       A    You're correct.

11       Q    Did he then excuse you from any further

12    work as a result of that appointment?

13       A    Yes, sir.  There's something that I need

14    to go back to your prior question.  Can I do that?

15       Q    Yes, that's fine.

16       A    That Thursday --

17       Q    The date that you went to see Dr.

18    Atkinson?

19       A    The date that I went to see Dr. Atkinson.

20       Q    Okay.

21       A    I'm sorry.  That day they gave me off.

22    Due to the fact that I worked the weekend, they gave

23    me off.  Sorry.

24       Q    So you're correcting your memory.  On that

25    Thursday, April 15th, you didn't actually go into

1    work at all that day?

2         A    No.

3         Q    You weren't even scheduled to work that

4    day?

5         A    You're right.

6         Q    You just went directly to the doctor's

7    appointment?

8         A    Exactly.  Sorry about that.

9         Q    That's fine.  And then, from the

10   appointment you had with Dr. Atkinson, did you

11   realize that you were going to be excused from work

12   for a period of time thereafter?  Did he tell you to

13   go back to work or did he tell you you needed to

14   stay away from work until we can find out --

15        A    That was the time that he took me away

16   from work.

17        Q    Was then Wednesday, April 14th, your

18   actually last day of active work for Laredo Coca-

19   Cola?

20        A    Yes, sir.

21        Q    Did Dr. Atkinson provide you with a

22   doctor's note excusing you from work as a result of

23   the appointment you had with him on Thursday, April

24   15th?

25        A    He sure did.

1   you at that point in time?

2        A    He said that's fine.

3        Q    Again, you don't have any complaints or

4   problems with the way Mr. Perez treated you, is that

5   correct?

6        A    That's correct.

7        Q    As of Thursday, April 15, 1999, had you

8   had any discussions with Ms. Olmos or anyone else in

9   the human resources department regarding your status

10  or your injury?

11       A    No, sir.  Excuse me.  Can you repeat that

12  question?

13       Q    Well --

14       A    Can you repeat it for me, please?

15       Q    Sure.  As of April 15, 1999, my question

16  was, had you had any discussions with Ms. Olmos or

17  anyone else in the human resources department

18  regarding your status or your injury?

19       A    I'm sorry.  I sure did.

20       Q    When did you have such a discussion

21  with --

22       A    I don't remember exact dates, but in the

23  period that I was waiting for the amendment or the

24  okay for my surgery --

25       Q    That's later.  I'm just talking about

1    the same procedure on the paperwork and faxed it

2    myself to Janie Olmos.

3         Q    Did you do that from the period of time

4    April 15, 1999, through April of 2000?  Did you keep

5    Mr. Perez updated from time to time in that same

6    fashion?

7         A    Not until -- no, sir, not until --

8         Q    When do you think was the last

9    conversation you had with Mr. Perez regarding your

10   injury or your status?

11        A    I don't remember exactly.

12        Q    Would it have been in 1999?

13        A    Yes, sir.

14        Q    And those conversations that you were

15   having with Mr. Perez, you would drop by the

16   facility after you would visit a doctor and just

17   give him an update as to what your status was, is

18   that correct?

19        A    Yes, sir.

20        Q    In any of those conversations did Mr.

21   Perez say anything about which you have a complaint?

22        A    No, sir.

23        Q    Was he cooperative, was he caring, did he

24   seem to be sincerely interested in your well being?

25        A    I -- he just seemed cold, you know, no

1    interest or anything.  I just -- sometimes I went

2    and he wasn't there, I would just make a copy, send

3    the paperwork and that was it.

4         Q    But there was nothing about your

5    conversations that you had with Mr. Perez through

6    the period of time where you spoke with him that you

7    felt was -- that you have a complaint about?

8         A    No, sir.

9         Q    I mean, is that correct?

10        A    That's correct.

11        Q    Other than Mr. Perez, did you speak with

12   any other members of the company's management,

13   including the human resources staff, in an effort to

14   keep them updated through the period of time of your

15   absence?

16        A    No, sir.

17        Q    So your only contact with individuals at

18   the company was Mr. Perez?

19        A    You're right.

20        Q    I had thought that you mentioned earlier

21   in your testimony that you do recall one

22   conversation you had with Ms. Olmos during this same

23   time period?

24        A    No, not during the same time period, no.

25        Q    Well, the time period I'm referring to is

1    from April 15, 1999, and April of 2000.  Other than

2    Mr. Perez, did you have any discussions with any

3    other member of the company's management or its

4    human resources staff regarding your status or

5    injury?

6         A    Can you repeat that, sir?

7         Q    Sure.  Other than Mr. Perez, did you have

8    any discussions with any other member of the

9    company's management or its human resources staff

10   regarding your injury or your status between the

11   time April 15, 1999, and, let's say, April 28, 2000?

12             MR. SALDANA:  I'm going to object to

13   the form of the question.  Go ahead.

14             THE WITNESS:  With Ms. Olmos when I

15   told her that I was sending her the paperwork, that

16   I was faxing the paperwork from the doctor, but that

17   was about it.

18        Q    (BY MR. BODE)  Let me take you to that

19   discussion you had with Ms. Olmos.  Do you recall

20   when during that time period, April 15, 1999,

21   through April 28, 2000, you had such a discussion

22   with her?

23        A    I called her to let her know that I was

24   sending her the paperwork.

25        Q    Do you recall when that conversation took

1  place?

2      A    I don't remember, sir.

3      Q    Would it have been before your surgery in

4  March of 2000?

5      A    Definitely.

6      Q    Do you recall, though, specifically when

7  prior to that surgery?

8      A    Excuse me?

9      Q    Do you recall what month you had that

10  conversation with Ms. Olmos?

11      A    It should have been September, somewhere

12  around September.

13      Q    September 1999?

14      A.   2000.

15      Q    So you're --

16      A    I'm sorry, you're right.   September 1999.

17  You're right, I'm sorry.

18      Q    I'm trying to capture all the discussions

19  you had with any member of the company's management,

20  Including it's human resources staff, between April

21  15, 1999, and April 28, 2000.

22      A    Okay.

23      Q    During that time period, you've already

24  indicated to us that for a period you would have

25  visits with Mr. Perez at which you would keep him

1   updated?

2      A      Exactly, sir.

3      Q      Other than Mr. Perez, though, I'm

4   interested in whether you had any additional

5   conversations with any other member of the company's

6   management or it's human resources staff.

7      A      That was Ms. Olmos.

8      Q      And now you're telling me about a

9   conversation you had with Ms. Olmos in or about

10  September of 1999, is that correct?

11     A      I'm not quite sure on dates, but more or

12  less.

13     Q      Let's say the fall of 1999.  Would that be

14  safer for you?

15     A      Yes, sir.

16     Q      And in the fall of 1999, what was the

17  discussion you had with Ms. Olmos?

18     A      The discussion was that -- as a matter of

19  fact, she told me that what was it because I told

20  her that, "I haven't got the okay for my surgery

21  yet," which she replied, "What's taking so long with

22  you."  She went like that.

23             "I mean we never had any problems

24  with anybody else taking that long to get the okay

25  for your surgery."  She said, "What's taking so

1    long?"  That was one of the discussions.

2        Q    Was that the discussion you're referring

3    us to that occurred in the fall of 1999?

4        A    You're right.

5        Q    I'll go back to that discussion in a

6    moment, but did you have any other discussions with

7    Ms. Olmos between April 15, 1999, and April 28,

8    2000?

9        A    Yes, sir, I sure did.

10       Q    How many other discussions did you have

11   with Ms. Olmos during that period of time?

12       A    I will say one or two more.

13       Q    I want to learn what was said in each of

14   those two to three discussions, but let me take you

15   to the first discussion that you recall with Ms.

16   Olmos that occurred in the fall of 1999.

17       A    Yes, sir.

18       Q    In that discussion you indicated that Ms.

19   Olmos indicated some -- again, you were telling

20   her -- what was the reason for you calling her -- or

21   did you call her or did she call you?

22       A    I called her to let her know that I was

23   waiting for my -- for the okay for my surgery, you

24   know, that what was going on, what was the delay.

25   That was my question.

1      Q     You were calling her to try to figure out
2   why there was a delay in your surgery?
3      A     Exactly, and the okay.
4      Q     In response, Ms. Olmos, it sounds like --
5   correct me if I'm wrong -- actually was sharing your
6   frustration?
7      A     Exactly.
8      Q     That is, she didn't know why there was a
9   delay either, is that right?
10     A     Exactly, you're correct on that, sir.
11     Q     Other than what you have testified to, did
12  you say anything else to Ms. Olmos or did Ms. Olmos
13  say anything else to you in that telephone
14  conversation?
15     A     No, sir.
16     Q     You don't have any complaints about the
17  way Ms. Olmos was responding to your concerns?
18     A     Oh, no, sir, not at all.
19     Q     You indicated you may have spoken with Ms.
20  Olmos on one or two other occasions during that,
21  basically, year period, correct?
22     A     Yes, sir.
23     Q     Can you take me to the next conversation
24  you had with Ms. Olmos and tell me when that
25  occurred?

1    A    Again, I don't recall exactly the moment

2  or the date.

3    Q    Can you give me an approximate time?  Are

4  we still in the latter part of 1999 or the early

5  part of 2000?

6    A    The latter part of 1999.

7    Q    Did you call Ms. Olmos then as well?

8    A    Yes, sir.

9    Q    What was the purpose of you calling Ms.

10  Olmos?

11    A    The same thing, the delay.

12    Q    The delay in the surgery?

13    A    In the surgery, right.  That what's

14  happening, you know.

15    Q    What did you say to Ms. Olmos and what did

16  Ms. Olmos say to you in that conversation?

17    A    The same thing.  I told her that -- she

18  said, "No word yet, there's nothing yet, we're

19  waiting for an okay."  I mean, "What's the delay?"

20  And she said, "I don't know."

21    Q    Do you recall anything else that Ms. Olmos

22  said to you in that conversation other than what you

23  testified in detail today?

24    A    Not on that one, no.

25    Q    And you said there may have been one

1  additional conversation with Ms. Olmos during that

2  period?

3       A    Yes, sir.

4       Q    Do you remember that there actually was?

5       A    I sure do.

6       Q    Take me to that conversation.  When did

7  that occur?

8       A    Yes, sir.  It was later on that date, but

9  I don't remember exactly.  Pinpoint, I don't

10  remember the date.

11       Q    Do you remember whether it was late --

12       A    But it was after -- I'm sorry, sir.  Go

13  ahead, sir.

14       Q    I'm just trying to get you to give me your

15  best estimate.  Do you remember whether it was late

16  in 1999 or early in 2000, this third conversation?

17       A    No, it was in November, late in 1999.

18       Q    Why did you call Ms. Olmos on that

19  occasion?

20       A    The reason was to let her know about what

21  Dr. Pechero wanted to do on his response on his

22  letter with my surgery; in other words, that he said

23  on his report that I needed a surgery, but according

24  to him I needed to be treated for a while.  I don't

25  know what he meant "for a while" since I was injured

1    since April 1999 and this was in November, okay?

2                    And that he recommended that

3    injection, to which I told Janie about it and she

4    advised me, which I already knew, but she advised me

5    not to take the injection to which she reminded me,

6    "Remember what happened to Ms. Casas because she had

7    the same problem," and first the injection for her

8    worked for a month or two months and she needed to

9    come to Harlingen like every week for that same

10   injection.

11                   And I said, "No, I'm not going to get

12   no injection," because that was not fixing the

13   problem.

14        Q    The purpose of your call in late November

15   1999 was simply to inform Ms. Olmos of what this

16   doctor had recommended?

17        A    Exactly, and to let her know that I was

18   not going to take the injection, I would rather have

19   the surgery done.

20        Q    But it was Ms. Olmos who indicated to you

21   that, because of another example involving another

22   employee --

23        A    On her boss, yes.

24        Q    -- that she didn't think the injection

25   worked --

1    13, which, as I recall, was among the documents you

2    furnished to us in the production in this case.  Is

3    that the doctor's note that released you to return

4    to work dated September 11, 2000?

5         A    You're correct.

6         Q    Now, between March 2nd, the date of your

7    surgery, and September 11, 2000, would it be fair to

8    assume that you were unable to return to work during

9    that period?

10        A    You can say that.

11        Q    That is, from your perspective, you were

12   not to work during the period of time between March

13   2 and September 11, 2000?

14        A    You're right.

15        Q    Prior to this doctor's note, Deposition

16   Exhibit 2 -- and it's dated September 11, 2000 --

17   have you continued to experience physical pain as a

18   result of your injury?

19        A    Yes.

20        Q    And what frequency did you experience --

21   in what frequency did you experience that pain?  Was

22   it a daily pain, a constant pain as you had

23   described earlier for us?

24        A    At the beginning it was daily and it

25   started to diminish.

1          Q     As of September 11, 2000, the date of your
2     doctor's release to return to work, what's --
3     describe the frequency of the pain that you were
4     experiencing at or about that time.
5          A     At the beginning, it was every day.
6          Q     I'm talking as of September 11, 2000.
7          A     Oh, okay, I'm sorry.
8          Q     Had the pain diminished in frequency?
9          A     Oh, yes.
10          Q     Were you still experiencing it from time
11     to time?
12          A     Yes, sir.
13          Q     But was it a constant daily pain at that
14     point in time?
15          A     No, sir.
16          Q     So from the period of March 2, the date of
17     your surgery, until the date of your release to
18     return to work, did your pain gradually decrease
19     both in frequency and in intensity?
20          A     Exactly.
21          Q     And did you believe, as your doctor
22     believed, that as of September 11, 2000, you were
23     able to return to work?
24          A     You're right.
25          Q     During the period of time between March

1    from any employment, is that correct?

2        A    No, sir.

3        Q    You had either left because of a layoff or

4    you left voluntarily?

5        A    Yes, for better place, better pay.

6        Q    Did you ever suffer any on-the-job

7    injuries prior to your employment at Coke?

8        A    Never.  Excuse me.  Can you repeat that?

9    Employment with who?

10       Q    With Laredo Coca-Cola, had you ever

11   suffered any on-the-job injuries prior to your

12   starting work in 1984 with the Coca-Cola facility?

13       A    Never.

14       Q    Mr. Espinoza, in your complaint you allege

15   that Laredo Coca-Cola violated the Family and

16   Medical Leave Act.  Do you still believe that to be

17   true?

18       A    Yes, sir.

19       Q    Specifically, in as much detail as you

20   can, tell me how the company violated your rights,

21   if any, under the Family and Medical Leave Act.

22            MR. SALDANA:  Objection to the form

23   of the question.  Go ahead.

24            THE WITNESS:  Since they found out

25   that I was injured and that I was going to be out

1    Q    (BY MR. BODE)   Do you know what the Family

2    and Medical Leave Act provides employees who are

3    eligible for coverage thereunder?

4    A    Can you repeat the question?

5                   MR. BODE:   Would you read back the

6    question?

7                   (The Pending Question Was Read)

8                   THE WITNESS:   No, not out of my

9    memory, no.

10    Q    (BY MR. BODE)   By your testimony, though,

11    again I come back to the idea that you feel like

12    your rights were violated because nobody told you

13    that you were out under the Family and Medical Leave

14    Act.

15    A    That's correct.

16    Q    With respect to that particular issue,

17    what did you expect to be told by the company?

18    A    I repeat again, only what is stated on the

19    book of the FMLA, they should have notified me the

20    fact that I was going to be out under the FMLA and I

21    have so much time to return so I would keep my

22    employment.

23    Q    Do you know how much time under the FMLA

24    you have to return even if somebody had told you

25    about it?

1        A        I'm not quite sure, but if I'm not -- if I

2    don't recall wrong, about 12 months or something

3    like that.

4        Q        Now, at or about the 1998, 1999 and 2000

5    timeframe, you were working out of the San Benito

6    facility that entire period, is that correct?

7        A        That's correct, sir.

8        Q        At the San Benito facility, is there

9    anyplace within the facility where notices are

10   posted by the company for the employees' review and

11   inspection?

12       A        There's a bulletin board, yes.

13       Q        And is that the bulletin board upon which

14   notices and important information are posted?

15       A        Yes, we all see them there.

16       Q        Where is that bulletin board located?

17       A        It was in the drivers' room, but then they

18   posted another one by the lunchroom, a very small

19   one for any notices.

20       Q        So there were actually two bulletin boards

21   upon which notices were posted by the company for

22   the employees' review, is that correct?

23       A        That's correct.

24       Q        One was in the drivers' room?

25       A        That's right.

1     Q    Did you understand that you should refer

2  to those bulletin boards to see what information is

3  on there?

4     A    Oh, yes.

5     Q    Did you, in fact, review those postings

6  from time to time during the period of time you were

7  employed?

8     A    Yes, sir.

9     Q    As you sit here today, do you have any

10  memory of the specific postings that were on those

11  bulletin boards during the 1998, 1999 and 2000

12  timeframe?

13     A    No, sir.

14     Q    In your complaint you also allege that

15  Laredo Coca-Cola fired you because you filed a claim

16  for worker's compensation.  Do you still believe

17  that to be true?

18     A    Yes, sir.

19     Q    What facts, information or evidence do you

20  have to support your claim that the company fired

21  you because you filed a claim for worker's

22  compensation?

23     A    The fact that they let me go.

24     Q    Other than that fact, that is that your

25  employment was terminated, do you have any other

1    information, evidence or facts which would support

2    your claim that the company fired you because you

3    filed a claim for worker's compensation?

4         A    No, sir.

5         Q    Earlier in your testimony you indicated,

6    when we were talking about the Family and Medical

7    Leave Act, that you would have hoped that Laredo

8    Coca-Cola could have or might have persuaded

9    somebody to act upon the surgery recommendation.

10   Those weren't your exact words but that was the

11   impression I got, that you felt like the company

12   didn't persuade somebody to ensure that your surgery

13   occurred in a timely fashion.

14                  Did I understand your prior testimony

15   correctly?

16        A    Can you repeat that?

17        Q    Let me ask you.  Do you feel like the

18   company should have done something more than it did

19   or didn't do with respect to your surgery for your

20   back?

21        A    Yes, sir.

22        Q    And what do you expect -- what do you

23   think the company should have done or should not

24   have done with respect to your back surgery?  You

25   used the word persuade, but specifically what do you

1   Cola and then you've also sued other defendants,

2   Continental Casualty Company and Constitution State

3   Service Company.  Do you hold Laredo Coca-Cola

4   responsible for how you were medically treated?

5        A    I sure do.

6        Q    Do you hold these other defendants

7   responsible for that as well?

8        A    As well, yes.

9        Q    Is there anything else that you believe

10  that the company should have done that it did not do

11  with respect to your injury?

12       A    No, sir.

13       Q    Do you have any other facts or information

14  that would support your claim that the company fired

15  you because you filed a claim for worker's

16  compensation?

17       A    No, sir.

18       Q    Do you have any evidence that Laredo Coca-

19  Cola or any of its employees, management, human

20  resources staff was involved in any form or fashion

21  in directing any decision regarding the handling of

22  your worker's comp claim?

23       A    No, sir, I don't.

24       Q    In Deposition Exhibit 1, the letter that

25  you received from Ms. Olmos indicating that your

1   employment was terminated, she indicated that the

2   employment was being terminated in accordance with

3   company policy.  Do you recall that portion of the

4   letter?

5         A    Yes, sir.

6         Q    Did you understand what policy Ms. Olmos

7   was referring to?

8         A    No, sir.

9         Q    Did you ever come or have you ever come to

10  any understanding as to what policy Ms. Olmos was

11  referring to?

12        A    No, sir.

13        Q    Did you ask Ms. Olmos, when you spoke with

14  her on May 4, what policy she was referring to?

15        A    No, sir.

16        Q    Do you have any understanding of a policy

17  that exists at Laredo Coca-Cola regarding leaves of

18  absence and the amount of time an employee can be on

19  a leave of absence?

20        A    No, sir, I don't.

21        Q    You mentioned earlier a 12-month time

22  limit.  Do you believe that time limit is a time

23  limit imposed by the Family and Medical Leave Act?

24        A    Yes, I do.

25        Q    Do you believe there's any policy within

1  Laredo Coca-Cola that addresses a 12-month time

2  limit?

3       A    I'm not sure on that.

4       Q    You just don't know one way or the other?

5       A    I don't know, no, sir.

6       Q    Again, I know you didn't draft this

7  complaint, but I need to ask what information, if

8  any, you have to support some of the statements in

9  this complaint.

10              Specifically, Mr. Espinoza, in

11  Article VII of your complaint it states that even if

12  there was a policy of discharging employees after

13  one year of absence, even if there was such a policy

14  in place, that you allege that it was not uniformly

15  applied to all employees.  That's what's alleged in

16  the complaint.

17              Do you have any facts, information or

18  evidence that would suggest that a policy of

19  discharging employees after one year of absence was

20  not uniformly applied to all employees?

21       A    I don't have that information.

22       Q    Can you identify any employee to whom the

23  policy, if it existed, was not applied?

24       A    No, sir.

25       Q    And do I understand your testimony

1  correctly that, prior to your receipt of the April

2  28, 2000, letter from Ms. Olmos, you weren't even

3  aware of the existence of such a policy?

4      A    You're correct.

5      Q    During the time that you were employed by

6  Laredo Coca-Cola, did there ever come occasions

7  where you were handed materials regarding your

8  benefits and what benefits you enjoyed, life

9  insurance, health insurance and that sort of thing?

10     A    Yes, sir.

11     Q    And how were those policies handed to you?

12 Do you remember getting them?

13     A    We had a meeting with Ms. Olmos.

14     Q    And during those meetings, were policies

15 then distributed to all the employees?

16     A    Yes.

17     Q    Again, do you remember receiving policies

18 not only in a loose leaf or several page fashion,

19 but also receiving policies that were in a packet or

20 cover, you know, something thicker than just a page

21 or two?

22     A    Yes, a folder.

23     Q    And from time to time you would receive

24 those folders which would explain the benefits that

25 you enjoyed as an employee of Laredo Coca-Cola?

1    that you were responsible for knowing what was in

2    the folder?

3         A    Yes, sir.

4         Q    These folders that you were given from

5    time to time, were they covered with the company's

6    logo and were they red folders and the like?

7         A    Yes, sir.

8         Q    On receiving those folders, did you spend

9    time reviewing each and every policy that was

10   contained therein?

11        A    Only the ones that things changed because

12   they were frequently changing like, for instance,

13   the amount that they were going to charge us, you

14   know, for certain family members and stuff, and that

15   sort of thing.

16        Q    Would it, likewise, be fair to say that

17   after being handed the folder you might not have

18   reviewed the entire packet?

19        A    You're right.

20        Q    Mr. Espinoza, during this portion of your

21   deposition -- and perhaps I should have made this

22   introduction earlier but, as you know, in addition

23   to suing the client that I represent, Laredo

24   Coca-Cola, you've also sued Continental Casualty

25   Company and Constitution State Service Company, and

```
 1        A    Yes, sir.

 2        Q    And you came to work on the 12th?

 3        A    Yes, sir.

 4        Q    And you went to a doctor?

 5        A    Yes, sir.

 6        Q    And then you came back and worked Monday,

 7   Tuesday, and Wednesday?

 8        A    That's correct.

 9        Q    That was April 12th, 13th and 14th?

10        A    Yes, sir.

11        Q    And it was on April 15th when you went

12   back to Dr. Atkinson again, he thought this injury

13   might be more serious, and you did not actually

14   return to work after that?

15        A    You're right.

16        Q    You brought the paperwork back to the

17   company, told them that the injury might be more

18   serious in effect, and from that day forward never

19   actually worked at the bottling company?

20        A    That's correct.

21        Q    Did you receive any sort of payment from

22   Coca-Cola, as opposed to the worker's compensation

23   carrier, after April 14, 1999?

24        A    Only my four weeks vacation that belonged

25   to me -- or three weeks, rather, because I had taken
```

1      Q    So can we agree that in this lawsuit you
2  are not complaining, first of all, about the
3  temporary income benefit payments that you received
4  from the insurance company, is that correct?
5      A    That's correct.
6      Q    And you are also not complaining about the
7  medical bills that were incurred as a result of your
8  treatment?
9      A    That's right.
10     Q    You were referred, as you told me earlier,
11 to Dr. Pisharodi by Dr. Atkinson, is that correct?
12     A    That's correct, sir.
13     Q    Did you consider Dr. Pisharodi to be your
14 main doctor for this back injury?
15     A    I sure do.
16     Q    He was the one who ultimately did the
17 surgery, is that correct?
18     A    That's correct.
19     Q    According to the records that I have, I
20 believe you first saw Dr. Pisharodi on May 7, 1999,
21 is that correct?
22     A    That sounds about right, yes.
23     Q    Tell me what kind of treatment he provided
24 to you over the next several months, say, leading up
25 through the summer -- through August of 1999, do you

1  recall?

2      A    What kind of treatment, you say?

3      Q    What did he do?  Did he give you

4  medication, did he send you to other doctors, did he

5  give you physical therapy?  Just tell me what you

6  recall that he did for you from the period May 1999

7  to August of 1999.

8      A    First of all, he gave me a prescription

9  for the pain, he sent me to therapy for a while, and

10  wanted me to go back and see him again.

11      Q    Did you get any better because of the

12  therapy?

13      A    A little bit of change, yes, a little bit.

14  Not much, but there was a little bit of change, yes.

15      Q    What else do you recall in the way of

16  treatment besides the pain medication and the

17  physical therapy?

18      A    Sending me for the CAT scan -- I'm sorry.

19  The CAT scan was done by Dr. Atkinson.  That's how

20  he realized I needed to be seen by Dr. Pisharodi.

21  He sent me to MRI's, more X-rays, and that's about

22  it.

23      Q    During this period -- I'm going to break

24  it down into periods if you'll bear with me -- from

25  May of 1999 when you first started seeing Dr.

1    Pisharodi until August -- through August of 1999,

2    did you feel like you got any better at all because

3    of the physical therapy and other treatment that you

4    received from Dr. Pisharodi?

5         A    Like I said again, a little change for the

6    better, but not much though.

7         Q    During this period from May through August

8    of 1999 were you in contact with anyone from the

9    insurance company?

10        A    Excuse me.  Can you repeat that?

11        Q    Did you have any contact with anyone from

12   the insurance company from the period May 1999

13   through August of 1999?

14        A    I had a contact.  I don't remember if it

15   was from the insurance, but there was a lady who

16   called me.  She told me she was a nurse and asked me

17   about my whereabouts, about my situation with my

18   back.

19        Q    She wasn't treating you, was she?

20        A    She was not treating me, no.  She just

21   wanted to get information about my status with the

22   company.

23        Q    Did she call you periodically?

24        A    Yes.

25        Q    How many times do you think you talked to

1  without the surgery, would that have been what you
2  would have wanted?
3      A    Sure, definitely.
4      Q    You were not anxious to jump into surgery
5  if --
6      A    No, hey, no.  That was my last option.
7      Q    So you were willing to go along with Dr.
8  Pisharodi to see if you could get better and return
9  to work without the surgery?
10      A    You're correct.
11      Q    Now, my understanding is that, while you
12  got a little bit get better, you did not get
13  significantly better as a result of what I'm going
14  to call the physical therapy and other treatment
15  during the summer of 1999, is that correct?
16      A    That's correct.
17      Q    Do you recall going to see Dr. Pisharodi
18  sometime in September of 1999 and Dr. Pisharodi
19  recommending to you surgery?
20      A    Yes, sir.
21      Q    According to your notes, it appears that
22  you saw Dr. Pisharodi in September at which time you
23  had a diskogram?
24      A    That's right.
25      Q    Do you remember that procedure?

1      A      Yes, sir.

2      Q      Tell me what you recall it involved.   How

3  did they go about doing that?

4      A      I don't wish for nobody to have that done.

5  It was very painful.   It was at Valley Regional

6  Hospital.

7      Q      Did you understand that they put some dye

8  in you and --

9      A      They put three needles this big inside of

10  you.   (Indicating)

11      Q      And they were trying to do a study to see

12  what the disk looked like?

13      A      Exactly, yes, that's what he told me they

14  wanted to find out.

15      Q      According to your notes, it was on

16  September 7th that Dr. Pisharodi recommended the

17  need for surgery, is that correct?

18      A      That's correct, sir.

19      Q      Were you willing at that point to do the

20  surgery?

21      A      I wasn't willing, but I felt at that time

22  that I didn't have no choice.

23      Q      Do you recall telling Dr. Pisharodi you

24  wanted to think about it and talk to your wife?

25      A      Yes.

1      Q      So as of September 7th, 1999, while Dr.

2    Pisharodi was recommending it, you told him, "Let me

3    think about it, I want to talk to my wife"?

4      A      Yes, because that's what he told me.

5      Q      Did you then go to see Dr. Atkinson to get

6    his opinion?

7      A      That's right.

8      Q      Did you -- do you recall telling Dr.

9    Atkinson that you wanted a second opinion?

10     A      That's correct.

11     Q      You, Noel Espinoza, wanted your own second

12   opinion?

13     A      Yes.

14     Q      Did Dr. Atkinson recommend somebody for

15   you to see?

16     A      Yes.

17     Q      Who did he recommend?

18     A      Dr. Tijerina.

19     Q      Had you seen Dr. Tijerina before the time

20   you went to see him for the second opinion?

21     A      Never in my life.

22     Q      Where is Dr. Tijerina located?

23     A      In McAllen.

24     Q      So you drove from Brownsville over to

25   McAllen to see Dr. Tijerina?

1      A    My wife took me over there.

2      Q    Do you recall the date that you saw him?

3      A    Not exactly, but I have it on my notes.

4  It was on the 27th of September.

5      Q    And on September 27, 1999, you went to see

6  Dr. Tijerina for a second opinion.  This is one you

7  wanted, correct?

8      A    That's right.

9      Q    Did you pay for the second opinion?

10     A    No, sir.

11     Q    Do you know who paid for it?

12     A    I believe workmen's comp.

13     Q    Do you think they paid for it?

14     A    I believe.

15     Q    Do you know if you told anybody at the

16  worker's compensation commission or the insurance

17  company that you were going to see Dr. Tijerina?

18     A    Can you repeat it, sir?

19     Q    Did you tell anybody before September 27,

20  1999, that you were going to see Dr. Tijerina?

21     A    Yes.

22     Q    Who did you tell?

23     A    Gracie -- Dr. Atkinson and Gracie.

24     Q    Who is Gracie?

25     A    The lady in charge of the workmen's comp

1  paperwork at that office that we were talking about.

2        Q    That's in Dr. Atkinson's office?

3        A    Yes, sir.

4        Q    Was she the one who set up the appointment

5  for you?

6        A    No.

7        Q    How did you get the appointment with Dr.

8  Atkinson?

9        A    Through Dr. Atkinson's secretary.

10       Q    Did Dr. Atkinson provide you with several

11 names and you picked one of them?

12       A    No, sir.

13       Q    He just said, "I'm going to recommend you

14 go see Dr. Tijerina"?

15       A    He asked me if I had a doctor.  I told him

16 no and he said, "Don't worry, we'll recommend you

17 someone."

18       Q    Did he just say, "I think you should go

19 see Dr. Tijerina"?

20       A    He didn't say.  He said, "We'll let you

21 know in a minute."

22       Q    When you left Dr. Atkinson's office, he

23 had not yet given you the name of who you were going

24 to see?

25       A    Yes, they give me the name before.

1  Q Before you left --

2  A No, I'm sorry, they did not give me the

3 name.  They called me over to the house and let me

4 know who the appointment was.

5  Q You went over to see Dr. Tijerina at the

6 suggestion of Dr. Atkinson?

7  A Yes, sir.

8  Q How long did you see Dr. Tijerina.

9  A Excuse me?

10  Q How long did you see him, how much time?

11  A I would say less than 30 minutes.

12  Q What did he tell you?

13  A I took him the records from Dr. Pisharodi

14 and all the X-rays that we had, and he said that he

15 agrees with Dr. Pisharodi that, in fact, I needed to

16 have that surgery done.

17  Q Did he give you anything in writing?

18  A No, sir, not to me, no.

19  Q Did you report his findings to anyone?

20  A When I got home -- the following day I

21 called Gracie and let her know what he said.

22  Q Did you report his findings to anybody

23 else?

24  A No, sir.

25  Q When did you next see a doctor regarding

1      Q      And of those five, you just happened to

2   pick Dr. Pacheco?

3      A      Yes, sir.

4      Q      And it's your understanding that Gracie in

5   Dr. Pisharodi's office scheduled an appointment with

6   Dr. Pacheco for you?

7      A      Betty.

8      Q      Betty, I'm sorry.

9      A      Yes, sir.

10     Q      And that appointment was for --

11     A      Was scheduled for the 21st but they called

12  me and switched over for the 22nd, the next day.

13     Q      So you went to see Dr. Pacheco on Friday,

14  October 22?

15     A      That's right.

16     Q      And it's your understanding that he agreed

17  with Dr. Pisharodi regarding the need for surgery?

18     A      That's correct.

19     Q      What did you do after that, after the

20  appointment of October 22nd?

21     A      What do you mean?

22     Q      What did you do in terms of follow-up with

23  any doctors to go forward with the surgery?

24     A      Just waited for the -- because I told Dr.

25  Pisharodi what he had said and -- to where he told

1          Q     This letter tells you that an appointment

2    has been scheduled for you with Dr. Pechero in

3    McAllen, Texas, for November 11, 1999.

4          A     That's right.

5          Q     So we get the sequence of events correct

6    here, you went to see Dr. Pacheco on Friday, October

7    22nd, 1999?

8          A     That's right.

9          Q     And on Thursday, October 28, 1999, six

10   days later, the insurance company sent you a letter

11   telling you that an appointment had been made for

12   you to see Dr. Pechero for November 11, 1999?

13         A     That's correct, sir.

14         Q     And this letter told you, among other

15   things, that it would be necessary that you take

16   your X-rays and other records to Dr. Pechero's

17   office?

18         A     That's correct.

19         Q     Do you -- did you have any understanding

20   as to why you were being sent to Dr. Pechero?

21         A     Only that Dr. Pisharodi told me that there

22   was still one more doctor that the company or

23   insurance needed to have the approval or have me

24   check it out -- check me out in order for them to

25   approve my surgery.

1    regarding your request for surgery?

2         A    That's right.

3         Q    And the response by the Worker's

4    Compensation Commission was favorable in the sense

5    that they said yes, you can have the surgery?

6         A    That's right.

7         Q    But you also knew, based on reading this

8    letter, did you not, that the insurance company had

9    a right to appeal?

10        A    Yes.

11        Q    They could contest it and say, "No, we

12   disagree, we don't think he needs it"?

13        A    That's correct.

14        Q    Do you know if the insurance company

15   appealed?

16        A    I don't think they did.

17        Q    Isn't it true that within a couple of

18   weeks after getting this letter you actually had the

19   surgery?

20        A    That's right.

21        Q    And do you recall the date of the surgery?

22        A    March the 2nd.

23        Q    March 2nd, 2000?

24        A    2000.

25        Q    Did you have it at Valley Regional Medical

**1**

CVisPDF – www.fastio.com

# *Valley Coca-Cola Bottling Company, Inc.*

MCALLEN TEXAS BRANCH

P.O. Box 90
McAllen, TX 78502
210-632-3700

April 28, 2000

Noel Espinoza
54 Fresno
Brownsville, TX 78521

Dear Noel,

As of April 15, 2000, you had been out on leave for one complete year. In accordance with corporate policy, your status as an active employee of Valley Coca-Cola Bottling is hereby terminated.

Please be advised that this change in your employment status will have no impact on the Workers Compensation benefits that you are currently receiving.

A letter outlining the continuation of insurance coverage under the consolidated Omnibus reconciliation Act (COBRA) will be mailed to you within the next few weeks. In the meantime, if you have any questions please feel free to give me a call.

Sincerely,

Janie Olmos
Sr. H. R. Clk.

**DEPOSITION
EXHIBIT**

1

DEF-011

**2**

CitisPDF – www.fastio.com

## MADHAVAN PISHARODI, M.D.
Neurosurgeon

942 Wildrose Lane
Brownsville, Texas 78520
Office Telephone
(956) 541-6725

Noel Espinoza _____ has been under my
care from and is able/unable to return to work/school on_____
09-11-00 _____, or till further evaluation on

RESTRICTIONS: pt. released to
work_____

REMARKS:  If you have any questions regarding this mater
please do not hesitate to contact my office.

MADHAVAN PISHARODI, M.D. DATE: 09-05-00



DEPOSITION
EXHIBIT
2

DEF-013

**3**

CVisPDF – www.fesno.com

JOB ANNIVERSARY DATE JULY 9th 84

4.00              #              813

DATE OF INJURY 4-10-99
TIME AT WORK WHEN INJURE 14 YRS 9 MONTHS
1ST DOCTOR TO CHECK ME WAS DR ATKINSON
ON APRIL 12th 99 FOLLOW UP WITH DR ATKINSON —
— ON APRIL 15th HE SEND ME TO A CAT SCAN
AT DOLLEY VINCENT HOSPITAL IN SAN BENITO.
AND HAVE THAT DONE ON 4-22-99 AT 11:00AM
DR ATKINSON SET ME UP AN APPT WITH DR —
PISHARODI, IN HNLN OFFICE AT 9:00AM THAN
HE SEND ME TO AN MRI AT VALLEY REGIONAL
ON THE 13th OF MAY I RECEIVE A CALL FROM
BETTY (DR PISHARODI OFFICE) THAT THEY JUST REC-
— CEIVE THE OK FROM INSURANCE ADJUSTER FOR
THE MRI AND EMG. HAD MRI AT VALLEY REG
ON 5/25/99 ON JUNE 3th 99
DR PISHARD GET THE RESULTS —
— FROM THE MRI HE FOUND THAT
THER WAS A HERNIATED DISK
AND IT WAS PINCHING THE NERVE THAT GOES
TO MY LEGS. THERE WAS THE REASON
FROM MY PAIN AND NUMMES OF MY LEGS.

DEPOSITION
EXHIBIT

3

ON JUNE 3th DR SEND ME TO 8th weeks
OF THERAPY. AND WANTED TO SO Me
ON JULY 1st '99
ON JULY 10th, I CALL BETTY (DR'S OFFICE)
AND SHE SAID THAT SHE HAVE JUST GOT THE
OK FOR JUST 4 WEEKS OF THERAPY AND TH
THEY WANTED AN EVALUATION FROM MY SITUATI
ON JULY 29th HAD AN APPT WITH DR PISHARD
AT 1:30 AND WENT TO THERAPY 1 ONE MORE WRE
AND SET mi UP AAPNT FOR AUG. 9th. '99
ON AUG-9th '99 DR PISHARDI SEND ME
TO A DISCO GRAM.
ON AUG 20th. '99 BETTY FROM DR PISHARDI
CALL ME TO GO ON MOND-23th. TO PRE-
REGISTER AT THE HOSPITH FOR THE DISCO
GRAM.
ON SEPT. 2ND. '99. HAD THE DISCO GRAM
ON SEAT. 7th DR PISHARDI TOLD ME
ABOUT THE NEED OF A SURGERY AND HE
SHOW ME THE DIFFRENT DEVISES.
ON SEPT. 27th. I HAD A 2ND OPINIO.
ON MY OWN PLEDGE BY DR TIJERINA
IN McALLEN HE AGREES. WITH DR PISHARD

Oct 4th. Appment with Dr Pishardi
I choose the Devise I figure it was
Best for my Back Surery.

★ Oct 11th. Ray threded infusion
came out. on choosing. Dr gave me
a choice of 5 Drs. to choose one
for my now 2nd opinion from the
Co.

Oct 21st. appt w/Dr Pacheco was
cancel for.

★ Oct 22nd. He also agrees with
Dr Pishardt.

★★ Nov 1st. I receive a letter from
my case mgt. Tamara Ross. stating
Appnt w/Dr Ruben Pechero in McAllen
on 11/11/98. at 1:15.

On Nov 11th Betty call me from Dr
Pishardt. that Dr Pechero. office
han cancel my Appnt. due to Dr
Pechero Accident. to 11-30-99

★★★ Nov. 30th Appt w/Dr Pechero
He recomoded the shot

CutePDF - www.texiss.com

**4**

CVisPDF – www.fasiio.com

# September

| Sunday | Monday | Tuesday | Wednesday |
|---|---|---|---|
| | | | **1** |
| | August '99<br>S M T W T F S<br>1 2 3 4 5 6 7<br>8 9 10 11 12 13 14<br>15 16 17 18 19 20 21<br>22 23 24 25 26 27 28<br>29 30 31 | October '99<br>S M T W T F S<br>1 2<br>3 4 5 6 7 8 9<br>10 11 12 13 14 15 16<br>17 18 19 20 21 22 23<br>24 25 26 27 28 29 30<br>31 | |
| **5** | **6**<br><br>Labor Day | **7** HAD THE APPNT AND THE DR TOLD ME TO THINK ABOUT A SURGERY AND SHOW ME DIFFERENT DEVICES TO PUT ON MY BACK. I HAVE AN APPNT FOR SEP 16th | **8** |
| **12** | **13** | **14**<br><br>DEPOSITION EXHIBIT<br>4 | **15** |
| **19**<br><br>Yom Kippur Begins at Sundown | **20**<br><br>Yom Kippur | **21** | **22** |
| **26** | **27** 2nd OPINION APPT WITH DR TITERINA IN MCALLEN AT 2:00 PM  SUIT 211 DR TITERINA AGREES WITH DR PISHARODI | **28** CALL GRACIE FROM WEIMANS COMP IN SAN BENITO TO TELL HER THE RESULT FROM DR TITERINA SO I TOLD HER THAT I'M GOING TO GO WITH | **29** |

| Thursday | Friday | Saturday | TO DO LIST |
|---|---|---|---|
| | **1** | **2** | TERRY MARTINO<br>1·800·880·6201 |
| AT·10:59 AM RECEIVE A CALL FROM TERRY MARTINO WANTING TO KNOW ABOUT MY INJURY + LAST APPNT WITH DR PISHNADI SAME COCA COLA INSURANCE # 800-880-6201 **7** | **8** | **9** | |
| **14** | **15** | **16** | |
| 2ND OPINION APTT THAT I CHOSE W/DR PACHECO AT 800 W JEFFERSON SUITE 140 AT 9:30 APT CHANGE FOR FRIDAY · 22 **21** | DR PACHECO 2ND OPINION APTT.<br><br>HE AGREES W DR PISHNADI **22** | **23** | CORPORATE CLAIMS MANAGEMENT INC |
| RECEIVE A CALL FROM RIBA GOLDMAN ANOTHER ADJUSTER 1·800·678·9355 EXT ( 3034) SHE CALL ON BEHALF OF TERRY MARTINO DUE TO EMERGENCY — FAMILY LEAVE. JUST WANTED TO KNOW THE STATUS OF MY APPMNTS W/DR PISHNADI. **28** | **29** | **30** | RIBA GOLDMAN<br>1·800·678·9355<br>EXT ( 3034) |

# November

| Sunday | Monday | Tuesday | Wednesday |
|---|---|---|---|
| | **1** Receive a letter from Constitution State Service Company from Thomas Ross w/Appt with Dr. Rueben Pecaero to Meet on 11/8/... | **2** Election Day | **3** |
| **7** | **8** I receive a call from Dr. Pishardis office and they told me tha sinse I had the appnt on 11/ with Dr. Pecaero then they don't need to scane until afterwards. | **9** I went to Dr Pishardis office just to Pick up My medical Records + Films. | **10** Talk to Maryland Vela + Told her the Arosedure / She wants to hear from me after the appnt with Dr Pecaero |
| **14** | **15** | **16** | **17** |
| **21** | **22** | **23** | **24** |
| **28** | **29** | **30** Appt. Dr Reuben Pecaero at 1:30 pm. | |

| Thursday | Friday | Saturday | TO DO LIST |
|---|---|---|---|
| **4** | **5** | **6** | ~~TERRY MARTINE~~<br>1-800-886-6351 |
| **11**<br><br>Veterans Day<br>Remembrance Day<br>(Canada) R G V O | 11/11/99 NADIRA<br>CALLME TO RE- **12**<br>SCHEDULE ME TILL<br>11/18/99 AT 3:15PM DUE<br>TO THE FACT THAT<br>DR REUBEN PECHERO<br>WASN'T FEELING WELL<br>AND HE WAS LEAVING<br>THE OFFICE | **13** | |
| APPT W/ REUBEN PECHERO<br>AT 3:15P— **18** | BETTY FROM DR<br>DISNARDI CALL TO LET ME **19**<br>KNOW THAT LUCY FROM<br>DR PECHERO CALLED AND<br>SAID THAT I WAS<br>RESCHEDULE TILL NOV<br>THE 30EU DUE TO THE<br>FACT THAT DR PECHERO<br>HAD AN ACCIDENT. | **20** | DR REUBEN PECHE<br>(956) 686-6510 |
| **25**<br><br><br>Thanksgiving Day | **26** | **27** | GERIATRIC CLAIMS<br>MANAGEMENT INC |
| October'99<br>S M T W T F S<br>          1  2<br>3  4  5  6  7  8  9<br>10 11 12 13 14 15 16<br>17 18 19 20 21 22 23<br>24 25 26 27 28 29 30<br>31 | December'99<br>S M T W T F S<br>         1  2  3  4<br>5  6  7  8  9  10 11<br>12 13 14 15 16 17 18<br>19 20 21 22 23 24 25<br>26 27 28 29 30 31 | | RING ELLDRINA<br>1-800-678-9355<br>EXT (3094)<br><br>MERIT BILLING<br>1-8__ ___-6951 |

# Phone Numbers & Addresses

FEB-14th BETTY CALL ME FROM DR PISHARDI SEING THAT SHE HAVE TRIED TO GET IN CONTACT WITH TAMARA ROSS AND SHE WAS UNABLE SO SHE LEFT A MESSAGE SO SHE CAN RETURNED THE CALL,

AT 5:19 02/14/00 BETTY CALLED ME BACK AND TOLD ME THAT WE FINALLY HAVE TALK TO TAMARA ROSS AND THAT SHE SAID THAT SHE WASN'T GOING TO APPEAL THE AMENDED SO FOR HER TO SCHEDULE ME UP TO GO WITH THE SURGERY, SO SHE MAKE ME AN APPOINTMENT FOR MONDAY 31 st AT 9:00 AM TO GO SEE DR PISHARDI

APPNT WITH DR PISHARDI 02/21/00 AT 9:00 AM. HE SET ME UP AN APPMT FOR MONDAY 02/28/00 TO SE HOW IM GOING TO BE DOING DUE TO THE FACT THAT IHVE GOT A COLD + RUNY NOSE. BUT HE SCHEDULE ME FOR SURGERY ON WED - MARCH THE 1st 2000. I CALL LORI LOVE AND GAVE HER THE NEWS ABOUT THE SURGERI DATE.

3/9/00 1ST APPNT WITH DR PISHARDI AFTER SURGERY HE SAID THAT I WAS DUING GREAT I ASK HIM ABOUT MY RIGHT FOOT STANDING TO THE OUTSIDE WHEN I'M WALKING ADD HE SAID THAT DON'T WELL THAT PHISICAL THERAPHY SPOUSE TO TAKE CARE OF THAT. SO THEY ARE GOING TO CHECK WITH THE INSURANCE FOR ON APROVEL FOR THERAPHY AND X RAY. AND THEY SUPOSE TO CALL ME FOR AN ANSWER, AND THE DOCTOR WAN TO SE ME ON APRIL/4/00, AT 9:30 AM.

# June

## 3th WEEK OF HARD WORKENING.

W CHECK 1541 CUT

Wool is introduced to America when the Spaniard Coronado brings several of his favorite sheep to southwestern North America. (Why Coronado found a need to travel by sea with "several of his favorite sheep" is still a mystery.)

**Monday** APPNT DR. PISHARODI 10:30 AM **12**

WE SAW THE X RAYS & DR. PISHARODI SAID THAT EVERYTHING LOOKS OK. HE ASK ME IF I WAS READY TO GO BACK TO WORK AND I TOLD HIM THAT PROBABLY BY THE TIME I FINISH WITH THE HARD WORKENEN PROGRAM THAT I PROBABLY WILL. I ASK HIM ABOUT THE PAIN IN MY BUTT & HE SAID AND HE GAVE THAT IT WAS PROBABLY A MUSLE. TO TAKE IBOPROFIN ME ANOTHER PRESCRIPTION FOR FOSAMAX CALCIUM/VIT.D.

**Tuesday** **13**

THERAPY

### Notes

SONIA CONNINGHAM

NEW CASE MGR.

(956) 425-5124

(956) 279-2328

SHE CALL FROM

(212) 595-2721

AND THAT SHE WILL CALL BACK

**Wednesday** **14**

THERAPY

Flag Day

**Thursday** AFTER THERAPY I CAME HOME **15**
AND RECEIVE A CALL FROM SONIA CONNINGHAM FROM THE RENG Co SHE TOLD ME THAT SHE WAS REPLACING LORI LOVE THE CASE MGR. SHE ASK ME WHAT WAS MY STATUS CONCERNING MY BACK & I TOLNER ABOUT MY TAILBONE PAYNE. I TOLD HER ABOUT ME BEING TRAMINATED FROM EMPLOYMENT TO WHICH SE SAID SHE DIDN'T KNOW. SHE SAID SHE WAS GOING TO DO SOME RESEARCA

**Friday** **16**

**Saturday** **17**

**Sunday** **18**

Father's Day

### June

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |   |

**B**

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| NOEL ESPINOZA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **NO. B-00-142** |
| | ) | |
| THE LAREDO COCA-COLA BOTTLING | ) | |
| COMPANY, INC., CONTINENTAL | ) | |
| CASUALTY COMPANY and | ) | |
| CONSTITUTION STATE SERVICE | ) | |
| COMPANY, | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF PETE CARREON III

STATE OF TEXAS      )
COUNTY OF BEXAR    )

This day, personally appeared before me, the Affiant, Pete Carreon III, who, after first being duly sworn by me, deposes and says the following:

1.      My name is Pete Carreon III.  I am over twenty-one (21) years of age, and am otherwise fully competent to make this affidavit.

2.      In my capacity as Human Resources Manager for The Laredo Coca-Cola Bottling Company, Inc. ("Laredo Coke") at all times relevant hereto, I have personal knowledge of all matters stated herein.

3.      Noel Espinoza was employed by Laredo Coke through April 28, 2000 at its San Benito, Texas facility.

::ODMA\PCDOCS\DOCS\889930\2

4.      In April of 1999, Mr. Espinoza sustained an on-the-job injury.  In connection with this injury, he was absent from work for over one year.

5.      Since on or before the date of Mr. Espinoza's injury in April of 1999, Laredo Coke has had in place a medical leave policy which is uniformly applied to all employees, regardless of the reason for their medical leave.  Under the terms of this policy, an employee is provided up to twelve (12) months of medical leave.  If an employee is not able or otherwise does not return to work at the end of this one-year absence, he or she is terminated.

6.      Pursuant to this medical leave policy, Mr. Espinoza's employment with Laredo Coke was terminated on April 28, 2000, because he did not return to work after being absent for over one year.

7.      Since on or before the date of Mr. Espinoza's injury in April of 1999, Laredo Coke has had posted the U.S. Department of Labor's statement of employee rights pursuant to the Family and Medical Leave Act ("FMLA") on the bulletin board of the San Benito facility at which Mr. Espinoza was employed.  (A copy of that posting is attached hereto as **Exhibit 1**.)

8.      During the course of his employment with Laredo Coke, Mr. Espinoza also received a written copy of the company's leave of absence policies, including both Laredo Coke's twelve-month maximum leave policy and a summary of employee rights pursuant to the FMLA.  (Such policies are attached hereto as **Exhibits 2 and 3**, respectively.  Mr. Espinoza's acknowledgment of receipt of the twelve-month company leave of absence policy is also attached hereto as **Exhibit 4**.)

9.      A letter was also sent to Mr. Espinoza near the beginning of his absence from work in April of 1999, which explained that his twelve (12) weeks of FMLA medical leave would run

concurrently with his twelve (12) months of medical leave pursuant to company policy. (A draft of this letter is attached hereto as **Exhibit 5**.)

10.    I made the decision to terminate Mr. Espinoza's employment. The decision to terminate Mr. Espinoza's employment in April of 2000 had nothing to do with the fact that he had filed a workers' compensation claim or had suffered an on-the-job injury in April of 1999.  The decision to terminate Mr. Espinoza was based solely on the fact that he was not able or otherwise did not return to work at the end of a one-year absence, pursuant to Laredo Coke's medical leave policy.

11.    Laredo Coke's medical leave policy has been uniformly applied, both to those employees who miss work due to an on-the-job injury and to those who miss work for other non-work-related causes, i.e., pregnancy, personal illnesses, accidents and/or injuries.

12.    Aside from initially notifying Laredo Coke's workers' compensation carrier of on-the-job injuries reported to the company, Laredo Coke has no role in administering, overseeing or otherwise handling workers' compensation claims which arise out of such injuries.  All scheduling of doctor visits, obtaining approval for various treatment options and other decisions affecting the administration, timing and/or handling of such workers' compensation claims are not processed, approved or otherwise overseen by Laredo Coke, aside from the scheduling of the initial doctor evaluation and coordinating time off from work for doctor visits for injured employees as necessary.

13.    Mr. Espinoza's former position as a special events leadman was not filled until on or about September 20, 1999. His group health insurance coverage also continued during the period of his medical leave of absence and until the termination of his employment.

**FURTHER THIS AFFIANT SAITH NOT.**

_____
PETE CARREON III

STATE OF TEXAS          )
COUNTY OF BEXAR      )

Sworn to and subscribed before me this _2_ day of _July_____, 2001.

_Blanca E. Peña_____          My commission expires: 05|12|2003
Notary Public

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that an exact copy of this pleading has been served upon counsel for all parties in this action, or upon said parties themselves as required by law, by delivering a copy thereof, or by depositing a copy of the same in the United States Mail, with sufficient postage affixed thereto to ensure delivery to the following:

> Miguel A. Saldaña, Esq.
> Corporate Plaza, Suite 109
> 302 Kings Highway
> Brownsville, TX  78521
>
> David N. Kitner, Esq.
> Strasburger & Price, LLP
> 901 Main Street, Suite 4300
> Dallas, TX  75202

on the ____ day of _____, 2001.

**1**

CVISPDF – www.fenrio.com

Exhibit (5)                                    FORM 1

# YOUR RIGHTS
## under the
# FAMILY AND MEDICAL LEAVE ACT OF 1993

FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave to "eligible" employees for certain family and medical reasons. Employees are eligible if they have worked for a covered employer for at least one year, and for 1,250 hours over the previous 12 months, and if there are at least 50 employees within 75 miles.

REASONS FOR TAKING LEAVE: Unpaid leave must be granted for <u>any</u> of the following reasons:

✓  to care for the employee's child after birth, or placement for adoption or foster care;
✓  to care for the employee's spouse, son or daughter, or parent, who has a serious health condition; or
✓  for a serious health condition that makes the employee unable to perform the employee's job.

At the employee's or employer's option, certain kinds of <u>paid</u> leave may be substituted for unpaid leave.

ADVANCE NOTICE AND MEDICAL CERTIFICATION: The employee may be required to provide advance leave notice and medical certification. Taking of leave may be denied if requirements are not met.

✓  The employee ordinarily must provide 30 days advance notice when the leave is "foreseeable."
✓  An employer may require medical certification to support a request for leave because of a serious health condition, and may require second or third opinions (at the employer's expense) and a fitness for duty report to return to work.

JOB BENEFITS AND PROTECTION:

✓  For the duration of FMLA leave, the employer must maintain the employee's health coverage under any "group health plan."
✓  Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.
✓  The use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

UNLAWFUL ACTS BY EMPLOYERS: FMLA makes it unlawful for any employer to:

✓  interfere with, restrain, or deny the exercise of any right provided under FMLA;
✓  discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement any proceeding under or relating to FMLA.

ENFORCEMENT:

✓  The U.S. Department of Labor is authorized to investigate and resolve complaints of violations.
✓  An eligible employee may bring a civil action against an employer for violations.

FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State or local law or collective bargaining agreement which provides greater family or medical leave rights.

FOR ADDITIONAL INFORMATION: Contact the nearest office of the Wage and Hour Division, listed in most telephone directories under U.S. Government, Department of Labor.

U.S. Department of Labor, Employment Standards Administration          WH Publication
Wage and Hour Division, Washington, D.C. 20210                         June

# Family and Medical Leave Act of 1993

FMLA Summary

U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
February 1993

The Family and Medical Leave Act of 1993 (FMLA) becomes effective on August 5, 1993, though special rules apply where a collective bargaining agreement is in effect. The Secretary of Labor must prescribe regulations implementing the Act in early June.

The FMLA requires private sector employers of 50 or more employees, and public agencies to provide up to 12 weeks of unpaid, job-protected leave to "eligible" employees for certain family and medical reasons. Employees are "eligible" if they have worked for a covered employer for at least one year, and for 1,250 hours over the previous 12 months, and if there are at least 50 employees within 75 miles. Similar provisions also apply to federal and congressional employees.

## Reasons for Taking Leave...

An employer must grant unpaid leave to an eligible employee for one or more of the following reasons:

- for the care of the employee's child (birth, or placement for adoption or foster care);
- for the care of the employee's spouse, son or daughter, or parent, who has a serious health condition; or,
- for a serious health condition that makes the employee unable to perform their job.

At the employee's or employer's option, certain kinds of paid leave may be substituted for unpaid leave.

## Advance Notice and Medical Certification...

The employee may be required to provide advance leave notice and medical certification.

- The employee ordinarily must provide 30 days advance notice when the leave is "foreseeable."
- An employer may require medical certification to support a request for leave because of a serious health condition.
- An employer may also require medical certification if the employee is unable to return from leave because of a serious health condition.

## Intermittent or Reduced Leave...

- An employee may take intermittent leave or may work a reduced leave schedule to reduce the usual number of hours per day or work week.
- Intermittent or reduced leave schedules are subject to employer approval unless medically necessary.

## Job and Benefits Protection...

- Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms. Employers may deny restoration to certain highly compensated employees, but only if necessary to avoid substantial and grievous economic injury to the employer's operation.
- The use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave.
- The use of unpaid FMLA leave cannot affect the exempt status of bona fide executive, administrative and professional employees under the Fair Labor Standards Act.

more.

CHNPDF - www.fastio.com

## Medical Insurance Coverage...

- For the duration of FMLA leave, the employer must maintain the employee's medical insurance coverage under any "group health plan," under the conditions coverage would have been provided if the employee had continued working.

- In some cases, the employer may recover premiums paid for maintaining an employee's health coverage if the employee fails to return to work from FMLA leave.

## Unlawful Acts by Employers...

FMLA makes it unlawful for any employer to:

- interfere with, restrain, or deny the exercise of any right provided under FMLA;
- discharge or discriminate against any person for opposing any practice made unlawful by FMLA; and,
- discharge or discriminate against any person because of involvement in any proceeding under or related to FMLA.

## Miscellaneous Provisions...

- Special rules apply to employees of local education agencies.

- Employers must post a notice approved by the Secretary of Labor explaining rights and responsibilities under FMLA. Any employer who willfully violates this requirement may be subject to a fine of up to $100 for each separate offense.

- A "Commission on Leave" will conduct a comprehensive study of existing and proposed policies relating to leave, and submit a report to Congress within two years.

## FMLA Does Not...

- affect any federal or state law prohibiting discrimination;
- supersede any state or local law which provides greater family or medical leave rights;
- diminish an employer's obligation to provide greater leave rights under a collective bargaining agreement or employment benefit plan, nor may the rights provided under FMLA be diminished by such agreement or plan; nor,
- discourage employers from adopting policies more generous than required by FMLA.

## Enforcement...

- The Secretary of Labor is authorized to investigate and attempt to resolve complaints of violations, and may bring an action against an employer in any federal or state court of law.

- FMLA's enforcement procedures parallel those of the federal Fair Labor Standards Act. The FMLA will be enforced by the department's Wage and Hour Division.

- An eligible employee may bring a civil action against an employer for violations.

- Employers who act in good faith and have reasonable grounds to believe their actions did not violate FMLA may have any damages reduced to actual damages at the discretion of a judge.

For more information, please contact the nearest office of the Wage and Hour Division, listed in most telephone directories under U.S. Government, Department of Labor, Employment Standards Administration.

# # #

## Family and Medical Leave

The Family and Medical Leave Act (FMLA), which went into effect on August 5, 1993, allows eligible employees to take up to 12 weeks of unpaid, job-protected leave during a twelve-month period for specific medical and/or family reasons.

You are eligible for FMLA leave if you have been with the company for one year, and have completed 1,250 hours of service in the previous 12 months.

The following reasons qualify for leave

- ► birth of your child, or the placement of a child for adoption or foster care in your home
- ► care for an immediate family member—your spouse, child or parent—with a serious health condition, as defined in the FMLA rules
- ► your inability to work because of a serious health condition.

### Going on Leave

You must give 30 days advance notice to the company if your leave is foreseeable. The company may require a doctor's notice as proof of a serious health condition. You must provide a doctor's notice within 15 days of the company's request. The company may also require you to obtain a second or third medical opinion. Any expenses you have for obtaining the additional medical opinions will be paid by Coca-Cola Enterprises. Request forms are available from your Human Resources/Benefits Representative.

### While on Leave

If you are on leave because of a family member's or your own health condition, you may be asked to provide medical proof of that condition periodically, and that proof must be provided within 15 days of the company's request.

If you are covered by the Personal Choice Plan before going out on leave, your coverage will continue as long as you make any required contributions on a per pay period basis. In addition, any benefits that you earn before leaving will be unaffected by your leave.

TO-6

CSMPDF - www.twmx.com

## Coming Back to Work

You will be restored to your original or an equivalent position, with equivalent pay, benefits and other employment terms had you not taken the leave. Certain employees may not be restored, however, if their reinstatement would cause substantial economic problems for the company.

The company may require a medical release from your doctor before you can return to work.

### If You Don't Return To Work

If you don't come back to work when your leave ends, you will be eligible to continue medical and dental coverage through COBRA. The date you should have returned to work will be the date your coverage is considered to end for determining COBRA coverage. See page MVP-26 for details on COBRA coverage.

### More Information

For more information on the Family and Medical Leave Act, contact your Human Resources/Benefits Representative or the nearest office of the Wage and Hour Division of the U.S. Department of Labor.

. . . . . . . . . . . . . . . . . .

## Medical Leave

As a regular, full-time employee, you may be eligible for up to 12 months of medical leave if you are unable to work for medical reasons. You become eligible for medical leave after you complete 60 days of employment. While you are out on leave, your Personal Choice benefits continue as long as you make the required contributions. See the Sick Pay/Disability Benefits section of this handbook for more information on pay and benefits during a medical leave.

The company may require a medical release from your doctor before you can return to work.

TO-7

CVISPDF - www.fenito.com

**3**

CVdPDF – www.fastio.com

*Coca-Cola Enterprises*                                   Interoffice Memo

August 15, 1995

TO:        All Employees

FROM:      Diana D. Casas  *DDC*

RE:        Family Medical Leave Act Policy

Attached you will find a copy of the Coca-Cola Enterprises, Inc.
**Family and Medical Leave Act** policy.

Please keep this Policy as a part of your employee records or
incorporate the Policy into your Employee Benefits Handbook.

/ddc

# COCA-COLA ENTERPRISES INC.
# FAMILY AND MEDICAL LEAVE ACT POLICY

# FOR USE IN ALABAMA, ARIZONA, ARKANSAS, COLORADO, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, KANSAS, MARYLAND, MICHIGAN, MISSISSIPPI, MISSOURI, NEBRASKA, NEVADA, NORTH CAROLINA, OHIO, PENNSYLVANIA, TEXAS AND VIRGINIA

# COCA-COLA ENTERPRISES INC.
## FAMILY AND MEDICAL LEAVE ACT POLICY

## AMOUNT OF LEAVE

The Family and Medical Leave Act (FMLA) entitles certain employees to a 12-week leave of absence.

## QUALIFICATIONS FOR LEAVE

In order to be entitled to FMLA leave, an employee must have been employed by Coca-Cola Enterprises Inc. for 12 months. The 12 months need not be consecutive, making it possible for a person to be re-employed and be eligible for FMLA leave if the total period of employment is 12 months or more. However, in order to be entitled to FMLA leave, an employee must also have worked at least 1,250 hours during the 12-month period immediately preceding FMLA leave. It should be noted that the time an employee was employed by a temporary help agency at Coca-Cola Enterprises Inc. counts toward the employee's 12-month and 1,250 hour requirements for FMLA eligibility.

## PURPOSES OF LEAVE

FMLA leave can be taken (1) for the birth of a child; (2) for the placement of a child for adoption or foster care; (3) to care for a spouse, child, or parent with a serious health condition; and (4) because of a serious health condition that causes an employee to be unable to perform the essential functions of his or her job.

## MEANING OF TERMS

"Spouse" means a husband or wife as recognized under state law. Unmarried domestic partners are not counted as spouses. "Parent" means a biological parent, an adoptive parent, a stepparent, or one who has stood in the place of a parent, but does not include in-laws. "Child" means a biological or adopted child and also includes a foster child or stepchild. The child can be 18 years of age or older if he or she is physically or mentally disabled. An employee requesting FMLA leave may be required to provide documentation showing that the necessary family relationship exists in accordance with these definitions and that the FMLA request is otherwise legitimate.

## HUSBAND AND WIFE RULE

When a husband and wife work for Coca-Cola Enterprises Inc. and are eligible for FMLA leave, they are limited to a combined total of 12 weeks of leave if the leave is taken (1) for the birth of a child; (2) for the placement of a child for adoption or foster care; or (3) to care for a parent with a serious health condition.

## PERIOD FOR TAKING LEAVE

The 12-week FMLA leave may be taken during the twelve month period beginning on the date an employee first takes FMLA leave. FMLA leave may be taken intermittently or on a reduced leave (part-time) basis. However, if FMLA leave is taken on an intermittent or reduced leave basis, an employee may be transferred temporarily to an available alternative position which better accommodates recurring periods of leave. In addition, if FMLA leave is taken for the birth of a child or the placement of a child for adoption or foster care, it must be taken at one time— not intermittently or on a reduced leave basis—and it must be concluded within one year of the birth or placement.

## EMPLOYEE NOTICE

In order to take FMLA leave, an employee must give Human Resources at least 30 days advance notice if the need for the leave is foreseeable. If the 30 days notice cannot be given because of an unexpected change in circumstances, a medical emergency, or the like, notice must be given with as much lead time as possible, normally within one or two working days of when an employee becomes aware of the need for FMLA leave—except in extraordinary circumstances. When an employee is planning medical treatment for himself, herself, or a family member, the employee should work with Human Resources to schedule this leave in a way that does not disrupt business operations to the extent that it is medically possible to do so. If FMLA leave will cause disruption, Coca-Cola Enterprises Inc. may require an employee to reschedule the leave if it is medically possible to do so. If the required notice is not given, Coca-Cola Enterprises Inc. will delay FMLA leave until the notice has been given and the appropriate amount of time has passed.

## MEDICAL CERTIFICATION BEFORE LEAVE

If an employee desires to take FMLA leave to care for a seriously ill spouse, child, or parent or because of the employee's own serious health condition, the employee must provide to Human Resources a medical certification from the treating health care provider. This certification must be provided within

15 calendar days of Coca-Cola Enterprises Inc.'s request for the medical certification. A form for this medical certification can be obtained from Human Resources. If this medical certification is not provided, an employee's request for FMLA leave will be denied. Coca-Cola Enterprises Inc. also reserves the right to obtain a second or third medical certification at the expense of Coca-Cola Enterprises Inc. as allowed by the FMLA. Additional medical certifications may also be requested by Coca-Cola Enterprises Inc. in accordance with FMLA regulations.

## SUBSTITUTION OF PAID LEAVE

FMLA leave is unpaid. However, an employee must substitute any earned vacation time or sick days in place of the FMLA leave. Accordingly, the paid leave and FMLA leave will run concurrently until the paid leave (earned vacation time or sick days) has been fully used. Any remaining FMLA leave will be unpaid. If any portion of an employee's leave is unpaid, vacation time and sick days will not accrue during the period of unpaid leave. The only exception to this substitution rule is that earned sick days must be substituted only for the purpose of an employee caring for himself or herself as a result of a serious health condition. If short term disability leave also qualifies as FMLA leave, an employee will not be required to substitute any paid leave (vacation time or sick days) during the absence from work, except to the extent that any portion of the short term disability leave is unpaid. However, the short term disability leave and the FMLA leave will run concurrently. When a work-related injury qualifies for FMLA leave and an employee is receiving workers' compensation benefits, the employee will not be required to substitute any paid leave (vacation time or sick days) during the absence from work. However, the leave taken for the work-related injury and the FMLA leave will run concurrently.

## DESIGNATION OF LEAVE

Within two business days of having all the facts necessary to determine whether FMLA leave should be granted, Human Resources will notify the employee of its decision and will give the employee documentation of its decision by the next payday. If Human Resources has knowledge of facts sufficient to put it on notice that the leave being taken by an employee qualifies as FMLA leave but does not designate it as FMLA leave, Human Resources can subsequently designate the leave as FMLA leave, but the designation will apply prospectively only. On the other hand, if Human Resources does not learn that the leave is for an FMLA purpose until after the leave has begun, the entire leave period will be retroactively designated as FMLA leave, and the employee will be promptly notified of this designation. Similarly, if Human Resources does not learn that the leave was for an FMLA purpose until the employee returns to work, the entire

CVAPDF - www.festo.com

leave period will be retroactively designated as FMLA leave if the designation occurs within two business days of the employee's return to work and the employee is so notified. If an employee does not request FMLA leave even though he or she has an FMLA purpose, the employee cannot subsequently have the leave changed to FMLA leave unless he or she requests that this change be made within two business days of returning to work and then provides the necessary documentation.

## GROUP HEALTH PLAN

During the period of FMLA leave, group health plan coverage will remain in effect for an employee. If paid leave is substituted as discussed above, an employee's portion of the health plan cost will be paid by payroll deduction as it normally is. If all or part of the leave is unpaid, then an employee must pay his or her portion of the health plan cost by the first day of each month, if the employee is a non-union employee. If an employee is a union employee, special provisions may apply, and the employee should contact Human Resources about these special provisions. If an employee's portion of the health plan cost is not paid in a timely manner, the employee's group health plan coverage will lapse during FMLA leave. An employee has a 30 day grace period within which to pay his or her portion of the health plan cost. At least 15 days before the expiration of the 30 day grace period, Human Resources will send a notice to the employee, stating that his or her health plan coverage will terminate at the end of the 30 day period. If an employee does not return to work after his or her FMLA leave, Coca-Cola Enterprises Inc. reserves the right to recover all group health plan costs paid by Coca-Cola Enterprises Inc. for an employee's health plan coverage, depending upon the reason for the employee's failure to return to work.

## STATUS REPORT

While an employee is on FMLA leave, he or she must report to Human Resources every two weeks on his or her status, including whether the employee intends to return to work and the date on which the employee will return to work if known.

## MEDICAL CERTIFICATION BEFORE RETURN FROM LEAVE

If an employee has been on FMLA leave because of his or her own serious health condition, before the employee can return to work, he or she must provide to Human Resources a medical certification from his or her treating health care provider which states that the employee is able to resume work. If the employee does not provide this medical certification, he or she will not be permitted to return to work.

## RETURN FROM LEAVE

Upon returning from FMLA leave, an employee will be given the same job he
or she had before the leave or an equivalent job. However, if an employee
is a key employee as defined in the FMLA (among the highest paid 10
percent of all employees within 75 miles of your worksite), he or she may
be denied the right to return to Coca-Cola Enterprises Inc. under certain
circumstances. If an employee does not return during or at the end
of FMLA leave, the right to be returned to the former job or an
equivalent one will be lost.

0122478

**4**

CVisPDF – www.fastio.com

ESF   JZA,   NOEL
44y-11-5093 : SAN BENITA

## ACKNOWLEDGEMENT OF RECEIPT OF
## THE EMPLOYEE BENEFITS BINDER

I acknowledge receipt of the Coca-Cola Enterprises Inc. Flexible
Benefits Plan Summary Plan Description.   I understand it is
important for me to read this Summary Plan Description because it
contains essential information about the Company's medical/vision,
dental, disability income, life insurance and accidental death and
dismemberment insurance benefits.   I also understand that this
description only summarizes the main provisions of the plan and is
not the complete plan.  I understand that in case of any conflict
between the provisions of the complete plan and this description,
the provisions of the complete plan will control.   I further
understand that the Company reserves the right to amend, supplement
or terminate any benefit program or any portion of the plan in its
sole and absolute discretion and that the Company will notify
employees of any such changes as they occur.


_Noel Espinoza_                          _3/4/91_
EMPLOYEE'S SIGNATURE                     DATE


_Noel Espinoza_
EMPLOYEE'S NAME (PRINT)


thg/12391

**5**

CfckPDF – www.fastio.com

April 5, 1999

Dear

I understand you had an accident and will be requiring a leave of absence. Please find enclosed the information on FMLA and STD benefits. Although you expect to be out _____ week I need these forms completed and returned as soon as possible. FMLA leave provides up to 12 weeks of job-protected leave. The copy of the CCE Family and Medical leave Act Policy will answer most questions you may have about FMLA.

Because you have accumulated ▴ hours of sick pay, these will be paid first. Should you require additional time, STD benefits will begin after you have exhausted your sick leave days. The maximum length of time benefits will be paid under the short-term disability program is 26 weeks. STD benefits are paid at 75% of base pay.

While you are out on leave, your Personal Choice benefits continue as long as you make the required contributions. The first 26 weeks of STD you will be receiving a regular payroll check and contributions will be deducted

Please don't hesitate to call me with any questions you may have. You may reach me at 632-3714.

Sincerely,


Janie Olmos
Sr. H.R. Clk.

ENCL:  FMLA Policy
            STD forms

Certification of Health
Care Provider
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division

FORM 1

1. Employee's Name

2. Patient's Name (if different from employee)

3. The attached sheet describes what is meant by a "serious health condition" under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

(1) _____  (2) _____  (3) _____  (4) _____  (5) _____  (6) _____ , or   None of the above _____

4. Describe the medical facts which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

5.a. State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity[2] if different):

b. Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment described in item 6 below)? _____

If yes, give the probable duration:

c. If the condition is a chronic condition (condition #4) or pregnancy, state whether the patient is presently incapacitated[2] and the likely duration and frequency of episodes of incapacity[2]:

6.a. If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments:

If the patient will be absent from work or other daily activities because of treatment on an intermittent or part-time basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

b. If any of these treatments will be provided by another provider of health services (e.g., physical therapist), please state the nature of the treatments.

---

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380

c. **If a regimen of continuing treatment** by the patient is required under your supervision, provide a general FORM
description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment):                (con

7.a.   If medical leave is required for the employee's **absence from work** because of the **employee's own
condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform
work of any kind?**_____

b.   If able to perform some work, is the employee **unable to perform any one or more of the essential
functions of the employee's job** (the employee or the employer should supply you with information about the
essential job functions)?_____ If yes, please list the essential functions the employee is unable to perform:

c.   If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment?**
_____

8.a.   If leave is required to **care for a family member** of the employee with a serious health condition, does
the patient require **assistance** for basic medical or personal needs or safety, or for transportation?_____

b.   If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or
assist in the patient's recovery?_____

c.   If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable
duration of this need:

_____          _____
(Signature of Health Care Provider)                   (Type of Practice)

_____          _____
(Address)                                    (Telephone number)

To be completed by the employee needing family leave to care for a family member:

State the care you will provide and an estimate of the period during which care will be provided, including a
schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full
schedule.

_____          _____
(Employee Signature)                             (Date)

2

A "Serious Health Condition" means an illness, injury impairment, or physical or mental condition that involves one of the following:

## 1. Hospital Care

Inpatient care (*i.e.,* an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

## 2. Absence Plus Treatment

(a) A period of incapacity[2] of more than three consecutive calendar days (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

(1)  Treatment[3] two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.,* physical therapist) under orders of, or on referral by, a health care provider; or

(2)  Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment[4] under the supervision of the health care provider.

## 3. Pregnancy

Any period of incapacity due to pregnancy, or for prenatal care.

## 4. Chronic Conditions Requiring Treatments

A chronic condition which:

(1)  Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(2)  Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(3)  May cause episodic rather than a continuing period of incapacity[2] (*e.g.,* asthma, diabetes, epilepsy, etc.).

## 5. Permanent/Long-term Conditions Requiring Supervision

A period of incapacity[2] which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

---

[3]   Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations

[4]   A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.