27

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 0 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| NOEL ESPINOZA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-142 |
| | § | |
| THE LAREDO COCA COLA BOTTLING | § | |
| COMPANY, CONTINENTAL CASUALTY | § | |
| COMPANY AND CONSTITUTION | § | |
| STATE SERVICE COMPANY | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS CONTINENTAL CASUALTY COMPANY'S AND CONSTITUTION
STATE SERVICE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

**DAVID N. KITNER**
State Bar No. 11541500
Southern District I.D. No. 2669
**AMANDA STAMPS**
State Bar No. 24013553
Southern District I.D. No. 27023

STRASBURGER & PRICE. L.L.P.
901 Main Street, Suite 4300
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile:  (214) 651-4330

ATTORNEYS FOR DEFENDANTS
CONTINENTAL CASUALTY COMPANY
AND   CONSTITUTION   STATE   SERVICE
COMPANY

# TABLE OF CONTENTS

I.    STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY JUDGMENT GROUNDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  SUMMARY JUDGMENT EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| NOEL ESPINOZA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.  B-00-142 |
| | § | |
| THE LAREDO COCA COLA BOTTLING | § | |
| COMPANY, CONTINENTAL CASUALTY | § | |
| COMPANY AND CONSTITUTION | § | |
| STATE SERVICE COMPANY | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS CONTINENTAL CASUALTY COMPANY'S AND CONSTITUTION STATE SERVICE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendants Continental Casualty Company ("Continental") and Constitution State Service Company ("Constitution" collectively "Defendants") file their Motion for Summary Judgment, respectfully stating as follows:

I.

## STATEMENT OF MATERIAL FACTS

Laredo Coca-Cola Bottling Company, Inc. ("Coca Cola") employed Plaintiff Noel Espinoza ("Plaintiff" or "Espinoza") at its San Benito, Texas facility. (Pl.'s Sec. Am. Comp. p. 3.) In April of 1999, Espinoza injured his back while at work. (Pl.'s Dep. pp. 10-11.) Espinoza was on a medical leave of absence from Coca Cola for over one year during which time Espinoza continuously received workers' compensation benefits. (Pl.'s Dep. Ex.

1.) During this time, Coca Cola's workers' compensation carrier was Continental. (Pl.'s Dep. Exs. 8, 11.) Constitution administered workers' compensation claims for Continental. (Pl.'s Dep. Ex. 6.) Espinoza's medical leave of absence expired on April 15, 2000—twelve months after the commencement of his leave of absence. (Pl.'s Dep. Ex. 1.) Coca Cola terminated Espinoza on the expiration of his medical leave of absence. (Pl.'s Dep. Ex. 1.)

Espinoza's entire complaint against Continental and Constitution starts and ends with the fact that Coca Cola terminated him. (Pl.'s Dep. p. 252.) If Coca Cola had not terminated Espinoza for exhausting his medical leave of absence, Espinoza would have no complaints about the Defendants' handling of his workers' compensation claim. (Pl.'s Dep. p. 252.) For example, Espinoza admits that at all times he was eligible, Defendants paid Espinoza's workers' compensation.    (Pl.'s Dep. p. 173.)    Espinoza also acknowledges that Defendants paid all of his medical bills for the treatment of his injury. (Pl.'s Dep. pp. 177-78.)

Espinoza's Complaint alleges that Defendants required him to seek a second opinion regarding the necessity of back surgery. Espinoza has admitted, however, that he has no complaint against the Defendants if the law allows for second opinions and the TWCC makes the determination of whether surgery should occur (which it does). (Pl.'s Dep. pp. 257-60.) Espinoza also has admitted that the Defendants never made a false statement or material misrepresentation to him. (Pl.'s Dep. p. 260.)

## Factual Timeline

1. On April 10, 1999, Espinoza injured his back while at work. (Pl.'s Dep. pp. 10-11, Ex. 5.)

2. On April 12, 1999, Espinoza saw Dr. Atkinson about his back injury. (Pl.'s Dep. p. 40.) Dr. Atkinson allowed Espinoza to return to light-duty work, but he scheduled a follow-up visit with Espinoza on April 15, 1999. (Pl.'s Dep. p. 42.) Espinoza returned to work and filed a notice of his injury with Coca Cola. (Pl.'s Dep. p. 243.)

3. On April 14, 1999, two days after Espinoza's notice of injury was filed, Constitution, the servicing company for Coca Cola's workers' compensation carrier Continental, sent Espinoza a letter informing him that as a result of his on-the-job injury that Espinoza could be entitled to workers' compensation. (Pl.'s Dep. pp. 148, 166, Ex. 6.) April 14, 1999 was the last day Espinoza worked for Coca-Cola. (Pl.'s Dep. p. 51.)

4. On April 15, 1999, Espinoza visited Dr. Atkinson for his follow-up appointment. Dr. Atkinson concluded that Espinoza's injury was more serious than previously thought and decided that Espinoza would need to undergo further tests. Dr. Atkinson also provided Espinoza an excuse from further work, and Coca-Cola placed Espinoza on a medical leave of absence. (Pl.'s Dep. p. 49-51.)

5. On May 7, 1999, Espinoza visited Dr. Pisharodi upon Dr. Atkinson's referral. (Pl.'s Dep. pp. 161, 179.) Dr. Pisharodi thereafter became Espinoza's treating physician

CMxPDF - www.texisi.com

for his back injury.  Dr. Pisharodi's protocol was, at first, conservative, treating Espinoza's back injury with physical therapy.   (Pl.'s Dep. pp. 179, 187-88.)

6.      On September 7, 1999, after seeing little improvement in Espinoza, Dr. Pisharodi recommended to Espinoza that he have back surgery.  (Pl.'s Dep. pp. 189-90.)

7.      On September 27, 1999, Espinoza, wanting his own second opinion regarding the necessity for having back surgery, visited Dr. Tijerina.   (Pl.'s Dep. p. 192.) Espinoza's visit to Dr. Tijerina was done on his own accord.  (Pl.'s Dep. p. 192.) Neither Coca Cola, Continental, nor Constitution required this visit.  (Pl.'s Dep. p. 253.) Dr. Tijerina concurred with Dr. Pisharodi's assessment that Espinoza needed surgery.  (Pl.'s Dep. p. 194.)

8.      On October 11, 1999, Espinoza returned to Dr. Pisharodi's office and advised him of Dr. Tijerina's assessment.  Dr. Pisharodi informed Espinoza that in order for the TWCC to approve his spinal surgery that second opinions would be needed–one from a doctor of Espinoza's choosing and another from a doctor of the insurance company's choosing.  (Pl.'s Dep. pp. 201-02.)   Because Dr. Tijerina was not on the list of approved doctors provided for by the TWCC, Dr. Pisharodi informed Espinoza that he would have to solicit another doctor's opinion from a list of five doctors provided for by the TWCC.    (Pl.'s Dep. pp. 196, 205-06, 254, Ex. 8.) Espinoza selected Dr. Pacheco. (Pl.'s Dep. p. 200.) Espinoza chose Dr. Pacheco of his own volition and was not sent to visit Dr. Pacheco by Coca Cola, Continental, or Constitution. (Pl.'s Dep. p. 253.)

9.   On October 22, 1999, Espinoza saw Dr. Pacheco.   (Pl.'s Dep. p. 198.)   Dr.
     Pacheco concurred that surgery was needed.  (Pl.'s Dep. p. 206.)

10.  On October 28, 1999, Constitution sent Espinoza a letter stating that an
     appointment had been made for Espinoza with Dr. Pechero on November 11, 1999.
     (Pl.'s Dep. pp. 206-11,  Ex. 9.)  Dr. Pechero was the doctor that Constitution
     selected from the TWCC's list of approved doctors for its second opinion.  (Pl.'s
     Dep. pp. 201-04, Ex. 9.)  Dr. Pechero was the only doctor that Constitution ever
     requested that Espinoza visit. (Pl.'s Dep. pp. 253-54.)  Dr. Pechero's office later
     changed the appointment to November 30, 1999.  (Pl.'s Dep. pp. 209-10.)

11.  On November 30, 1999, Espinoza saw Dr. Pechero.  (Pl.'s Dep. p. 210.)  Dr.
     Pechero's opinion was that Espinoza should try injections rather than having
     surgery .  (Pl.'s Dep. p. 210.)

12.  As of November 30, 1999, Espinoza had completed the process of getting a second
     opinion from a doctor of his choosing, Dr. Pacheco, and a doctor of Constitution's
     choosing, Dr. Pechero.  (Pl.'s Dep. p. 211.)  Espinoza admits that the insurance
     company did not require him to get four second opinions as he alleged in his
     Complaint.  (Pl.'s Dep. p. 211.)

13.  On February 9, 2000, the TWCC issued its findings regarding the results of the
     spinal surgery second opinion process.  The TWCC notified Espinoza that of the
     three doctors' opinions: two were in favor of spinal surgery and one was opposed.
     The TWCC, thus, authorized Espinoza's back surgery with the caveat that
     Espinoza's workers' compensation carrier could appeal its decision by requesting

**DEFENDANTS CONTINENTAL CASUALTY COMPANY'S AND
CONSTITUTION STATE SERVICE COMPANY'S FOR SUMMARY JUDGMENT** - Page 5

a Spinal Surgery Contested Case Hearing (SSCCH) within 10 days of receipt of the
letter. (Pl.'s Dep. Ex. 12.)

14.  On February 14, 2000, five days after the TWCC's decision, Espinoza learned that
Continental would not appeal the TWCC's authorization of back surgery. (Pl.'s
Dep. p. 242.)  Continental informed Dr. Pisharodi's assistant that she could
schedule Espinoza's surgery at the parties' convenience. (Pl.'s Dep. p. 242.)

15.  On March 2, 2000, Espinoza underwent back surgery. (Pl.'s Dep. pp. 69-70.)

16.  On April 28, 2000, Coca Cola terminated Espinoza's employment because
Espinoza's twelve month medical leave of absence had expired on April 15, 2000
and he had not returned to work. (Pl.'s Dep. Ex. 1.)

17.  On August 31, 2000, the TWCC found that Espinoza had reached maximum
medical improvement. (Pl.'s Dep. Ex. 15.)

18.  On September 11, 2000, Espinoza's treating physician authorized Espinoza to
return to work. (Pl.'s Dep. Ex. 2.)

II.

## SUMMARY JUDGMENT GROUNDS

This Court must grant summary judgment in favor of Defendants on all of Espinoza's
claims against Defendants:  (1) breach of duty of good faith and fair dealing;  (2)
negligence; and (3) fraud. (Pl.'s Sec. Am. Pet. pp. 6-7.) No genuine issue of material facts
exists in the instant case with regard to the facts underlying any of these claims.

1.   Breach of duty of good faith and fair dealing.   This Court must grant summary
judgment because Espinoza admits Defendants never denied or delayed payment

of workers' compensation benefits. Moreover, Espinoza's claim against Constitution, the adjuster for Continental, fails to state a claim upon which relief can be granted. Texas law does not recognize a cause of action for breach of duty of good faith and fair dealing against an independent adjuster for a workers' compensation carrier.

2.   Negligence. This Court must grant summary judgment on Espinoza's negligence claim because Texas law does not recognize a cause of action for negligence regarding the handling of workers' compensation claims. Because the only common law duty recognized is the duty of good faith and fair dealing, Espinoza's negligence cause of action fails to state a claim upon which relief can be granted. Moreover, even if this Court were to allow Espinoza's negligence claim, Espinoza cannot show any delay or denial of benefits that could constitute a breach of duty.

3.   Fraud. This Court must grant summary judgment because Espinoza admits, contrary to the allegations in the Complaint, Defendants never falsely misrepresented to him that four doctor's opinions were necessary before spinal surgery could be approved.

### III.

### SUMMARY JUDGMENT EVIDENCE

1.   Exhibit A - Deposition of Espinoza (selected pages) and selected exhibits.

2.   Exhibit B - Plaintiff's Second Amended Complaint.

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully pray that judgment be rendered and that Plaintiff take nothing by his suit and that Defendant be granted such other relief as may be appropriate.

Respectfully submitted,

**DAVID N. KITNER**
State Bar No. 11541500
Southern District I.D. No. 2669
**AMANDA STAMPS**
State Bar No. 24013553
Southern District I.D. No. 27023

STRASBURGER & PRICE. L.L.P.
901 Main Street, Suite 4300
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile: (214) 651-4330

ATTORNEYS FOR DEFENDANTS
CONTINENTAL CASUALTY COMPANY
AND CONSTITUTION STATE SERVICE
COMPANY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been forwarded to the following counsel of record, on this the ___7___ day of September, 2001, as indicated below:

Miguel A. Saldana                                              VIA CMRRR
302 Kings Highway, Suite 109
Brownsville, Texas 78521

Raymond A. Cowley                                        VIA REGULAR MAIL
Rodriguez Colvin & Chaney, L.L.P.
4900 A-2N Tenth Street
McAllen, Texas 78504

John Bode                                                        VIA REGULAR MAIL
Miller & Martin
1000 Volunteer Building
832 Georgia Avenue
Chattanooga, TN 37402

DAVID N. KITNER

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 0 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| NOEL ESPINOZA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-142 |
| | § | |
| THE LAREDO COCA COLA BOTTLING | § | |
| COMPANY, CONTINENTAL CASUALTY | § | |
| COMPANY AND CONSTITUTION | § | |
| STATE SERVICE COMPANY | § | |
| | § | |
| Defendants. | § | |

## APPENDIX TO DEFENDANT CONTINENTAL CASUALTY COMPANY AND CONSTITUTION STATE SERVICE COMPANY'S MOTION FOR SUMMARY JUDGMENT

A.    Deposition of Espinoza (selected pages) and selected exhibits.

B.    Plaintiff's Second Amended Complaint.

APPENDIX TO DEFENDANT CONTINENTAL CASUALTY COMPANY AND CONSTITUTION
STATE SERVICE COMPANY'S MOTION FOR SUMMARY JUDGMENT- Page 1
665168.1/SP0/83395/1884/09072001

Respectfully submitted,

_____

**DAVID N. KITNER**
State Bar No. 11541500
Southern District I.D. No. 2669
**AMANDA STAMPS**
State Bar No. 24013553
Southern District I.D. No. 27023

STRASBURGER & PRICE. L.L.P.
901 Main Street, Suite 4300
Dallas, Texas 75202
Telephone: (214) 651-4300
Facsimile:  (214) 651-4330
ATTORNEYS FOR DEFENDANTS
CONTINENTAL CASUALTY COMPANY
AND CONSTITUTION STATE SERVICE
COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been forwarded to the following counsel of record, on this the _____ day of September, 2001, as indicated below:

| | |
|---|---|
| Miguel A. Saldana<br>302 Kings Highway, Suite 109<br>Brownsville, Texas 78521 | VIA CMRRR |
| Raymond A. Cowley<br>Rodriguez Colvin & Chaney, L.L.P.<br>4900 A-2N Tenth Street<br>McAllen, Texas 78504 | VIA REGULAR MAIL |
| John Bode<br>Miller & Martin<br>1000 Volunteer Building<br>832 Georgia Avenue<br>Chattanooga, TN 37402 | VIA REGULAR MAIL |

_____
DAVID N. KITNER

# EXHIBIT A

CUtePDF - www.fastio.com



IN  H  DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| NOEL ESPINOZA | § § | |
| VS. | § § | CIVIL ACTION NO. B-00-142 |
| THE LAREDO COCA COLA BOTTLING COMPANY, INC., ET AL | § § § | |

CONDENSED TRANSCRIPT & WORD INDEX

# DEPOSITION OF NOEL ESPINOZA

## MARCH 14, 2001

*PREPARED FOR MR. KITNER BY:*



## SCHWAB COURT REPORTING SERVICE

2900 CENTRAL BOULEVARD, SUITE C
P. O. BOX 3665
BROWNSVILLE, TEXAS 78520

**(956) 544-5126 • FAX (956) 542-8842**

Page 9

1  that it was those same notes that were produced to
2  the defendants as part of the discovery process in
3  this lawsuit?
4      A  Yes, sir.
5      Q  Other than the notes to which you've made
6  reference to today, do you possess or are you aware
7  of any document which you believe supports your
8  claims against my client, the Laredo Coca-Cola
9  Bottling Company?
10     A  Just what I have here and which are the
11 same notes I have given my attorney.
12     Q  So, other than those notes which have been
13 produced prior to today's deposition, would it be
14 fair to say that you're not aware of any other
15 document that you believe would support the claims
16 in this lawsuit against the Laredo Coca-Cola
17 Bottling Company?
18     A  You're right.
19     Q  And, specifically, for your reference,
20 just to make sure that this part of the record is
21 clear, the claims I understand you are making
22 against my client, the Laredo Coca-Cola Bottling
23 Company, are that you were fired because you filed a
24 claim for worker's compensation benefits and also
25 you believe that the company violated your rights

Page 10

1  under the Family and Medical Leave Act.  Is that
2  your understanding of the claims?
3      A  That's my understanding, you're right.
4      Q  Would your answer to my prior question
5  change with the knowledge of the specific claims to
6  which I'm referring?
7      A  No, sir, not at all.
8      Q  Have you ever recorded or attempted to
9  record any conversation with any current or former
10 employee of any of the defendants?
11     A  No, sir.
12     Q  Taking you back to the personal notes to
13 which you made reference to earlier in your
14 deposition, why did you begin preparing those notes?
15     A  I repeat it, there was no intention
16 whatsoever.  I wrote them down because I didn't know
17 what was going to happen with me and because I just
18 wanted to document the things that were happening to
19 me.
20     Q  And when did you first begin preparing the
21 notes?
22     A  Since the very first day I had the injury
23 that I couldn't, you know, really go back to work.
24     Q  And what injury or what date of injury are
25 you now referring to?

Page 11

1      A  I'm referring to the date of April 10,
2  1999.
3      Q  For purposes of clarification, the notes
4  that were produced to me in advance of this
5  deposition also make reference to an earlier injury
6  that you experienced in 1998, I think relating to a
7  sprained ankle.
8      A  You're right, you're correct on that.
9      Q  Having given you that clarification, let
10 me ask the question again.  When did you first begin
11 preparing notes as it relates to anything that
12 occurred in your employment with Laredo Coca-Cola
13 Bottling Company?
14     A  That year, 1998, when I had my sprained
15 ankle, I documented it.
16     Q  And my question, I guess, is based upon
17 the fact -- so you've clarified that you actually
18 think you began preparing notes sometime in the fall
19 of 1998 when you first suffered a sprained ankle, is
20 that correct?
21     A  You're right.
22     Q  I want to make sure I understand, Mr.
23 Espinoza, your note-taking procedures.
24     A  Mm hm.
25     Q  Are you one that just generally likes to

Page 12

1  record what's going on in your life by making
2  notations to your personal calendars or making other
3  notes to your personal records?
4      A  I'm that kind, especially when it refers
5  that I'm losing work because of an injury or because
6  of a sprained ankle or anything like that.  I'm the
7  type that I like to write down, you know, whatever
8  happens and what's the reason why I've been out and
9  stuff like that.
10     Q  Do you also record other events?  I'm
11 taking you away from the -- your employment at
12 Laredo Coca-Cola for a moment, but is it your
13 tendency to also jot down other events that either
14 occur or that are going to occur in the future as
15 part of your note-taking procedure?
16     A  Sir, no, because the reason being that I
17 was not -- I didn't have any accidents or incidents
18 at any other jobs prior to this one right here that
19 I had to miss work.
20     Q  Those notes, then, that were produced for
21 the defendants prior to today's deposition, do those
22 encompass all of your personal notes that you took
23 regardless of what was memorialized in those notes
24 during the time you were employed by Laredo
25 Coca-Cola?

Page 9 - Page 12

Page 37

1 which would have been Monday, April 12th. Did you,
2 in fact, report to work on that day?
3 A I sure did, sir.
4 Q What time did you report to work?
5 A 8:00 o'clock.
6 Q Was that your regular start time?
7 A Yes, sir.
8 Q And what happened then?
9 A I just went to the front desk, reported to
10 work, and went to the front desk to Yolanda Soto,
11 our receptionist, and she gave me the form to go see
12 the doctor.
13 Q So, based upon your discussion with Mr.
14 Perez, as of that Monday morning it was your
15 intention to go see a doctor first thing?
16 A Yes.
17 Q And you indicated that you went to who to
18 get the form?
19 A To Yolanda Soto, our receptionist.
20 Q Did you know from prior dealings that it
21 was Ms. Soto who would have the forms?
22 A You're correct.
23 Q And did she cooperate, was she helpful in
24 assisting you?
25 A Definitely, yes.

Page 38

1 Q And, specifically, what did she give you?
2 A The regular form which is -- it's a form
3 that we take when somebody is injured or whatever.
4 It's just a form so they can receive us at the San
5 Benito Medical Association.
6 Q So you understood from perhaps prior
7 injuries that you would need this particular form to
8 be received by the San Benito Medical Association?
9 A You're correct, sir.
10 Q And it was Ms. Soto who gave you that
11 form?
12 A You're right.
13 Q Did you then proceed to the San Benito
14 Medical Association?
15 A On the spot.
16 Q Did you have any discussions with anybody
17 other than Ms. Soto that Monday morning regarding
18 your back pain or your need to see a doctor?
19 A Just notifying my supervisor that I was on
20 my way to see the doctor.
21 Q That is, notify Mr. Perez?
22 A Yes, sir.
23 Q How did you notify him of that fact, did
24 you see him personally?
25 A Yes, sir.

Page 39

1 Q When did you see him? Was it before you
2 visited with Ms. Soto or after that?
3 A Before.
4 Q So as you arrived that day, your first
5 conversation with anybody was Mr. Perez?
6 A Yes, sir.
7 Q And you indicated to him what in that
8 conversation?
9 A That I was going to see the doctor.
10 Q And what, if anything, did Mr. Perez say
11 in response?
12 A He just said, "Go ahead."
13 Q And that was really a follow-up to the
14 discussion you had last had with Mr. Perez, is that
15 correct?
16 A That's correct, sir.
17 Q Did you have any further discussions with
18 Mr. Perez prior to visiting with San Benito Medical
19 Association, actually prior to going to the doctor?
20 A Yes, to which I gave him the prescription
21 that the doctor had given me.
22 Q I'm saying before you had gone to the
23 doctor.
24 A I'm sorry, I didn't understand what you
25 were saying. Prior to that.

Page 40

1 Q Let me start the question again.
2 A Okay.
3 Q You indicated that you had the initial
4 discussion with Mr. Perez that morning, April 12th,
5 at which point in time you told him that you felt
6 like you still needed to see a doctor?
7 A Exactly, you're right.
8 Q He indicated that was fine and to go ahead
9 and see the doctor?
10 A You're right.
11 Q Then you went to Ms. Soto and got the
12 form?
13 A The form.
14 Q Did you speak with any other employee at
15 Laredo Coca-Cola prior to visiting the doctor that
16 morning, April 12th?
17 A No, sir.
18 Q And with whom did you visit that morning
19 at the --
20 A With Dr. Eduardo Atkinson.
21 Q Had you ever been treated by Dr. Atkinson
22 at any point in time prior to April 12th for any
23 ailment?
24 A Yes, sir, on my sprained ankle in 1998.
25 Q So did you know it would be Dr. Atkinson

Case 1:00-cv-00142   Document 27   Filed in TXSD on 09/10/2001   Page 18 of 57

**Page 41**

1  who you would see when you arrived?
2  A  No, sir, I didn't know.
3  Q  Is there a group of doctors at the San
4  Benito Medical Association?
5  A  Yes, sir, there are a group of doctors,
6  yes.  You just register and they'll choose whoever.
7  Q  But upon your arrival that morning, they,
8  as you understood, selected Dr. Atkinson to see you,
9  is that correct?
10  A  I did not select him.  They chose him for
11  me.
12  Q  But you knew who Dr. Atkinson was because
13  you had worked with him in the fall with respect to
14  your ankle?
15  A  Yes, sir.
16  Q  Do you know whether anybody at Laredo
17  Coca-Cola, either be it Ms. Soto or anybody else,
18  had called the San Benito Medical Association before
19  your arrival to let them know that you were coming?
20  A  I'm not aware of that, sir.
21  Q  You met with Dr. Atkinson, and did you
22  describe for him as you have described for us today
23  how your injury --
24  A  Exactly the same thing, yes, sir.
25  Q  With respect to your workings, your

**Page 42**

1  dealings with Dr. Atkinson, had you been satisfied
2  with his treatment prior to that day?
3  A  Yes, sir.
4  Q  So you didn't have any complaints or
5  problems with Dr. Atkinson as it relates to any
6  prior treatments that you had received from him, is
7  that correct?
8  A  That's correct.
9  Q  That day how did Dr. Atkinson -- what did
10  he do for you?
11  A  He went ahead and checked me physically,
12  and at the beginning -- at that point he thought it
13  was just a muscle spasm.
14  Q  And did he prescribe any medication for
15  you?
16  A  Yes, sir, Tylenol.
17  Q  After that examination and the diagnosis
18  and the treatment that he provided to you, what did
19  you do next?
20  A  He sent me back to work.  He said that --
21  we had light duty.  He sent me to light duty and to
22  see him on Thursday.
23  Q  Did you, in fact, return to the San Benito
24  facility after your visit with Dr. Atkinson that
25  morning, April 12th?

**Page 43**

1  A  I sure did.
2  Q  I see you're opening your calendar and the
3  like.  Let me just deal with your memory for the
4  time being.
5  A  That's fine.
6  Q  What time do you believe you actually
7  returned to the San Benito facility that Monday,
8  April 12th?
9  A  I'm not quite sure, but it could have been
10  around 10:30 or 11:00.
11  Q  And with whom did you speak upon your
12  return?
13  A  First with Ms. Soto.
14  Q  And Ms. Soto -- did you seek her out, was
15  that somebody you felt you needed to speak with?
16  A  No, I needed to give her the paperwork
17  that the doctor gave me.
18  Q  You understood that you needed to return
19  some paperwork to Ms. Soto upon your return to the
20  San Benito facility?
21  A  Exactly, because she needed to fax them to
22  human resources, Janie Olmos.
23  Q  Did you understand that that was what Ms.
24  Soto needed to do with the paperwork at the time you
25  gave it to her?

**Page 44**

1  A  I understood that was the procedure.
2  Q  And did you have any conversation with Ms.
3  Soto regarding anything or did you just simply hand
4  her the paperwork?
5  A  I handed her the paperwork and told her I
6  was returning to work light duty and I told her that
7  I had to go back to the doctor on Thursday.
8  Q  What, if anything, did Ms. Soto say to you
9  in response?
10  A  Nothing at all.
11  Q  Did she continue to be cooperative and
12  courteous?
13  A  Yes, sir.
14  Q  After finishing that discussion or
15  transaction with Ms. Soto, with whom did you next
16  speak?
17  A  Mr. Perez.
18  Q  And take me to that point.  What did you
19  tell Mr. Perez?
20  A  I told him what the doctor had said and to
21  which he said, "Fine, just sit down on your desk and
22  do whatever you can on paperwork, whatever you
23  have," because I was behind on it.
24  Q  Did you continue to work that full day?
25  A  Yes, sir.

Page 49

1  Q  And did you have any discussions with Mr.
2  Perez prior to leaving for Dr. Atkinson's office on
3  Thursday, April 15th?
4  A  No, sir.
5  Q  Did you have any discussions with any
6  member of the company's management or human
7  resources prior to leaving for that doctor's
8  appointment?
9  A  No, sir.
10  Q  Upon arriving at Dr. Atkinson's office,
11  did he examine you again?
12  A  Yes, sir.
13  Q  Tell me what transpired at that
14  examination.
15  A  I told him that the thing that he sent me
16  back to work, that it was probably a mistake because
17  I was so much in pain. I couldn't be standing still
18  for about 15 minutes to which I had to get up due to
19  my pain, I couldn't be standing more than 15 minutes
20  at the most and I had to sit down and he said, "What
21  happened?" So I told him that I was in pain, so
22  that's when he sent me for some X-rays and he said
23  "Well, then there's something else wrong with you."
24  Q  In that discussion would it be fair to say
25  that you had communicated to Dr. Atkinson that his

Page 50

1  Tylenol treatment didn't seem to be helping very
2  much?
3  A  You're right.
4  Q  And that you continued to be in pain even
5  doing the light duty tasks that he had restricted
6  you to?
7  A  You're correct.
8  Q  And it was at that point in time he
9  decided he needed to perform more tests?
10  A  You're correct.
11  Q  Did he then excuse you from any further
12  work as a result of that appointment?
13  A  Yes, sir. There's something that I need
14  to go back to your prior question. Can I do that?
15  Q  Yes, that's fine.
16  A  That Thursday --
17  Q  The date that you went to see Dr.
18  Atkinson?
19  A  The date that I went to see Dr. Atkinson.
20  Q  Okay.
21  A  I'm sorry. That day they gave me off.
22  Due to the fact that I worked the weekend, they gave
23  me off. Sorry.
24  Q  So you're correcting your memory. On that
25  Thursday, April 15th, you didn't actually go into

Page 51

1  work at all that day?
2  A  No.
3  Q  You weren't even scheduled to work that
4  day?
5  A  You're right.
6  Q  You just went directly to the doctor's
7  appointment?
8  A  Exactly. Sorry about that.
9  Q  That's fine. And then, from the
10  appointment you had with Dr. Atkinson, did you
11  realize that you were going to be excused from work
12  for a period of time thereafter? Did he tell you to
13  go back to work or did he tell you you needed to
14  stay away from work until we can find out --
15  A  That was the time that he took me away
16  from work.
17  Q  Was then Wednesday, April 14th, your
18  actually last day of active work for Laredo Coca-
19  Cola?
20  A  Yes, sir.
21  Q  Did Dr. Atkinson provide you with a
22  doctor's note excusing you from work as a result of
23  the appointment you had with him on Thursday, April
24  15th?
25  A  He sure did.

Page 52

1  Q  What, if anything, did you do with that
2  note?
3  A  I went straight to work.
4  Q  Even though you weren't scheduled for
5  work, you decided to stop by work on your way back
6  home?
7  A  Exactly, to let them know about the
8  situation.
9  Q  And with whom did you speak at work on
10  Thursday, April 15th?
11  A  First with Ms. Soto.
12  Q  And did you provide her with the paperwork
13  or a copy of the paperwork that the doctor had
14  provided you?
15  A  I made the copies myself and I faxed them
16  myself to Janie Olmos.
17  Q  But you were doing that at the plant?
18  A  Yes, sir.
19  Q  Did you have a discussion with Ms. Soto as
20  to --
21  A  No, sir, not at all. I just told them
22  that I was back from the doctor's office and what he
23  had given me, so at the same time I was making a
24  copy at the copy machine and faxed it over to Ms.
25  Olmos.

Page 69

1   A Sharp.

2   Q -- that you were experiencing during that

3 period of time?

4   A Sharp pain, numbness of my legs, a sharp

5 pain between my hip and my legs down.

6   Q This, from your prior testimony, was a

7 constant pain you were experiencing every day?

8   A Constant pain day and night.

9   Q On a scale from one to 10, one being

10 manageable or no pain, 10 being just excruciating,

11 pain with which you couldn't function at all, how

12 would you rate the pain that you were experiencing

13 on an everyday basis between April 15 and March 2,

14 the date of your surgery?

15   A I will say like nine.

16   Q Now, following your surgery on March 2,

17 did you have to participate in rehabilitation

18 programs and the like?

19   A Therapy.

20   Q Did there come a time at some point in

21 time after March 2nd when you, in fact, were

22 released to return to work by your physician?

23   A Yes, lately.

24   Q Let me hand you a doctor's note identified

25 as Deposition Exhibit 2, also Bates stamped document

Page 70

1 13, which, as I recall, was among the documents you

2 furnished to us in the production in this case. Is

3 that the doctor's note that released you to return

4 to work dated September 11, 2000?

5   A You're correct.

6   Q Now, between March 2nd, the date of your

7 surgery, and September 11, 2000, would it be fair to

8 assume that you were unable to return to work during

9 that period?

10   A You can say that.

11   Q That is, from your perspective, you were

12 not to work during the period of time between March

13 2 and September 11, 2000?

14   A You're right.

15   Q Prior to this doctor's note, Deposition

16 Exhibit 2 -- and it's dated September 11, 2000 --

17 have you continued to experience physical pain as a

18 result of your injury?

19   A Yes.

20   Q And what frequency did you experience --

21 in what frequency did you experience that pain? Was

22 it a daily pain, a constant pain as you had

23 described earlier for us?

24   A At the beginning it was daily and it

25 started to diminish.

Page 71

1   Q As of September 11, 2000, the date of your

2 doctor's release to return to work, what's --

3 describe the frequency of the pain that you were

4 experiencing at or about that time.

5   A At the beginning, it was every day.

6   Q I'm talking as of September 11, 2000.

7   A Oh, okay, I'm sorry.

8   Q Had the pain diminished in frequency?

9   A Oh, yes.

10   Q Were you still experiencing it from time

11 to time?

12   A Yes, sir.

13   Q But was it a constant daily pain at that

14 point in time?

15   A No, sir.

16   Q So from the period of March 2, the date of

17 your surgery, until the date of your release to

18 return to work, did your pain gradually decrease

19 both in frequency and in intensity?

20   A Exactly.

21   Q And did you believe, as your doctor

22 believed, that as of September 11, 2000, you were

23 able to return to work?

24   A You're right.

25   Q During the period of time between March

Page 72

1 2nd and the date of your release to return to work,

2 did you continue to receive worker's compensation

3 payments?

4   A Yes, sir.

5   Q And did you continue to receive them at

6 the $366 per week rate?

7   A Yes, sir.

8   Q From your perspective -- and I know you're

9 not a doctor nor am I, but, from your perspective,

10 did you believe that it took you from March 2 to

11 September 11, 2000, to recover from the surgery that

12 you experienced at least in a manner that would

13 allow you to return to work?

14   A Yes, sir.

15   Q Now, how long after September 11, 2000 --

16 again referring to Deposition Exhibit 2 -- was it

17 before you actually began looking for other work?

18   A I would say like about a week after.

19   Q So your first efforts to begin to find

20 other work occurred approximately a week after

21 September 11, 2000?

22   A More or less, yes, sir.

23   Q And by whom were you next employed?

24   A Can you repeat that? Can you rephrase me

25 that question? Can you break it down?

Page 145

1   A   No, sir, I was not getting a paycheck from
2   them, I was not getting anything taken away either.
3   Q   Normally, the way you would pay for the
4   insurance provided by the Coca-Cola Company would be
5   to have a deduction from your paycheck?
6   A   Yes, sir.
7   Q   Am I correct in that -- in the year 2000
8   you're not aware of any compensation, any money that
9   you received from Coca-Cola, is that correct?
10   A   That's correct, sir.
11   Q   When you had been injured before with your
12   sprained ankle, did I hear correctly that you missed
13   approximately eight weeks of work?
14   A   More or less, yes.
15   Q   Prior to that ankle injury which occurred
16   in 1998, you indicated that you had been injured on
17   the job but had never had to miss any time from
18   work?
19   A   That's right.
20   Q   So the first time you received an
21   on-the-job injury that required you to miss any time
22   from work was the ankle sprain in 1998?
23   A   That's right.
24   Q   At that point, you were off work eight
25   weeks approximately?

Page 146

1   A   Approximately.
2   Q   Did you receive any compensation payments
3   from the worker's compensation carrier for those
4   eight weeks?
5   A   Yes, I did.
6   Q   Did you receive approximately the same
7   amount that you received on a weekly basis for your
8   back injury?
9   A   No, sir.
10   Q   How much did you receive?
11   A   $394.
12   Q   Did you receive more money?
13   A   Yes, sir.
14   Q   Do you know why you received more money
15   for the ankle injury than the back injury?
16   A   If I understand, they base on the amount
17   of money that I was making when I had my sprained
18   ankle. I was putting more time, more overtime.
19   Q   So you believe that you received more
20   money on a weekly compensation basis because of your
21   ankle injury simply because you were making more
22   money?
23   A   Yes, sir.
24   Q   That was primarily because you were
25   working more overtime?

Page 147

1   A   Yes, sir.
2   Q   What was your rate of pay, if you recall,
3   in 1998 when you had the ankle injury?
4   A   If I'm not mistaken, it was $9.06.
5   Q   What do you recall your rate of pay in
6   April of 1999?
7   A   Right about the same.
8   Q   Do you recall who was the worker's
9   compensation carrier for your ankle injury?
10   A   I'm sorry. I'm not going to -- can I
11   rephrase, go back to that?
12   Q   If you want to correct an answer, please
13   do.
14   A   I want to correct an answer, the one
15   before this.
16   Q   Go ahead.
17   A   I believe in 1998 it was -- I'm not quite
18   sure -- but it was like $8.90, pretty close there,
19   about $8.85, somewhere around there, I'm not exactly
20   sure.
21   Q   Do you believe that in April of 1999 you
22   were making more money per hour than you were in
23   1998 when you had the ankle injury?
24   A   So much cents because we had what they
25   call the --

Page 148

1   Q   Cost of living?
2   A   Cost of living raise, yes, sir.
3   Q   Whatever additional amount you were making
4   would have been in the matter of 20 or 30 cents an
5   hour or something like that?
6   A   Yes, sir.
7   Q   But, again, you believe the reason you
8   received a higher weekly compensation was because
9   back in 1998 you were working more overtime and
10   making more money?
11   A   You're right.
12   Q   Who was the worker's compensation carrier
13   in 1998, do you remember?
14   A   Tamara Ross.
15   Q   She was the claim person that you dealt
16   with?
17   A   Yes, sir.
18   Q   Did you understand that she was in some
19   way associated with Constitution State Service
20   Company?
21   A   Yes, sir.
22   Q   Did you understand that that company was
23   not the insurance carrier, but was a company that
24   represented the insurance carrier?
25   A   I didn't know.

Page 161

1 furnishe  t appears    s you said before, that
2 Dr. Atkinson told yo   stay off work beginning
3 April 15th, 1999, is that correct?
4    A That's correct, sir. (tour)
5    Q And then within a couple of weeks he
6 referred you to Dr. Pisharodi?
7    A Pisharodi.
8    Q Have you been seen by him before?
9    A Never.
10    Q Did you understand he had a specialty?
11    A I didn't know.
12    Q Did you get along with Dr. Pisharodi?
13    A Yes.
14    Q Did you find him to be someone that you
15 felt confident in?
16    A Yes, sir.
17    Q If he recommended something or wanted to
18 do something, you felt like he knew what he was
19 doing?
20    A Exactly, sure did.
21    Q I'm going to hand you what's been marked
22 for identification as Exhibit 3. Those are some
23 pages of the notes that you kept, is that correct?
24    A This is correct.
25    Q Were these notes made on the dates that

Page 162

1 the events actually occurred? For example, did you
2 make notes on April 10, 1999?
3    A Oh, no, sir.
4    Q When did you make that note?
5    A I don't recall exactly the date, but I
6 made it after taking the notes from my calendar.
7    Q There are three pages of notes that I've
8 handed to you, is that correct?
9    A Yes, sir.
10    Q Were all these notes taken from -- made at
11 one time?
12    A No, sir. You can see by the writing they
13 were not made on the same time, no.
14    Q Were any of them made on a daily basis; in
15 other words, something happened and you would go
16 back and write it up?
17    A Yes, sir.
18    Q I'm going to hand you what's been marked
19 as Deposition Exhibit Number 4. Do you recognize
20 that as some other notes that you prepared?
21    A Yes, sir.
22    Q Now, these were taken -- or they're in a
23 notebook or calendar type of format. Do you agree
24 with me?
25    A Yes, sir.

Page 163

1    Q Were these made on the dates of the events
2 when they occurred?
3    A Yes, sir.
4    Q So if there's something written, for
5 example, for September 7, 1999, you wrote it down on
6 that date or shortly thereafter?
7    A Yes, sir.
8    Q I take it the purpose of this was to
9 record some of the events as you were going along,
10 is that correct?
11    A That's correct.
12    Q You did this on your own as opposed to
13 being told to by an attorney?
14    A Excuse me, sir.
15    Q You did this on your own?
16    A On my own.
17    Q Nobody told you to do it?
18    A No, I didn't have an attorney back then.
19    Q If you look at -- the last date that's on
20 this set of notes here is something was done in June
21 of 2000. Do you see that? The very last page of
22 the exhibit.
23    A Okay.
24    Q Do you believe you had an attorney by that
25 time?

Page 164

1    A June 2000.
2    Q Do you remember one way or the other?
3    A Not exactly.
4    Q I'm going to hand you what's been marked
5 for identification as Exhibit Number 5, which is
6 entitled "Industrial Accident Report"?
7    A Yes, sir.
8    Q Does this appear to be the industrial
9 accident report relating to your injury?
10    A That's right, you're right.
11    Q Do you see where it talks in the --
12 towards the bottom, "How did the accident occur."
13    A Yes, sir.
14    Q Is the description there correct as far as
15 you can tell?
16    A You're right.
17    Q Does it sound like something that you told
18 somebody at Coca-Cola and they wrote it down?
19    A I made this report.
20    Q Is this in your writing?
21    A This is my writing.
22    Q So Exhibit Number 5 contains your writing?
23    A Yes, sir.
24    Q Do you remember when you filled it out?
25    A It had to be that Monday, Monday morning.

Case 1:00-cv-00142 Document 27 Filed in TXSD on 09/10/2001 Page 23 of 57

Page 165

1   Q   Who did you give it to? Who did you give
2 it to at the --
3   A   Yolanda Soto.
4   Q   Have you seen this document, Exhibit
5 Number 5, since that time?
6   A   Have I seen it?
7   Q   Yes. Have you seen it again before today?
8   A   No, sir.
9   Q   Did you understand -- did she give this to
10 you to fill out?
11   A   I had to ask her for it. She kept it in
12 her files, a blank.
13   Q   Had you filed out a form similar to
14 Exhibit Number 5 for your ankle injury?
15   A   Yes, sir, sure did.
16   Q   And did you -- when you injured yourself
17 on Saturday and came in on Monday, did you know that
18 you needed to fill out a worker's compensation claim
19 form?
20   A   No, sir.
21   Q   When you told Ms. Soto that you had been
22 injured, did she then say, "Here, you'll need to
23 fill out this form"?
24   A   No, sir.
25   Q   Tell me how it came to be that you filled

Page 166

1 out this form.
2   A   I asked her for it because Mr. Perez told
3 me I needed to fill out a report, that it was a
4 usual thing to do.
5   Q   So you asked for the form to fill out for
6 your injury because Mr. Perez instructed you?
7   A   Because it was a procedure.
8   Q   And it's because of that that you filled
9 out this report that's Exhibit Number 5 and you did
10 so on that Monday, April 12th?
11   A   Yes, sir.
12     (Brief Discussion Off The Record)
13   Q   (BY MR. KITNER) I'm going to hand you
14 what's been marked for identification as Exhibit
15 Number 6. Mr. Espinoza, do you have Exhibit Number
16 6 before you?
17   A   Yes, sir.
18   Q   Is that a letter dated April 14, 1999,
19 from Vivian Outley at Constitutional State Service
20 Company?
21   A   Yes, sir.
22   Q   And it's addressed to you, is that
23 correct?
24   A   Yes, sir.
25   Q   Do you recall receiving this?

Page 167

1   A   Yes, sir.
2   Q   This letter, among other things, tells you
3 that if you lose more than seven days of work or
4 have a reduction in your weekly salary that you
5 might be entitled to some compensation?
6   A   Yes, sir.
7   Q   You have a note at the bottom dated April
8 27, 1999. Is that in your writing?
9   A   Yes, sir.
10   Q   This note indicates that you had talked to
11 Ms. Outley, is that correct?
12   A   Yes, sir.
13   Q   And that she told you your case was being
14 transferred to Tamara Ross?
15   A   Yes.
16   Q   That's the same lady you had dealt with
17 before?
18   A   Yes, sir.
19   Q   Ms. Outley gave you Ms. Ross' telephone
20 number, is that correct?
21   A   Yes, sir.
22   Q   This letter appears to be dated April 14,
23 1999, which would be within two days of the date
24 that you reported your accident?
25   A   Yes, sir.

Page 168

1   Q   So it appears that the insurance company
2 responded promptly to notification, did they not?
3   A   Yes.
4   Q   I'm going to hand you what's been marked
5 for identification as Exhibit Number 7. Is that,
6 again, another letter that was sent to you from
7 Constitution State Service Company?
8   A   Yes, sir.
9   Q   This one is from Tamara Ross, is that
10 correct?
11   A   That's correct.
12   Q   She indicates in here that she's sending
13 you your first payment of worker's compensation
14 benefit?
15   A   Yes, sir.
16   Q   She goes on to say this is a temporary
17 income benefit and will be paid to you weekly?
18   A   Yes, sir.
19   Q   Is this similar to the procedure that you
20 underwent before for the eight weeks?
21   A   That's correct.
22   Q   Did you understand before for the eight
23 weeks that what you were receiving was what was
24 called temporary income benefit?
25   A   Yes, sir.

Page 173

1 them up, especially during holidays. They will tell
2 me that they cannot -- one time there were three
3 delays, but they all came together afterwards.
4     Q Ultimately, would it be fair to say that,
5 as far as you, Noel Espinoza, are concerned, you
6 received all of the temporary income benefits that
7 you were entitled to receive from April of 1999
8 until September of 2000 when Dr. Pisharodi
9 authorized you to return to work?
10     A That's correct.
11     Q And you're not making any complaint and
12 that's not the basis of your lawsuit?
13     A That's right.
14     Q You received all the income payments to
15 which you were entitled at far as you are concerned?
16     A Yes, sir.
17     Q And you received them all pretty much on a
18 timely basis every week?
19     A That's correct.
20     Q The few delays that were there were
21 explained to you as administrative or holiday or
22 whatever?
23     A That's right, they were explained.
24     Q And that was satisfactory to you?
25     A Well, it wasn't at the moment that it was

Page 174

1 happening, but eventually what could I do, you know.
2     Q Well, you understand that sometimes those
3 things happen, do you not?
4     A I didn't know that that happened, but now
5 I do.
6     Q And certainly there was nothing that
7 you're aware of that indicated any delay was
8 personal as to you; in other words, they were doing
9 it because it was you as opposed to that's just what
10 happens sometimes, is that correct?
11     A Can you repeat that, sir?
12     Q Was there anything to indicate to you that
13 any delay in receiving those income payments was
14 personal as to you; in other words, it wasn't
15 happening to anyone else?
16     A Oh, no.
17     Q It was just one of those things that
18 sometimes happens when there's a company and they
19 have to make payments to a lot of people?
20     A Probably, yes.
21     Q Did you receive these income checks every
22 week?
23     A With the exception of the delays, yes,
24 sir.
25     Q And what I was really trying to get to,

Page 175

1 you received a check every week as opposed to every
2 two weeks or every month?
3     A That's correct.
4     Q How did the amount that you were
5 receiving -- which was $366, is that correct?
6     A That's correct.
7     Q How did that compare to what you had been
8 making as an employee?
9     A It was fine.
10     Q Well, but how much on an average were you
11 making as an employee at the Coca-Cola Company
12 before your injury?
13     A Average $400, $300, so it was compare,
14 more or less.
15     Q So the income that you received on a
16 temporary basis from the insurance company pretty
17 much was equal to what you were receiving as an
18 employee for working?
19     A Yes, sir.
20     Q So, in terms of economic impact on you or
21 your family, there should not have been any because
22 you were receiving these temporary income benefits?
23     A That's right.
24     Q Is that correct?
25     A That's correct.

Page 176

1     Q So pretty much during the time up to your
2 maximum medical improvement, your economic status
3 did not change?
4     A It changed in a way.
5     Q How did it change?
6     A Okay, it changed that -- in a way that I
7 had a payroll deduction automatic as I was paying a
8 van. After I got out, I wasn't able to do my
9 payment. I just couldn't, you know, complete the
10 payment I was making on that van.
11     Q Was that to the credit union?
12     A Yes, so, therefore, it was repossessed at
13 the end of December of 1999.
14     Q Would you agree with me that, other than
15 somebody automatically taking the money out of your
16 paycheck so you didn't have to do it, you were still
17 receiving the approximate same amount of money so,
18 if you wanted to, you could have written a check to
19 the union?
20     A Well, I didn't have a checking account,
21 but close.
22     Q You could have taken the money by there
23 every week if you had wanted to?
24     A Yes and no.
25     Q Well, I can understand if your weekly pay

Page 173 - Page 176

Case 1:00-cv-00142   Document 27   Filed in TXSD on 09/10/2001   Page 25 of 57

**Page 177**

1 was. ....ample, $600 that you were taking home and
2 the t... ....ary income benefits were only $300 that
3 you ... say, "Well, I wasn't making enough money
4 becau... my injury, so I couldn't make the car
5 paymen... is that correct?
6   A That's correct.
7   Q But that wasn't the situation, was it? Do
8 you agree with me?
9   A Yes.
10   Q The situation was, essentially, that the
11 amount of money that you were receiving as temporary
12 income benefits was, basically, the same as what you
13 had been taking home as an employee?
14   A Almost the same, yes.
15   Q So in terms of the dollars that you had to
16 spend, if you had wanted to, you could have still
17 paid for the car, isn't that correct? Do you agree
18 with me?
19   A Excuse me?
20   Q Do you agree with me, you still had the
21 same dollars that you could have used if you had
22 wanted to pay for the vehicle that you financed with
23 the credit union?
24   A Yes, well, I agree with you.
25   Q Now, one of the other things that the

**Page 178**

1 worker's compensation pays for is medical, is that
2 correct?
3   A That's correct.
4   Q During all the time that you were treated
5 for your back injury, did you ever have to pay any
6 of the medical yourself?
7   A No, sir.
8   Q To your knowledge, were all the medical
9 bills paid?
10   A To my knowledge, yes.
11   Q So the insurance company, to your
12 knowledge, paid for all the medical bills associated
13 with any of the doctors or hospitals or health care
14 providers who gave you any treatment, is that
15 correct?
16   A That's correct.
17   Q So you don't have any complaint about the
18 insurance company not paying any of the medical
19 bills for medical treatment, is that correct?
20   A No, sir.
21   Q That's not correct?
22   A That is correct.
23   Q That is not a complaint in this lawsuit,
24 is that correct?
25   A That's correct.

**Page 179**

1   Q So can we agree that in this lawsuit you
2 are not complaining, first of all, about the
3 temporary income benefit payments that you received
4 from the insurance company, is that correct?
5   A That's correct.
6   Q And you are also not complaining about the
7 medical bills that were incurred as a result of your
8 treatment?
9   A That's right.
10   Q You were referred, as you told me earlier,
11 to Dr. Pisharodi by Dr. Atkinson, is that correct?
12   A That's correct, sir.
13   Q Did you consider Dr. Pisharodi to be your
14 main doctor for this back injury?
15   A I sure do.
16   Q He was the one who ultimately did the
17 surgery, is that correct?
18   A That's correct.
19   Q According to the records that I have, I
20 believe you first saw Dr. Pisharodi on May 7, 1999,
21 is that correct?
22   A That sounds about right, yes.
23   Q Tell me what kind of treatment he provided
24 to you over the next several months, say, leading up
25 through the summer -- through August of 1999, do you

**Page 180**

1 recall?
2   A What kind of treatment, you say?
3   Q What did he do? Did he give you
4 medication, did he send you to other doctors, did he
5 give you physical therapy? Just tell me what you
6 recall that he did for you from the period May 1999
7 to August of 1999.
8   A First of all, he gave me a prescription
9 for the pain, he sent me to therapy for a while, and
10 wanted me to go back and see him again.
11   Q Did you get any better because of the
12 therapy?
13   A A little bit of change, yes, a little bit.
14 Not much, but there was a little bit of change, yes.
15   Q What else do you recall in the way of
16 treatment besides the pain medication and the
17 physical therapy?
18   A Sending me for the CAT scan -- I'm sorry.
19 The CAT scan was done by Dr. Atkinson. That's how
20 he realized I needed to be seen by Dr. Pisharodi.
21 He sent me to MRI's, more X-rays, and that's about
22 it.
23   Q During this period -- I'm going to break
24 it down into periods if you'll bear with me -- from
25 May of 1999 when you first started seeing Dr.

Page 185

1  Q  Do you know who he works for?
2  A  No, sir.
3  Q  Did you ever talk to Mr. Cook?
4  A  Yes, sir.
5  Q  When did you talk to him?
6  A  I don't recall exactly.  I have it written
7  down.
8  Q  If you want to look at your notes and tell
9  me.
10  A  Yes, sir.  February 8, 2000.
11  Q  What are you looking at, because I may not
12  have all the records you're looking at.  Let me just
13  see that for a moment.
14  A  Yes, sir.
15  (Brief Discussion Off The Record)
16  MR. BODE:  If I might, on the record
17  as well, this is John Bode, counsel for Laredo
18  Coca-Cola.  Mr. Espinoza has a number of materials
19  in front of him that, from my perspective, he's been
20  glancing at them from time to time in answering the
21  questions posed by Mr. Kitner.
22  Are these all materials that we
23  already have a copy of?  Can you make that
24  representation?
25  MR. SALDANA:  Yes, with the exception

Page 186

1  of this, which is a compilation of notes that he
2  made in the last couple of days from all of this,
3  it's just basically a chronology that he made, and
4  I'll be glad to make a copy of it.
5  MR. BODE:  I would just like to make
6  sure that I have a copy of all of that which he's
7  been referring to today in his deposition testimony
8  and, unfortunately, including the legal pad document
9  that you're showing as well.
10  MR. SALDANA:  Sure.
11  Q  (BY MR. KITNER)  Your notebook indicates
12  that on February 8 you talked with Rob Cook.  Do you
13  know who Rob Cook is or who he works for?
14  A  Betty explained to me or told me that he
15  was the person that needed to okay my surgery.
16  That's all I know.
17  Q  Did you understand that he was someone who
18  worked at the Worker's Compensation Commission?
19  A  No, sir.
20  Q  Do you know if he was an employee of
21  either Coca-Cola or the insurance company?
22  A  I knew he was not from Coca-Cola, probably
23  the insurance company or, like you said, workmen's
24  compensation.
25  Q  You don't have a telephone number on your

Page 187

1  notebook.  Do you know the number of this person?
2  A  Not offhand, sir.  I would have to get it
3  for you if you need it in case it's necessary, but
4  they referred to him as the commission, that's all I
5  know.
6  Q  Betty and Dr. Pisharodi referred to Mr.
7  Cook as being at the commission?
8  A  Yes, sir.
9  Q  Do you remember if the number you called
10  had an area code of 512, which is the Austin area
11  code?
12  A  I don't remember, sir.
13  Q  From May of 1999, when you first saw Dr.
14  Pisharodi, until say the end of August of 1999,
15  would it be fair to say that Dr. Pisharodi did not
16  discuss with you the need for surgery?
17  A  He told me from the very beginning that
18  that's what it looked like, when he first told me
19  about the situation, that I had a herniated disk.
20  Q  Did tell you that sometime in May of 1999?
21  A  Yes, definitely.
22  Q  Did he tell you what his course of
23  treatment was going to be?
24  A  Yes, he did.
25  Q  What did he tell you?

Page 188

1  A  He told me, due to the fact of your last
2  injury, it looks on the X-rays -- after I had the
3  X-rays and he looked at them -- that I had a
4  herniated disk with a pinched nerve, and that's why
5  he wanted to try, first of all, therapy to see if it
6  would loosen up out of there so that I could have
7  better comfort and less pain, and that he was going
8  to treat me, you know, with therapy for a while and
9  then he will decide what happens from then on.
10  Q  So early on in May of 1999 when you first
11  saw Dr. Pisharodi, did you understand that surgery
12  might be a possibility?
13  A  Yes, I did.
14  Q  Did you understand, though, that initially
15  Dr. Pisharodi was going to see if he could treat it
16  with physical therapy and maybe avoid the surgery?
17  A  That's right, that was my understanding.
18  Q  And is that how you proceeded for the next
19  several months, with the physical therapy in the
20  hopes of avoiding the surgery?
21  A  That's right.
22  Q  Did you want to have the surgery if you
23  could avoid it?
24  A  Can you repeat that?
25  Q  If you could get better and return to work

Page 185 - Page 188

Page 189

1 without the surgery, would that have been what you
2 would have wanted?
3     A  Sure, definitely.
4     Q  You were not anxious to jump into surgery
5 if --
6     A  No, hey, no.  That was my last option.
7     Q  So you were willing to go along with Dr.
8 Pisharodi to see if you could get better and return
9 to work without the surgery?
10    A  You're correct.
11    Q  Now, my understanding is that, while you
12 got a little bit get better, you did not get
13 significantly better as a result of what I'm going
14 to call the physical therapy and other treatment
15 during the summer of 1999, is that correct?
16    A  That's correct.
17    Q  Do you recall going to see Dr. Pisharodi
18 sometime in September of 1999 and Dr. Pisharodi
19 recommending to you surgery?
20    A  Yes, sir.
21    Q  According to your notes, it appears that
22 you saw Dr. Pisharodi in September at which time you
23 had a diskogram?
24    A  That's right.
25    Q  Do you remember that procedure?

Page 190

1     A  Yes, sir.
2     Q  Tell me what you recall it involved.  How
3 did they go about doing that?
4     A  I don't wish for nobody to have that done.
5 It was very painful.  It was at Valley Regional
6 Hospital.
7     Q  Did you understand that they put some dye
8 in you and --
9     A  They put three needles this big inside of
10 you.  (Indicating)
11    Q  And they were trying to do a study to see
12 what the disk looked like?
13    A  Exactly, yes, that's what he told me they
14 wanted to find out.
15    Q  According to your notes, it was on
16 September 7th that Dr. Pisharodi recommended the
17 need for surgery, is that correct?
18    A  That's correct, sir.
19    Q  Were you willing at that point to do the
20 surgery?
21    A  I wasn't willing, but I felt at that time
22 that I didn't have no choice.
23    Q  Do you recall telling Dr. Pisharodi you
24 wanted to think about it and talk to your wife?
25    A  Yes.

Page 191

1     Q  So as of September 7th, 1999, while Dr.
2 Pisharodi was recommending it, you told him, "Let me
3 think about it, I want to talk to my wife"?
4     A  Yes, because that's what he told me.
5     Q  Did you then go to see Dr. Atkinson to get
6 his opinion?
7     A  That's right.
8     Q  Did you -- do you recall telling Dr.
9 Atkinson that you wanted a second opinion?
10    A  That's correct.
11    Q  You, Noel Espinoza, wanted your own second
12 opinion?
13    A  Yes.
14    Q  Did Dr. Atkinson recommend somebody for
15 you to see?
16    A  Yes.
17    Q  Who did he recommend?
18    A  Dr. Tijerina.
19    Q  Had you seen Dr. Tijerina before the time
20 you went to see him for the second opinion?
21    A  Never in my life.
22    Q  Where is Dr. Tijerina located?
23    A  In McAllen.
24    Q  So you drove from Brownsville over to
25 McAllen to see Dr. Tijerina?

Page 192

1     A  My wife took me over there.
2     Q  Do you recall the date that you saw him?
3     A  Not exactly, but I have it on my notes.
4 It was on September 27th of September.
5     Q  And on September 27, 1999, you went to see
6 Dr. Tijerina for a second opinion.  This is one you
7 wanted, correct?
8     A  That's right.
9     Q  Did you pay for the second opinion?
10    A  No, sir.
11    Q  Do you know who paid for it?
12    A  I believe workmen's comp.
13    Q  Do you think they paid for it?
14    A  I believe.
15    Q  Do you know if you told anybody at the
16 worker's compensation commission or the insurance
17 company that you were going to see Dr. Tijerina?
18    A  Can you repeat it, sir?
19    Q  Did you tell anybody before September 27,
20 1999, that you were going to see Dr. Tijerina?
21    A  Yes.
22    Q  Who did you tell?
23    A  Gracie -- Dr. Atkinson and Gracie.
24    Q  Who is Gracie?
25    A  The lady in charge of the workmen's comp

Page 189 - Page 192

Page 193

1  paperwork at that office that we were talking about.
2      Q  That's in Dr. Atkinson's office?
3      A  Yes, sir.
4      Q  Was she the one who set up the appointment
5  for you?
6      A  No.
7      Q  How did you get the appointment with Dr.
8  Atkinson?
9      A  Through Dr. Atkinson's secretary.
10     Q  Did Dr. Atkinson provide you with several
11  names and you picked one of them?
12     A  No, sir.
13     Q  He just said, "I'm going to recommend you
14  go see Dr. Tijerina"?
15     A  He asked me if I had a doctor.  I told him
16  no and he said, "Don't worry, we'll recommend you
17  someone."
18     Q  Did he just say, "I think you should go
19  see Dr. Tijerina"?
20     A  He didn't say.  He said, "We'll let you
21  know in a minute."
22     Q  When you left Dr. Atkinson's office, he
23  had not yet given you the name of who you were going
24  to see?
25     A  Yes, they give me the name before.

Page 194

1      Q  Before you left --
2      A  No, I'm sorry, they did not give me the
3  name.  They called me over to the house and let me
4  know who the appointment was.
5      Q  You went over to see Dr. Tijerina at the
6  suggestion of Dr. Atkinson?
7      A  Yes, sir.
8      Q  How long did you see Dr. Tijerina.
9      A  Excuse me?
10     Q  How long did you see him, how much time?
11     A  I would say less than 30 minutes.
12     Q  What did he tell you?
13     A  I took him the records from Dr. Pisharodi
14  and all the X-rays that we had, and he said that he
15  agrees with Dr. Pisharodi that, in fact, I needed to
16  have that surgery done.
17     Q  Did he give you anything in writing?
18     A  No, sir, not to me, no.
19     Q  Did you report his findings to anyone?
20     A  When I got home -- the following day I
21  called Gracie and let her know what he said.
22     Q  Did you report his findings to anybody
23  else?
24     A  No, sir.
25     Q  When did you next see a doctor regarding

Page 195

1  possible surgery on your back?
2      A  Besides Tijerina and besides Pisharodi, it
3  was, I believe, in October, but that was after Dr.
4  Pisharodi gave me that list of those five doctors
5  that it was required for me to choose, to go see Dr.
6  Pacheco.
7      Q  Did Dr. Pisharodi give you a written list
8  of doctors?
9      A  Dr. Pisharodi did, yes, sir.
10     Q  Do you know where he got the list?
11     A  No, sir.  He just came out with a sheet
12  and showed me the list of those five doctors, showed
13  it to me, which I chose that one.
14     Q  And you chose Dr. Pacheco?
15     A  Dr. Pacheco.
16     Q  Pacheco?  Excuse me.
17     A  Yes, sir, Pacheco.
18     Q  Do you know where he got the list?
19     A  No, sir, I sure don't.
20     Q  How did you come to choose Dr. Pacheco?
21     A  Just because I didn't know either one.
22     Q  How many were on the list?
23     A  Five.
24     Q  Do you have a note as to when you were
25  presented with the list?

Page 196

1      A  Yes, sir.
2      Q  When was that?
3      A  October 11, 1999.
4      Q  Was that in Dr. --
5      A  Dr. Pisharodi's office in Brownsville.
6      Q  Are you saying October 11 or October 21?
7      A  October 11 is when I had the appointment
8  with Dr. Pisharodi when he presented me those five
9  doctors.
10     Q  I'm looking here and I may not have a
11  complete list because of the way your notebook is
12  and we'll get a better copy in a minute, but on
13  Exhibit Number 4 there is a document here that says
14  second opinion appointment that I chose for Dr.
15  Pacheco for October 21.  Is that the date of the
16  appointment?
17     A  I'm sorry.  Exhibit what?
18     Q  Exhibit Number 4 for October 21, there's a
19  reference to a second opinion.
20     A  I'm in September, Exhibit 4, unless I'm
21  missing --
22     Q  Second page.
23     A  October what?
24     Q  Do you see the entry for October 21?
25     A  Okay.  Go ahead.

Page 197

1  Q  Is that when you had the actual
2  appointment with Dr. Pacheco?
3  A  No, it was changed to October 28.
4  Q  Who is Terry Martino?
5  A  She said that she was one of the case
6  managers for a management company or something like
7  that.  Terry Martino?
8  Q  Yes, Terry Martino.
9  A  She said she was one of the appoint
10  managers.  That's what she told me.  You see that
11  little square on the bottom?
12  Q  Would it be fair to say that on October
13  11, 1999, Dr. Pisharodi presented you with a list
14  that had five doctors on it?
15  A  That's right, sir.
16  Q  Do you know where he got the list?
17  A  No, sir.
18  Q  The list with the doctors on it is written
19  here on the entry for October 10, is that correct?
20  A  It's the 11th.  I just made a note, but it
21  was for the 11th when he presented me that copy.
22  Q  Who are the five doctors that are listed?
23  What are their names?
24  A  Dr. Finnegan, Dr. Adobbati, Dr. Six, Dr.
25  Pacheco, and Dr. Kuri.

Page 198

1  Q  And of those five, you just happened to
2  pick Dr. Pacheco?
3  A  Yes, sir.
4  Q  And it's your understanding that Gracie in
5  Dr. Pisharodi's office scheduled an appointment with
6  Dr. Pacheco for you?
7  A  Betty.
8  Q  Betty, I'm sorry.
9  A  Yes, sir.
10  Q  And that appointment was for --
11  A  Was scheduled for the 21st but they called
12  me and switched over for the 22nd, the next day.
13  Q  So you went to see Dr. Pacheco on Friday,
14  October 22?
15  A  That's right.
16  Q  And it's your understanding that he agreed
17  with Dr. Pisharodi regarding the need for surgery?
18  A  That's correct.
19  Q  What did you do after that, after the
20  appointment of October 22nd?
21  A  What do you mean?
22  Q  What did you do in terms of follow-up with
23  any doctors to go forward with the surgery?
24  A  Just waited for the -- because I told Dr.
25  Pisharodi what he had said and -- to where he told

Page 199

1  me that that was not it, that still the company or
2  the insurance had to send me to another doctor of
3  their own to give their opinion before they okayed
4  it, before they okayed my surgery.
5  Q  I'm going to hand you what's been marked
6  as Exhibit 8.  Do you see where Exhibit 8 consists
7  of, among other things, a list of doctors?  Is that
8  the list you received?
9  A  No, sir.
10  Q  Does that list -- look at that list and
11  tell me if it includes the same doctors that you
12  wrote down.
13  A  The same except one.
14  Q  Which one is that?
15  A  Dr. Pechero.
16  Q  Did you have before you, when you received
17  the list from Dr. Pisharodi, a list that was similar
18  to the one that is part of Exhibit 8; in other
19  words, except for the name that's on here that has
20  Dr. Pechero?
21  A  Similar, but not quite the same.
22  Q  Can we agree that four of the five doctors
23  that you were presented with are on Exhibit Number
24  8?
25  A  Only two, sir.  I'm sorry, there's only

Page 200

1  two that were on that list that are here on Exhibit
2  8.
3  Q  Tell me which two.
4  A  Dr. Fennegan -- I'm sorry, three.  Dr.
5  Fennegan, Dr. Six, and Dr. Kuri.
6  Q  What about Dr. --
7  A  Pacheco.
8  Q  -- Adobbati.
9  A  I'm sorry, yes, Dr. Adobbati also.  He was
10  included.
11  Q  So four of the five doctors that you were
12  presented with for a second opinion are contained on
13  Exhibit 8?
14  A  Four of them, yes, sir.
15  Q  That was a list that Dr. Pisharodi
16  presented to you on October 11th?
17  A  That's correct.
18  Q  And in that list you picked Dr. Pacheco
19  and eventually went to see him on October 22nd?
20  A  That's right.
21  Q  I'm going to hand you what's been marked
22  as Deposition Exhibit Number 9.  That is a letter
23  from Tamara Ross to you.  Do you recognize that
24  letter?
25  A  Yes, sir, I do.

**Page 201**

1  Q  This letter tells you that an appointment
2  has been scheduled for you with Dr. Pechero in
3  McAllen, Texas, for November 11, 1999.
4  A  That's right.
5  Q  So we get the sequence of events correct
6  here, you went to see Dr. Pacheco on Friday, October
7  22nd, 1999?
8  A  That's right.
9  Q  And on Thursday, October 28, 1999, six
10  days later, the insurance company sent you a letter
11  telling you that an appointment had been made for
12  you to see Dr. Pechero for November 11, 1999?
13  A  That's correct, sir.
14  Q  And this letter told you, among other
15  things, that it would be necessary that you take
16  your X-rays and other records to Dr. Pechero's
17  office?
18  A  That's correct.
19  Q  Do you -- did you have any understanding
20  as to why you were being sent to Dr. Pechero?
21  A  Only that Dr. Pisharodi told me that there
22  was still one more doctor that the company or
23  insurance needed to have the approval or have me
24  check it out -- check me out in order for them to
25  approve my surgery.

**Page 202**

1  Q  Did you know, prior to receiving Exhibit
2  Number 9, that you were going to -- may need to go
3  see another doctor?
4  A  Yes, Dr. Pisharodi let me know about that.
5  Q  So Dr. Pisharodi told you in October -- on
6  October 11th, is that when he told you?
7  A  Yes.
8  Q  So Dr. Pisharodi told you on October 11th,
9  1999, that you would need to go see a doctor you
10  chose and also to go see a doctor that the insurance
11  company chose for a second opinion?
12  MR. SALDANA:  Objection to the form
13  of the question.  Go ahead.
14  THE WITNESS:  That I needed to go --
15  he told me about the list because I told Dr.
16  Pisharodi that I went for a second opinion of my
17  own, to which he said that was not going to be valid
18  and he said, "You have to choose from a list of five
19  doctors," and after that one he said, "You still
20  have to go see another doctor the company will send
21  you to."
22  Q  (BY MR. KITNER) Let's get the sequence of
23  events on what happened here correctly.  Will you do
24  that with me?
25  A  Yes, sir.

**Page 203**

1  Q  Dr. Pisharodi tells you in September,
2  early September 1999, you're not getting any better
3  in his opinion, he recommends surgery, correct?
4  A  That's right.
5  Q  You want to think about it and talk to
6  your wife about it?
7  A  That's right.
8  Q  So you talk to your wife and the two of
9  you go to see Dr. Atkinson to get his advice?
10  A  That's right.
11  Q  And Dr. Atkinson says, "Why don't you go
12  see Dr. Tijerina," is that correct?
13  A  It was not to get his advice, just to let
14  him know -- put him up to date of what Dr. Pisharodi
15  wanted to do.
16  Q  Okay.  And it was Dr. Atkinson, he's the
17  one who sent you to Dr. Tijerina?
18  A  That's right.
19  Q  Then you went back to Dr. Pisharodi?
20  A  You're right.
21  Q  And Dr. Pisharodi told you at that time,
22  in order to get the surgery approved, you would need
23  to go see another doctor because Dr. Tijerina really
24  didn't count?
25  A  That's right.

**Page 204**

1  Q  You had to go see a doctor that you chose,
2  is that correct?
3  MR. SALDANA:  Objection to the form
4  of the question.
5  Q  (BY MR. KITNER) Did he tell you that you
6  should go see a doctor that you chose from the list
7  of five?
8  A  Yes.
9  Q  Did he tell you that you would also need
10  to go see a doctor that the insurance company chose?
11  A  Afterwards, yes, he sure did.
12  Q  When did he tell you that you needed to
13  see a doctor chosen by the insurance company?
14  A  About the same time when he gave me the
15  list of the five doctors, he mentioned to me there
16  was still another doctor that needed to see me.
17  THE COURT REPORTER:  Excuse me.  I
18  need to change my disk.
19  (Brief Recess)
20  Q  (BY MR. KITNER) Mr. Espinoza, I'm -- just
21  bear with me once more and I want to see if you and
22  I can agree on what you believe occurred.
23  A  Sure.
24  Q  According to your records, in early
25  September Dr. Pisharodi recommended surgery, is that

Page 205

1  correct?
2      A  That's right.
3      Q  Is it correct that you wanted some time to
4  think about it?
5      A  That's correct.
6      Q  Did you want to discuss it with your wife?
7      A  Actually, it was two reasons:  To discuss
8  it with my wife and just to have another doctor's
9  opinion.
10      Q  And to get another doctor's opinion you
11  went back to see Dr. Atkinson?
12      A  That's correct.
13      Q  And when you went to see Dr. Atkinson, he
14  said, "You ought to see Dr. Tijerina"?
15      A  That's correct.
16      Q  You went to see Dr. Tijerina?
17      A  That's right.
18      Q  Dr. Tijerina agreed that surgery was
19  indicated?
20      A  That's correct.
21      Q  You went back to Dr. Pisharodi around
22  October 11, 1999, is that correct?
23      A  That's correct.
24      Q  Dr. Pisharodi told you on October 11th,
25  1999, that Dr. Tijerina's recommendation really

Page 206

1  wasn't going to be helpful?
2      A  That's true.
3      Q  He said that you needed to choose a doctor
4  from a list that he presented to you?
5      A  That's right.
6      Q  And it was from that list of five that you
7  picked Dr. Pacheco?
8      A  That's right.
9      Q  And it was on October 11th, 1999, that Dr.
10  Pisharodi told you that you would still have to see
11  yet another doctor to complete the process?
12      A  That's true.
13      Q  You knew, as of October 11th, 1999, you
14  would have to see Dr. Pacheco and another doctor
15  chosen by the insurance company?
16      A  That's correct.
17      Q  You went to see Dr. Pacheco and saw him on
18  Friday, October 22, 1999?
19      A  That's right.
20      Q  Dr. Pacheco told you that he concurred,
21  that surgery was indicated?
22      A  That's true.
23      Q  Then, as I understand it, on October 28th,
24  1999, you received what is Exhibit Number 9?

Page 207

1      Q  And that is a letter from Tamara Ross
2  indicating to you that you should go see Dr.
3  Pechero?
4      A  That's right.
5      Q  You knew when you received Exhibit Number
6  9 that this was the doctor that the insurance
7  company had chosen?
8      A  That's correct.
9      Q  So this letter did not come as a surprise
10  to you?
11      A  Oh, no.
12      Q  This letter indicated to you, among other
13  things, that the doctor the insurance company had
14  apparently selected was Dr. Ruben Pechero in
15  McAllen, Texas?
16      A  That's correct.
17      Q  And they had set up an appointment with
18  you for November 11, 1999, at 1:15 p.m.?
19      A  That's true.
20      Q  Approximately two weeks after the date of
21  the letter?
22      A  That's right.
23      Q  And the letter told you, among other
24  things, that you should get your X-rays and other
25  medical records to bring to the appointment?

Page 208

1      A  That's correct.
2      Q  Did you have any other contact with
3  anybody regarding going to see Dr. Pechero until you
4  went to see him?
5      A  Yes, because there was a cancellation of
6  the date of that appointment that I had with Ruben
7  Pechero.
8      Q  Is that when Dr. Pechero's office called
9  you and told you that he was ill and it would need
10  to be rescheduled?
11      A  That's true.
12      Q  Is that indicated in your notes?
13      A  It is, yes.
14      Q  When do you indicate that in your notes?
15      A  That same day, sir.
16      Q  What date is that?
17      A  November 11th.
18      Q  So you were prepared to go see Dr. Pechero
19  on November 11th, but his office called and said he
20  was sick and he needed to reschedule it?
21      A  I was on my way out when I received the
22  phone call.
23      Q  So you didn't actually get in your car?
24      A  No, sir.
25      Q  They caught you before you left?

1    A  Yes.
2    Q  When did the appointment get rescheduled
3  to?
4    A  The secretary of Dr. Pechero, she had
5  rescheduled it for the 18th, but later in the day, I
6  will say about maybe 30 minutes from the time that I
7  spoke with her, Betty called me From Dr. Pisharodi
8  to let me know about the change and they let her --
9  they gave her a different date of the 18th that they
10  had given me, which they rescheduled it for the
11  30th.
12    Q  Look at Exhibit Number 3, which is your --
13  look at whatever is easiest.  On Exhibit 3 on the
14  third page you indicate that it was November 1st
15  that you received the letter from Tamara Ross
16  telling you of the appointment with Dr. Ruben
17  Pechero, is that correct?
18    A  That's right, that's what I have written
19  down here.
20    Q  So Exhibit 9, which is dated October 28,
21  was actually received by you on November 1st?
22    A  Yes, sir.
23    Q  And you indicate here that on November
24  11th Betty in Dr. Pisharodi's office called you to
25  tell you that Dr. Pechero's office had called and

1  they needed to cancel the appointment because Dr.
2  Pechero had been involved in an accident?
3    A  That's right.
4    Q  Was the appointment rescheduled to
5  November 30, 1999, at that time?
6    A  That's correct.
7    Q  And you indicate here that -- did you
8  actually go see Dr. Pechero on November 30th, 1999?
9    A  Sure did.
10    Q  Did Dr. Pechero at that time indicate to
11  you that he thought that you ought to try the shots
12  first?
13    A  That's right.
14    Q  Those would have been injections to see if
15  that would make you better instead of having to do
16  the surgery?
17    A  That's correct.
18    Q  And it was after that conversation with
19  Dr. Pechero that you had the call with Janie Olmos?
20    A  Excuse me.  Can you repeat that?
21    Q  Was it after that meeting with Dr. Pechero
22  that you had the conversation with Janie Olmos
23  telling her about what he had recommended?
24    A  That's correct.
25    Q  And I understood you were not interested

1  in doing the shots?
2    A  That's true.
3    Q  So as of November 30th, 1999, you had gone
4  through the process of seeing Dr. -- a doctor for a
5  second opinion that you chose and a doctor for a
6  second opinion that the insurance company chose?
7        MR. SALDANA:  Objection to the form
8  of the question.
9    Q  (BY MR. KITNER)  Is that what had occurred
10  by November 30th, 1999?
11    A  Can you repeat the question, sir?
12    Q  By November 30th, 1999, had you gone
13  through the process of getting a second opinion from
14  a doctor that you had chosen and getting a second
15  opinion from a doctor chosen by the insurance
16  company?
17        MR. SALDANA:  Objection to the form
18  of the question.
19        THE WITNESS:  Yes, sir.
20    Q  (BY MR. KITNER)  Do you know what was then
21  necessary in order to get the surgery approved?
22    A  Betty would tell me that they needed the
23  okay from the insurance, to which they started, I
24  don't know, making it longer or what, but it took
25  that much time to get it approved.

1    Q  Do you know if any approval was required
2  by the Worker's Compensation Commission in order to
3  do the surgery?
4    A  No, sir, I didn't know.
5    Q  Do you know what role, if any, the
6  Worker's Compensation Commission had in determining
7  whether or not there would be surgery?
8    A  No, sir.
9    Q  I'm going to hand you what's been marked
10  for identification as Exhibit 10.  That is a letter
11  dated December 13th, 1999, from Tamara Ross to you,
12  is that correct?
13    A  That's correct.
14    Q  Do you see where she's indicating you have
15  an appointment for a second opinion with Dr. Pechero
16  for December 23rd, 1999, at 1:00 p.m.?
17    A  That's right.
18    Q  When you got that letter you had already
19  had the second opinion from Dr. Pechero, is that
20  correct?
21    A  That's correct.
22    Q  Did you contact anybody to indicate that
23  you had already had the second opinion that was
24  indicated here?
25    A  I contacted Betty and she told me that

Page 241

1  A  That's right, because Betty just referred
2  to him as the commission.
3  Q  We know the next day, February 9th, is the
4  date the letter went out authorizing the surgery,
5  isn't that correct?
6  A  I believe so.
7  Q  Maybe your call to Rob Cook did some good?
8  A  Probably.
9  Q  When is the next time that you had any
10  conservation or contact with anybody from the
11  insurance company?
12  A  That same day at a later date -- I mean at
13  a later time, I would say an hour and 25 minutes
14  later, I spoke with him again.
15  Q  With who?
16  A  Rob Cook.
17  Q  What did he say?
18  A  To which he stated that Betty had gotten
19  in contact with Anthony -- I don't know if he was
20  his helper or what -- and that everything was taken
21  care of and that the paperwork will come out on the
22  following day, which was February 9th.
23  Q  And apparently it did?
24  A  Yes, sir.
25  Q  When is the next time you had any contact

Page 242

1  with anybody or conversation with anybody from the
2  insurance company?
3  A  Not directly, but on February 14th Betty
4  called me from Dr. Pisharodi that she had tried to
5  get in contact with Tamara Ross and she was not
6  able, so she left a message, and that same day at
7  5:19 Betty called me back to tell me she had finally
8  talked to Tamara Ross stating that she wasn't going
9  to appeal the procedure of the surgery, to go ahead
10  and schedule.
11  Q  So you knew as of February 14th, which was
12  just five days after the commission made its
13  decision, that the insurance company wasn't going to
14  appeal?
15  A  That's right.
16  Q  So from February 14th on it was just up to
17  you and Dr. Pisharodi as to when the surgery
18  occurred?
19  A  I was ready right that day.
20  Q  But what I'm saying is, isn't it true
21  that, as of February 14th, it was up to your
22  schedule and Dr. Pisharodi's schedule as to when the
23  surgery would occur?
24  A  That's correct.
25  Q  Nothing further needed to be had from

Page 243

1  either the Worker's Compensation Commission or the
2  insurance company or Coca-Cola or anybody else?
3  A  That's true.
4  Q  When is the next time you had any contact
5  with anybody from the insurance company?
6  A  On February 21st a lady by the name of
7  Lori Love.  She was the next person asking me
8  questions about the situation.
9  Q  Let me stop you right there.
10  A  Yes, sir.
11  Q  From April 15th -- back up.  Exhibit
12  Number 6 is a letter that is an acknowledgment from
13  the insurance company dated April 14th, 1999, just
14  two days after you filed your notice of injury,
15  acknowledging that they had the claim, isn't that
16  correct?
17  A  Yes, sir.
18  Q  Now from that date, April 14th, 1999,
19  until Dr. Pisharodi recommended surgery in September
20  of 1999, do you have any complaints about anything
21  that the insurance company did regarding your claim?
22  A  Just the delays that they would take to
23  get the approval of things concerning my injury.
24  For instance, therapy:  They took not one day, not
25  three days.  Weeks for them to approve that it was

Page 244

1  okay for me to have therapy, that it was okay
2  every time I had to go see a doctor, whatever, we
3  always had to wait for an approval, wait for an
4  approval.
5       Too bad I don't have the right dates,
6  but Betty did and she told me that she's got
7  everything logged down, every time she would call
8  because I would call her, "Have you received an okay
9  for that?"
10  Q  From April of 1999 until September of
11  1999, is the only complaint that you have regarding
12  the insurance company is what you perceived to have
13  been some delay in approving procedures?
14  A  You can say that, yes.
15  Q  Is there anything else, any other
16  complaints you have regarding what the insurance
17  company did or did not do?
18  A  I don't remember at the moment.  That's
19  about it.
20  Q  You ultimately got all of the treatment
21  that was requested.  You're just saying sometimes
22  you didn't get it as quickly as you or the doctor
23  wanted it approved?
24  A  That's correct.
25  Q  Now, from September of 1999 to February

Page 249

1 approved?
2     A That's correct.
3     Q You're not aware of any treatment that you
4 were denied or didn't get that the doctor wanted to
5 give you, it was just a matter of perhaps it didn't
6 get approved as quickly as either you or the doctor
7 wanted it. Is that fair to say?
8     A I don't recall, but there was one that
9 they denied it. It was concerning my weight. There
10 was a certain program the doctor wanted me to get in
11 because of my overweight and that's one thing they
12 didn't approve.
13     Q That was because the weight was not
14 something related to your injury is what you were
15 told?
16         MR. SALDANA: Objection to the form
17 of the question.
18     Q (BY MR. KITNER) Were you told that the
19 weight issue was not something related to your
20 injury?
21     A I believe it was.
22     Q I know you believe it was, but did you
23 understand that that was the reason it was not
24 approved?
25     A I don't know what the reason because they

Page 250

1 didn't explain me the reason why they didn't approve
2 it.
3     Q With that one qualification, is it fair to
4 say that every procedure that you wanted or that Dr.
5 Pisharodi wanted to do for you got done, it's just
6 that in one or two instances that you've described
7 to me it didn't get done or approved as quickly as
8 you thought it might should have been?
9     A That's correct.
10     Q Have I fairly stated that?
11     A Yes, sir.
12     Q Now, that covers the time period both
13 before and after this surgery process began, do you
14 understand that?
15     A Yes, sir.
16     Q Now I want to focus in on the period where
17 you were going through this process of trying to get
18 an approval, do you understand?
19     A Yes, sir.
20     Q Now, my understanding is that you did not
21 go see Dr. Pechero until November 30th, 1999, isn't
22 that correct?
23     A That's correct.
24     Q So this second approval process was not
25 completed such that the Worker's Compensation

Page 251

1 Commission could even make a decision until after
2 November 30th, 1999. Do you agree with me?
3     A That's correct.
4     Q So the earliest that the Worker's
5 Compensation Commission could have authorized this
6 procedure would have been sometime in December of
7 1999. Do you agree with me?
8         MR. SALDANA: Objection to the form
9 of the question.
10         THE WITNESS: Can you repeat it for
11 me, please?
12     Q (BY MR. KITNER) Since you did not see the
13 second opinion doctor requested by the insurance
14 company until November 30th, 1999, would you agree
15 with me that the Worker's Compensation Commission
16 could not make a decision regarding your surgery
17 until sometime after that date?
18     A That's correct.
19         MR. SALDANA: Same objection.
20     Q (BY MR. KITNER) If you had had the
21 surgery sometime in December of 1999, do you know if
22 you would have recovered sufficiently such that you
23 could have returned to work before the one year
24 anniversary of your injury?
25     A Probably if it wasn't for so many layouts

Page 252

1 of so many lengths of times where they didn't
2 approve things. If I would have had therapy sooner,
3 for instance, or things like that, I might. I don't
4 know.
5     Q If your job at Coca-Cola had not been
6 terminated in April of 2000, would you have any
7 complaints about either Coca-Cola or the insurance
8 company?
9     A No, sir.
10     Q So it all starts and ends, as far as
11 you're concerned, in your complaint with the fact
12 that you got terminated in April of 2000?
13     A You're correct.
14     Q In your complaint here -- and just as was
15 said earlier, I know you didn't prepare this, a
16 lawyer prepared it, and that would be Mr. Saldana,
17 correct?
18     A That's correct.
19     Q Has he been your lawyer throughout the
20 process to the extent you've ever had a lawyer?
21     A Since I came over to talk to him, yes.
22     Q This complaint alleges, among other
23 things, that the insurance company required you to
24 get four opinions before you could have your
25 surgery. Were you aware of that?

Page 253

1    A  No, sir.
2    Q  Would you agree with me that that is not
3 true?
4    A  I don't know.
5    Q  Do you know of any opinion from a doctor
6 that the insurance company required other than the
7 one from Dr. Pechero?
8    A  Can you repeat the question?  I'm sorry.
9    Q  Do you know of any opinion from any doctor
10 regarding your surgery that the insurance company
11 requested other than an opinion from Dr. Pechero?
12    A  I'm not aware of that.
13    Q  Isn't it true that the opinion from Dr.
14 Pisharodi was not requested by the insurance
15 company?  They didn't send you to him to get an
16 opinion, did they?
17    A  No, sir.
18    Q  They did not send you to Dr. Atkinson for
19 an opinion, did they?
20    A  No, sir.
21    Q  And they didn't send you to Dr. Tijerina
22 for an opinion?
23    A  No, sir.
24    Q  You chose Dr. Tijerina pursuant to Dr.
25 Atkinson's recommendation?

Page 254

1    A  Yes, sir.
2    MR. SALDANA:  Object to the form of
3 the question.
4    Q  (BY MR. KITNER)  Is that correct?
5    A  That's correct.
6    Q  And the insurance company did not send you
7 to Dr. Pacheco for an opinion, did they?
8    A  No, sir.
9    Q  You went to see Dr. Pacheco because Dr.
10 Pisharodi told you that, in order to get the
11 surgery, you would need to have a doctor see you
12 from a list that he presented to you?
13    A  Because he said there was a rule or
14 something, that it had to be done, not just because
15 he told me that I need the surgery.  I will agree
16 that the insurance was not going to approve it out
17 of his word, that it had to be through this process.
18    Q  Did Dr. Pisharodi tell you that that rule
19 was a rule of the Texas Worker's Compensation
20 Commission and not a rule of the insurance company?
21    A  He didn't explain.
22    Q  Now, the insurance company did request
23 that you go see Dr. Pechero?
24    A  That's correct.
25    Q  And would you agree with me that is

Page 255

1 the only doctor that they requested that you go see?
2    A  Can you repeat that?
3    Q  Would you agree with me that the only
4 doctor that the insurance company requested that you
5 go see regarding your surgery for an opinion was Dr.
6 Pechero?
7    A  I don't agree.  I -- I'm not sure if it
8 was him, the only doctor, Dr. Pechero or Dr.
9 Pacheco.  Like I said, Dr. Pisharodi said it was
10 something that needed to be done.
11    I didn't know by whom or who ordered
12 it or if it was a rule by the insurance or by the
13 commission, whatever, that I needed to see him,
14 also, so I didn't know that Dr. Pechero was the only
15 one that they would take into consideration.
16    Q  Can we agree that the insurance company
17 did not require you to go see Dr. Pisharodi for an
18 opinion?  Will you agree with me on that?
19    A  Yes, sir.
20    Q  Will you also agree with me that the
21 insurance company did not require you to see Dr.
22 Tijerina for an opinion?
23    A  That's correct.
24    Q  Would you also agree with me that, to the
25 extent that an opinion was necessary from Dr.

Page 256

1 Pacheco, you chose him, not anyone else?
2    MR. SALDANA:  Object to the form of
3 the question.
4    THE WITNESS:  I chose him because my
5 doctor or Dr. Pisharodi told me that I had to choose
6 one of them.  I didn't know by whom or what, but
7 yes.
8    Q  (BY MR. KITNER)  Would you agree with me
9 that the only doctor that you didn't have a say in
10 determining whether to go see was Dr. Pechero?
11    MR. SALDANA:  Objection to the form
12 of the question.
13    THE WITNESS:  Yes.
14    Q  (BY MR. KITNER)  So, to the extent that
15 your petition or your complaint in this lawsuit
16 alleges that the insurance company required four
17 opinions, that's just not correct.  Can we agree on
18 that?
19    A  I don't know.
20    Q  Do you believe that the insurance company
21 required four opinions before they would authorize
22 the surgery?
23    A  If you tell me that.  I'm just learning it
24 right now as you're telling me, as you speak.  I
25 didn't know that it was the rule that they had to

Case 1:00-cv-00142  Document 27  Filed in TXSD on 09/10/2001  Page 35 of 57

**Page 257**

1 have four doctors.
2    Q I'm not asking you what rules or ___hing
3 exists. What I'm asking you is, do you know, of
4 your own personal knowledge, that the insurance
5 company did not require you to get four opinions in
6 order to have this surgery, isn't that correct?
7    A That's correct.
8    Q Do you know that Dr. Pisharodi was not
9 chosen by the insurance company, isn't that correct?
10    A I know that.
11    Q You know Dr. Tijerina was not chosen by
12 the insurance company?
13    A That's true.
14    Q And you know that Dr. Pacheco was chosen
15 by you pursuant to a request from your own doctor,
16 Dr. Pisharodi?
17    A That's correct.
18    Q The only doctor that was chosen by the
19 insurance company was Dr. Pechero?
20    A That's right.
21    Q Do you know if the insurance company,
22 under the rules and regulation of the Worker's
23 Compensation Commission, had the right to ask for a
24 second opinion from a doctor chosen by the insurance
25 company?

**Page 258**

1    MR. SALDANA: Objection to the form.
2    THE WITNESS: I didn't know.
3    Q (BY MR. KITNER) If they had the right to
4 request that opinion and then it would be up to the
5 Worker's Compensation Commission to make a decision
6 whether to do the surgery or not, tell me what
7 complaint you would have against the insurance
8 company regarding this surgery process?
9    A I didn't understand the question, sir.
10 Can you repeat it for me, please?
11    Q Assume with me that the insurance company
12 had a right by law to ask you to go see a doctor of
13 their choosing, in this case Dr. Pechero. Will you
14 do that?
15    A Sure.
16    Q Assume with me that under the law, once
17 you had gone to see a doctor of your choosing and a
18 doctor of their choosing, it would be submitted to
19 the Worker's Compensation Commission and the
20 Worker's Compensation Commission would make the
21 decision whether to allow the surgery. Do you
22 understand me so far?
23    A Yes, sir.
24    Q If that's the law and that's what occurred
25 here, tell me what complaint you had regarding what

**Page 259**

1 the insurance company did regarding the approval
2 process?
3    A I don't know if there was an objection for
4 the insurance to okay my surgery by having only one
5 doctor's opinion, which is Dr. Pechero.
6    Q Well, what I'm asking you to do is to
7 assume that under the rules when an employee gets
8 injured and a doctor is recommending back surgery,
9 that there's a process whereby a second opinion
10 process gets going; that is, the employee chooses
11 one doctor and the insurance company chooses another
12 doctor.
13    A That's right.
14    Q And you understand that's what occurred in
15 this case?
16    A That's right, I sure do.
17    Q Now, once that process is completed
18 whereby the insurance company has a doctor look at
19 you and you get a doctor to look at you of your own
20 choosing and it's up to the Worker's Compensation
21 Commission to decide -- and that's what happened
22 here -- tell me, what is the complaint you have
23 regarding the insurance company?
24    MR. SALDANA: Objection to the form
25 of the question. Go ahead.

**P:**

1    THE WITNESS: None.
2    Q (BY MR. KITNER) One of the claims you
3 have against the insurance company is fraud. Hav
4 you ever heard that term before?
5    A Not exactly.
6    Q In here it's stated that the insurance
7 company made a false statement, a material
8 misrepresentation to you. Do you know what false
9 statements or material misrepresentations the
10 insurance company made to you?
11    A No, sir.
12    Q Did the insurance company ever state to
13 you that a fourth opinion was necessary before the
14 surgery would be approved?
15    A No, sir.
16    Q Now, as a result of the back injury you
17 received, you've already told us that you were in
18 considerable pain, isn't that correct?
19    A That's correct.
20    Q I think you said that, on a scale of 10
21 being the worst, that you were about a nine?
22    A That's right.
23    Q Would you agree with me that following the
24 surgery you did get better and you had pain relief?
25    A Yes, sir.

1    IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN OF TEXAS
2       BROWNSVILLE DIVISION

3 NOEL ESPINOZA    )
           )
4 VS.        ) NO. B-00-142
           )
5 THE LAREDO COCA COLA )
 BOTTLING COMPANY, INC., )
6 ET AL       )

7

8    **ORAL DEPOSITION OF NOEL ESPINOZA**
       **MARCH 14, 2001**
9

10     **FURTHER CERTIFICATION**

11

12   The original deposition was/~~was not was~~ returned to

13 Schwab Court Reporting Service on _____4-27-01_____;

14   If returned, the attached Changes and Signature

15 page(s) contain(s) any changes and the reasons

16 therefor;

17   If returned, the original deposition was

18 delivered to John R. Bode, Custodial Attorney;

19   That the deposition was delivered in accordance

20 with the Federal Rules of Civil Procedure, and that

21 a copy of this certificate was served on all parties

22 shown herein.

23

24

25

1       CERTIFIED to by me this __26th__ day of

2  __April_____, 2001.

3

4                           _____

               Eric Schwab

5            Texas CSR 401

            Expiration Date:  12/31/02

6            SCHWAB COURT REPORTING SERVICE

            2900 Central Boulevard, Suite C

7            P.O. Box 3665

            Brownsville, Texas  78520

8            (956) 544-5126

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# *Valley Coca-Cola Bottling Company, Inc.*

MCALLEN TEXAS BRANCH

P.O. Box 3C
M°A en  TX  78499
2 9-632-3765

April 28, 2000

Noel Espinoza
54 Fresno
Brownsville, TX 78521

Dear Noel,

As of April 15, 2000, you had been out on leave for one complete year. In accordance with corporate policy, your status as an active employee of Valley Coca-Cola Bottling is hereby terminated.

Please be advised that this change in your employment status will have no impact on the Workers Compensation benefits that you are currently receiving.

A letter outlining the continuation of insurance coverage under the consolidated Omnibus reconciliation Act (COBRA) will be mailed to you within the next few weeks. In the meantime, if you have any questions please feel free to give me a call.

Sincerely,

Janie Olmos
Sr. H. R. Clk.

DEPOSITION
EXHIBIT
1

DEF-011

CutePDF - www.texto.com

# MADHAVAN PISHARODI, M.D.
### Neurosurgeon

942 Wildrose Lane
Brownsville, Texas 78520
Office Telephone
(956) 541-6725

*Noel Espinoza* _____ has been under my
care from and is able/unable to return to work/school on _____
*09-11-00* _____, or till further evaluation on

RESTRICTIONS: *pt. released to*
*work* _____

_____

REMARKS:  If you have any questions regarding this mater
please do not hesitate to contact my office.

MADHAVAN PISHARODI, M.D. DATE: *09-05-00*



DEPOSITION
EXHIBIT
2

DEF-013

# INDUSTRIAL ACCIDENT REPORT

## CONFIDENTIAL


DEPOSITION EXHIBIT

5

| REPORTED TO TPA BY | DATE REPORTED TO TPA: |
|---|---|
| ___ FIRST AID ___ MEDICAL ONLY ___ LOST TIME CLAIM | TPA CLAIM NO. |

## EMPLOYER IDENTIFICATION

| REGION/DIVISION | AREA | BRANCH NAME | BRANCH NO |
|---|---|---|---|
| MAILING ADDRESS (No. and Street, City, State, and Zip Code) | | | DEPARTMENT |
| LOCATION, if different from mailing address | | | |

## EMPLOYEE IDENTIFICATION

| NAME OF INJURED EMPLOYEE (Last, First, Middle Initial) | SOC. SEC. NO. | EMPLOYEE? (Check One) |
|---|---|---|
| ESPINOZA NOEL | 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 | Yes ☑ No ☐ |

| HOME ADDRESS (No. and Street, City, State, and Zip Code) | PHONE NO. | DATE OF BIRTH 4-25-57 |
|---|---|---|
| 54 FRESNO st. BROWNSVILLE TEX. 78521 | (956) 542-4647 | AGE 41 |

| JOB TITLE/POSITION HELD | EXPERIENCE AT CURRENT POSITION | SEX (Circle One) |
|---|---|---|
| SPECIAL EVENTS | 10 YEARS ___ MONTHS | F (M) |

| HIRE DATE | MARITAL STATUS/DEPENDENTS | PAY RATE | SUPERVISOR/PHONE NO. |
|---|---|---|---|
| 7-9-'84 | MARRIED / 5 | 9.07 hr | JOE PEREZ 233-4555 |

## ACCIDENT INFORMATION

| DATE OF ACCIDENT | TIME OF ACCIDENT | ACCIDENT WAS (Circle One) | DATE REPORTED |
|---|---|---|---|
| 4-10-99 | 10:45 AM | (INJURY) ILLNESS | 4-10-99 To SUPERVISOR |

| DATE LAST WORKED | DATE RETURNED TO WORK |
|---|---|
| 4-11-99 | 4-10-99 |

WHERE DID ACCIDENT HAPPEN (Give Exact Location, Address, Shop, etc.) OUTSIDE THE UTB/TSC CAFETERIA

ON EMPLOYER'S PREMISES? (Check One) Yes ☐ No ☑

WHAT OBJECT OR SUBSTANCE CAUSED THE INJURY/ILLNESS (For example, the machine or thing that struck person, thing person was pulling, chemical inhaled, etc.)

A- SPECIAL EVENT UNIT

WHAT IS CURRENT DISPOSITION OF EQUIPMENT, ETC.

OK

IF INJURY WAS INVOLVED, WHAT WAS PERSON DOING WHEN INJURED (Be specific. If person was using tools or equipment or handling material, name them and tell what he was doing with them.)

I WAS PULLING THE S.E. UNIT TO SLIDE IT ON TOP OF THE STAND FROM THE TRUCK BED TO BE ABLE TO TAKE IT INSIDE THE CAFETERIA WITH THE HAND TR WHEN I HURT MY BACK. (LOWER BACK)

HOW DID THE ACCIDENT OCCUR (Be specific. State facts, do not assign blame or fault or draw conclusions. Describe what happened and how it happened.)

AS I SAID PULLING THE DISPENSER SLIDING IT TOWARDS THE STAND WHEN I FELT A SHARP PAIN ON MY LOWER BACK

4487    **Constitution State Service Company**

VIVIAN M OUTLEY
P.O. BOX 42927
HOUSTON  TX  77242-2927
(713) 787-4299

APRIL 14, 1999

NOEL       ESPINOZA
54 FRESNO
BROWNSVILLE  TX  78521-4814



DEPOSITION
EXHIBIT

6

| | |
|---|---|
| Employee: | NOEL ESPINOZA |
| Employer: | COCA-COLA ENTERPRISES INC |
| Date of Injury: | 04/10/99 |
| File Number: | 478 CM BED9637 R |
| Social Security No.: | 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 |

Your employer has notified us about your injury. I will be responsible for managing your claim for Workers' Compensation benefits.

The above-captioned file number has been assigned to your claim. To help give your claim prompt attention, please give this file number to your physician and other medical providers. Keep this number easily accessible so that you may refer to it when you contact me. Please note that our billing address is the same as the one on the letterhead.

IF YOU LOSE MORE THAN SEVEN (7) DAYS FROM WORK OR YOU HAVE A REDUCTION IN YOUR WEEKLY SALARY AS A RESULT OF THIS INJURY, PLEASE CALL ME IMMEDIATELY

If you have any questions about your claim, please call me.

Sincerely,

VIVIAN M OUTLEY
CLAIM REPRESENTATIVE
(713)787-4023

4/27/99  I FINALLY TALK TO HER AND SHE SAID THAT MY CASE WAS
TRANSFER TO TAMARA ROSS ON MONDAY 4/26 1·8 00· AND THAT SHE
SHOULD BE CONTACTING ME. HER DIRECT LINE WAS (713),787- 4093

C-23433  New 4-95  Printed in U.S.A.

F3162C23061040044457

PAGE.02                           512 502 6446                                    OCT 20 1999 13:32

LEON. TO W. RILEY, JR.
EXECUTIVE DIRECTOR



**TEXAS**
**WORKERS' COMPENSATION COMMISSION**
SOUTHFIELD BUILDING, MS-42, 4000 SOUTH IH-35, AUSTIN, TEXAS 78704-7491
(512)440-3985



DEPOSITION
EXHIBIT
8

## Attention Insurance Carrier

Attached is your sublist of five qualified doctors for the Spinal Surgery Second Opinion Process.

If you choose to request a second opinion, select a doctor from the list and schedule the appointment.

- The second opinion exam you schedule must occur within 30 days of the acknowledgment date.
- Notify the injured employee, the treating doctor, and/or surgeon of the appointment date, time and location at least 10 calendar days prior to the appointment. Failure to do so will result in an autowaiver finding the carrier liable for the recommended spinal surgery. Rule 133.206 (g)(3): a carrier will be deemed to have waived a second opinion if the carrier chooses a doctor not on the sublist or sets an appointment which exceeds 30 days from the acknowledgment date or fails to timely notify the injured employee, the surgeon and the treating doctor of the scheduled second opinion examination. Notification of the examination must be sent at least ten working days prior to the appointment.
- Resubmit the TWCC-63 form to us within 14 days of the acknowledgment date. Include the name of the doctor, the doctor's license number, the appointment date, the appointment time, your signature and date in Box #40 of the form.

If you choose to waive your second opinion, check the waiver box (Box #40), sign, and date the form. Resubmit the TWCC-63 to us within 14 days of the acknowledgment date.

If the claimant is not covered by your insurance carrier, please notify us in writing.

If you have any questions regarding the spinal surgery second opinion process, please call Spinal Surgery, Medical Review, at (512)440-3985.

RECEIVED

OCT 1 8 1999

An Equal Opportunity Employer   CNA Austin                    MR



Consolidation State Service Company
P O Box 42927
Houston, TX 77242-2927

Michael A. Brown
Manager
Claim Department
Houston Office

10/28/1999

Noel Espinoza
54 Fresno
Brownsville, TX 78521



DEPOSITION
EXHIBIT

9

Noel Espinoza
54 Fresno
Brownsville, TX 78521

| | | | |
|---|---|---|---|
| **Employer:** | Coca-Cola Enterprises Inc | **State Case Num:** | 99024612 |
| **Employee:** | Noel Espinoza | | |
| **Date of Loss:** | 04/10/1999 | | |
| **SSN:** | 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 | | |
| **File Number:** | 478-CB-BED9637R | | |

Dear Noel Espinoza:

As provided by the Texas Workers' Compensation Act, an appointment has been made for you to be examined by
DR. RUEBEN PECHERO
1005 E NOLANA ST.
MCALLEN, TX. 78504

Phone 956-686-6510

DATE: 11/11/99  TIME: 1:15 PM

To fully evaluate your medical condition, it is necessary that you obtain any X-rays, CT scans, or MRI films that are available. Please arrange to get these films and take them with you to this examination for the review by the doctor.

Please make every effort to keep this appointment. Your failure to do so may affect your claim for compensation benefits.

If you are unable to keep this appointment, please telephone the doctor's office immediately and reschedule the appointment to suit your convenience.

Should you have any questions or concerns, please call me

Sincerely,

Tamara L Ross,  Claim Representative
(713)787-4093
Workers' Compensation Unit

C22510WGIM

LEONARD W RILEY, JR.
EXECUTIVE DIRECTOR



TEXAS
WORKERS' COMPENSATION COMMISSION
SOUTHFIELD BUILDING, MS-42 4000 SOUTH IH-35, AUSTIN, TEXAS 78704-7491
(512)440-3985

February 9, 2000




NOEL ESPINOZA
54 FRESNO ST
BROWNSVILLE, TX 78521-48

SSN: 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
DOI: 04/10/1999

**INJURED EMPLOYEE:** NOEL ESPINOZA
**TWCC NO.:** 99-024612




12

CARRIER: CONTINENTAL CASUALTY COMPANY
**BOX # 08**
EMPLOYER: COCA-COLA ENTERPRISES INC

**RESULT OF SPINAL SURGERY SECOND OPINION PROCESS**

This letter is notification of the results of the spinal surgery second opinion process.

One of the 2nd opinion doctors agreed with your doctor's recommendation for spinal surgery, creating a 2 to 1 decision in favor of spinal surgery. This means that if the carrier does not file an appeal, they will be responsible (liable) for the reasonable and necessary costs of spinal surgery related to the compensable injury, and for the medically necessary care related to the spinal surgery.

The carrier may appeal this decision by requesting a Spinal Surgery Contested Case Hearing (SSCCH) within 10 days of receipt of this letter. To request a SSCCH the carrier may write to Medical Review, Spinal Surgery, at the above address or fax the request to (512)440-3501.

**This letter is valid for one year from the date the letter is issued.**

If you have any questions or concerns regarding this matter, please call Medical Review, Spinal Surgery, at (1-800)372-7713, extension 3985. **The 800 number is for the injured employee's use only, if your doctor, attorney or insurance adjuster calls, they should call (512)440-3985.** Si tiene preguntas o no entiende la carta, llame al numero (1-800)372-7713, extencion 3985.

cc: NOEL ESPINOZA
PISHARODI, MADHAVA A P MD
PISHARODI, MADHAVA A P MD
CONTINENTAL CASUALTY COMPANY
File Copy

LEONARD W. RILEY, JR.
EXECUTIVE DIRECTOR



## TEXAS
## WORKERS' COMPENSATION COMMISSION
SOUTHFIELD BUILDING, MS-600, 4000 IH-35, AUSTIN, TEXAS 78704-7491
(512)804-4000

October 04, 2000



15

NOEL ESPINOZA
54 FRESNO ST
BROWNSVILLE, TX 78521-4814

TWCC #:          99024612-HL00
Carrier#:        478CBBED9637R
Employee:        NOEL ESPINOZA
Employer:        COCA COLA ENTERPRISES INC
Date of Injury:  April 10, 1999

| 1. Doctor's Name: |
| --- |
| PISHARODI, MADHAVA A P MD |
| 2. Maximum Medical Improvement (MMI) Date: |
| August 31, 2000 |
| 3. Impairment Rating |
| 13 % |
| 4. Number of Weeks Impairment Income Benefits Payable: 39 |

The Commission has received a report from the doctor named in Block 1 stating that you reached maximum medical improvement (MMI) on the date in Block 2 and that you have a whole body impairment rating as indicated in Block 3.

An employee reaches maximum medical improvement:

    1. When the doctor says that the employee has recovered from the injury as much as can be expected; or,

    2. 104 weeks after the start of the employee's right to receive temporary income benefits. An employee's right to receive temporary income benefits starts when the employee has missed more than seven days from work or received lower wages due to the injury.

The doctor's statement that you have reached maximum medical improvement means that you may no longer receive temporary income benefits. If an impairment rating was assigned in Block 3, impairment income benefits will be paid at the rate of three weeks of benefits for each percentage point of impairment. Based on the above doctor's report, you will receive impairment income benefits for the number of weeks indicated in Block 4 unless you or the insurance carrier dispute the certification of maximum medical improvement or the assigned impairment rating. You are entitled to these benefits even if you are currently employed or searching for a job.

If you do not agree with the certification of maximum medical improvement or the percentage of impairment assigned for any reason, you must dispute these issues by contacting the Commission within 90 days after you receive notice of the certification or rating. For assistance, or if you have any question, call or write the field office handling your claim or call 1-800-252-7031.

                              Sincerely,
                              Texas Workers' Compensation Commission

C: CONTINENTAL CASUALTY COMPANY

# EXHIBIT B

CVisPDF – www.fastio.com

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **NOEL ESPINOZA,** | § | |
| **Plaintiff** | § | |
| | § | |
| | § | |
| **v.** | § | CIVIL ACTION NO. _____ |
| | § | |
| **THE LAREDO COCA COLA** | § | |
| **BOTTLING COMPANY, INC.,** | § | |
| **CONTINENTAL CASUALTY** | § | |
| **COMPANY AND CONSTITUTION** | § | |
| **STATE SERVICE COMPANY,** | § | |
| **Defendants** | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, *NOEL ESPINOZA,* complains of *THE LAREDO COCA COLA BOTTLING COMPANY, INC., CONTINENTAL CASUALTY COMPANY AND CONSTITUTION STATE SERVICE COMPANY,* and in support thereof shows:

I.

### DISCOVERY LEVEL

Pursuant Tex.R.Civ.P. 190.1, discovery is intended to be conducted under Level 2, Tex. R.Civ.P. 190.3.

II.

### JURY REQUEST

Pursuant to Rule 216, Texas Rules of Civil Procedure, Plaintiff hereby demands a **TRIAL BY JURY.** For cause of action Plaintiff would respectfully show this Honorable Court the following facts and circumstances:

III.

### STATEMENT OF CASE

This case involves Plaintiff's separation from employment while he was injured and receiving worker's compensation benefits pursuant §451.001 of the Texas Labor Code. Plaintiff also states a cause of action against his former employer for violations of the Family

Medical Leave Act, (FMLA). Plaintiff states a cause of action against the worker's compensation carrier and adjuster company for fraud and negligence. Additionally, Plaintiff brings a cause of action against the worker's compensation carrier for breach of the duty of good faith and fair dealing.

<div align="center">

**IV.**
**PARTIES**

</div>

Noel Espinoza is an individual and resides in Cameron County, Texas. The Laredo Coca Cola Bottling Company, Inc., is a corporation duly licensed and incorporated in the State of Delaware and doing business in Texas while maintaining a principal office in Cameron County, Texas. The Laredo Coca Cola Bottling Company, Inc. may be served by serving Raymond A. Cowley, Esq., Rodriguez, Colvin & Chaney, 4900 North 10th Street, McAllen, Texas 78504. Continental Casualty Company is a corporation duly licensed and incorporated in the State of Illinois and doing business in the State of Texas and may be served by serving its registered agent, C.T. Corporation. 350 N. St. Paul Street, Dallas, Texas 75201. Constitution State Service Company is a corporation duly licensed and incorporated in the State of Montana and may be served by serving its registered agent, C.T. Corporation, 350 N. St. Paul Street, Dallas, Texas 75201. No service is required at this time.

<div align="center">

**V.**
**JURISDICTION AND VENUE**

</div>

This suit has been removed to the United States District Court, Southern District of Texas, Brownsville Division. Plaintiff contends that removal was improper and will file a Motion for Remand to the State Court based on jurisdictional and venue facts pleaded below.

The State District court is a court of general jurisdiction and has personal jurisdiction of all the parties by virtue of their residence or by the fact that the parties do business in Texas on a regular, continuing basis. The State District Court has subject matter jurisdiction at common law and by statute including §451.003 of the Texas Labor Code and 29 USC §2617(a)(2). Venue is proper in this Court pursuant §15.002(a)(1) of the Texas Civil Practice and Remedies Code because all the events or omissions including, but not limited to, Plaintiff's place of hiring, Plaintiff's area where he discharged his duties, place of Plaintiff's

injury, place where Plaintiff obtained and received medical services, and place of separation all occurred in Cameron County. Additionally, venue is proper in Cameron County pursuant §15.002 (a)(3) and (4) of the Tex.Civ.Prac. & Rem.Code because Defendant Coca Cola maintains a principal office in Cameron County and because Plaintiff is a resident of Cameron County.

## VI.
## FACTS

**A.**     Plaintiff, Noel Espinoza, hereinafter, Espinoza, began work for Valley The Laredo Coca Cola Bottling Company, Inc.., hereinafter Coca Cola on July 9, 1984. Espinoza was a loyal, honest, and diligent employee for many years. By April of 1999, Espinoza was in the position of special events lead man working full time at an hourly rate of $9.07 per hour, plus overtime. Espinoza also enjoyed a full benefit package including health insurance. On April 10, 1999, Espinoza injured his back in the course and scope of his employment. He reported the injury and eventually was seen by Dr. Eduardo Atkinson, the company doctor. Atkinson diagnosed a back sprain and sends Espinoza back to work. Espinoza attempts to work the next three or four days but the pain becomes unbearable. Espinoza returns to Atkinson who takes him off work and refers him to Dr. Madhavan Pisharodi.

**B.**     Espinoza continues off work and is treated conservatively by Dr. Pisharodi. During this time, Espinoza receives worker's compensation indemnity benefits from Defendant Continental Casualty Company, hereinafter, Continental. Espinoza's claim is sent to Constitution State Service Company, hereinafter, Constitution, for monitoring and adjustment.

**C.**     On or about September 7, 1999, after failure of the conservative treatment, several diagnostic tests are conducted. Dr. Pisharodi diagnoses a L4-5 disk tear with nerve root compression and recommends surgery to Espinoza. Espinoza informs the company doctor, Atkinson, about Pisharodis' recommendation. Atkinson then refers Espinoza to Dr. Humberto Tijerina for another opinion. On September 27, 1999, Dr. Tijerina concurs with Dr. Pisharodi in his diagnoses and recommends the surgery. Espinoza returns to Dr.

Pisharodi and is informed that although recommended by the company doctor, Tijerina's opinion is insufficient as far as Continental and Constitution were concerned. Espinoza is instructed by Dr. Pisharodi's office that he must select another doctor from the carrier's approved list. Espinoza chooses Dr. Helson Pacheco who also informs Espinoza that he too concurs with Dr. Pisharodi and Dr. Tijerina's opinion and recommends surgery.

         **D.**      Constitution again delays the thrice approved surgery and informs Espinoza that he needs to see yet another doctor, Dr. Ruben Pechero. Espinoza then is scheduled with Dr. Pechero for November 11, 1999. Plaintiff is informed that Dr. Pechero is ill and is eventually rescheduled for November 30, 1999. Dr. Pechero, the fourth medical doctor and the one specifically chosen by Constitution announces to Plaintiff that he does not need surgery but should continue conservative treatment.

         **E.**      Espinoza appeals the decision of Dr. Pechero to the Worker's Compensation Commission in early December of 1999. Espinoza is unable to communicate with the Commission either in December or January of 2000. After finally contacting a representative of the Commission on February 8, 2000, Plaintiff is informed that it was the Commission's position that he had failed to keep the November 11, 1999 appointment with Dr. Pechero and that they did not received any report from Constitution or Dr. Pechero's office in order to make a decision on the surgery.

         **F.**      On February 9, 2000, a representative of the Commission sends out a letter approving Espinoza's surgery. Dr. Pisharodi's office contacts Constitution to determine if Constitution is going to further appeal the Commission's initial ruling. On February 14, 2000, Constitution announces that it will not appeal and approves the surgery. Plaintiff is finally operated on March 2, 2000.

         **G.**      Espinoza is informed he will need from sixty to ninety days to recuperate from the surgery before returning to work. Espinoza, however, receives a discharge letter from Coca Cola dated April 28, 2000 indicating that he was let go because he was absent from his job for one year, allegedly in violation of Coca Cola policy. Plaintiff never conferred with the

human resources department of Coca Cola or was he ever informed if he was eligible for extended Family Medical Leave Act time off. Defendant Coca Cola monitored Espinoza's claim at all times and was aware of the utilization of all of Espinoza's available sick and vacation leave..

## VII.
## TEXAS LABOR CODE §451.01

Plaintiff Espinoza states a cause of action against Defendant Coca Cola for retaliation pursuant §451.01 of the Texas Labor Code. Espinoza states that he was fired from his employment because he filed a claim for worker's compensation in good faith. Espinoza states that there was not in place a non-discriminatory policy discharging employees after one year of absence. Espinoza states that even if such policy was in place it was not uniformly applied to all employees. Espinoza further states that Coca Cola knew that the five month delay and Espinoza's problems in having to obtain four medical opinions, was not his fault but still insisted on not informing him of any additional leave. Coca Cola never attempted to accommodate Espinoza or explain to him his rights due to the unreasonable delay by third parties. At all times relevant Coca Cola knew the status of Espinoza's claim and never informed him of Coca-Cola's alleged policy or of the adverse repercussions to his long time employment. In essence Coca-Cola stealthily waited while Espinoza was being bandied about by Defendant's Continental and Constitution and sprung the discharge trap when it felt it could rid itself of an injured worker

## VIII.
## FAMILY MEDICAL LEAVE ACT (FMLA)
## 29 USC§2601et.seq.

**A.** Espinoza is an eligible employee pursuant the FMLA. Defendant Coca Cola is an employer engaged in commerce and/or industry or actively affecting commerce. Coca Cola has over fifty employees working within 75 miles of Espinoza's worksite.

**B.** Coca Cola unlawfully interfered with, restrained, or denied the exercise of or the attempt to exercise by Espinoza his rights under the FMLA. Coca Cola did so by failing to adequately notify Espinoza of the impact of Coca Cola's family leave policies on

rights provided by the FMLA where there existed an apparent conflict between Coca Cola's policy and Espinoza's FMLA rights. Such conduct by Coca Cola caused Espinoza to unwittingly forfeit the protections offered him by the FMLA.

C. Espinoza's medical condition was a serious health condition that involved continuing treatment by a health care provider and required surgery and in-patient care in a hospital.

## IX.
## AGENCY RELATIONSHIP-CONTINENTAL CASUALTY COMPANY-CONSTITUTION STATE SERVICE COMPANY

A. At all times relevant, Defendant Constitution was the agent of Defendant Continental serving as the adjuster for Continental. Constitution was acting within the authority expressly conferred upon it by Continental, or alternatively, within the authority necessarily implied in order for Constitution to perform and exercise the authority expressly granted. In the further alternative, Espinoza will show that Continental is estopped to deny Constitution's authority due to Continental's conduct which led Espinoza to suppose that Constitution had the authority to act on Continental's behalf as alleged.

B. Further, in the alternative, Continental has in all things ratified the exercise of authority by Constitution by providing, denying, or delaying Espinoza's benefits as dictated by Constitution.

C. Further, in the alternative, Constitution was the vice-principal of Continental in that Constitution was engaged in the non-delegable duties of Continental and Continental had confided the entire aspect of adjusting claims to Constitution.

## X.
## GOOD FAITH AND FAIR DEALING

Defendant Continental at all times relevant owed the non-delegable duty of good faith and fair dealing to Espinoza as third party beneficiary of Coca Cola's worker's compensation policy. Defendant, Continental, acting through its agent, Constitution, breached that duty by unreasonably requiring four independent opinions and never approving the surgery required by Espinoza until an adverse Commission ruling. The unreasonable requests

and resultant delay was the direct and proximate cause of Espinoza's damages as set out below. There was no reasonable basis for the request for a fourth opinion and the five month delay which followed. Continental's conduct was the direct and proximate cause of Plaintiff's damages set out below.

## XI.
## NEGLIGENCE

Defendant Continental and its agent, Constitution, owed Espinoza the duty to handle and adjust his claim in a reasonable and prudent manner. Continental and Constitution breached that duty by requiring four opinions before being ordered by the Commission to approve the surgery. Not one of the doctors was independently chosen by Espinoza. The first doctor, Dr. Pisharodi, was selected by Coca Cola's company doctor, Dr. Atkinson, as was. Dr. Tijerina. Dr. Pacheco was picked from a list provided by Constitution. Dr. Pechero was specifically chosen by Constitution. Additionally, Continental and Constitution were negligent in failing to provide the Commission with Dr. Pechero's report in a reasonable and timely manner. Continental and Constitution's negligent conduct in requiring a fourth opinion and the failure to send Dr. Pechero's report resulted in a five month delay in Espinoza's medical treatment and return to work. Said negligent conduct was the direct and proximate cause of Espinoza's damages set out below.

## XII.
## FRAUD

Espinoza states a cause of action for fraud against Defendants Continental and Constitution. Continental and Constitution made a material representation to Espinoza that a fourth opinion was necessary before approving the required surgery. This representation was false. Defendants knew that this was false and made the assertion of the necessity of a fourth opinion as a positive assertion. Defendants made the representation with the intent that it should be acted upon by Espinoza and which he did act upon by waiting for an additional five months, all to his damages as set out below.

## XIII.
## DAMAGES

**A.**    As a direct and proximate cause of Defendant Coca Cola's actions, Espinoza suffered the following damages:

   1)    lost wages and fringe benefits;

   2)    diminished earning capacity;

   3)    front pay; and

   4)    mental anguish in the past and in all reasonable probability in the future all in excess of the minimum jurisdictional amounts of the            Court.

**B.**    As a direct and proximate cause of Defendant Continental's and Constitution's action, Espinoza suffered the following damages:

   1)    lost  wages and fringe benefits;

   2)    diminished earning capacity;

   3)    front pay;

   4)    mental anguish in the past and in all reasonable probability in the future;

   5)    physical pain and suffering in the past and in all reasonable probability in the future;

   6)    impairment in the past and in all reasonable probability in the future all in excess of the minimum jurisdictional amounts of the            court.

## XIV.
## PUNITIVE DAMAGES

Defendants Coca Cola's, Continental's and Constitution's actions were such that they constituted actual fraud and malice against Espinoza for which he seeks punitive damages in excess of the minimum jurisdictions amounts of the Court.

## XV.
## ATTORNEY'S FEES AND COSTS

Espinoza seeks reasonable and necessary attorney's fees and costs of suit against Coca Cola for violation of the FMLA.

## XVI.
## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Espinoza prays that Defendants be
served, made to answer, and upon trial of the merits he recover:

1)  Actual damages as set out above;

2)  Punitive damages;

3)  Attorney's fees and costs as allowed by law;  and

4)  Pre and Post Judgement interest as allowed by Law

5)  Any and all further relief that he may be entitled to at law or in
equity.

Respectfully submitted,

Law Offices of
MIGUEL A. SALDAÑA
Corporate Plaza, Suite 109
302 Kings Highway
Brownsville, Texas  78521
Telephone:  (956) 541-6555
Telefax:    (956) 542-3651

By: _____
MIGUEL A. SALDAÑA
State Bar No. 17529450
Federal Bar No. 10954

## CERTIFICATE OF CONFERENCE

On September 12, 2000, Plaintiff's counsel conferenced with Mr. Raymond A. Cowley and David N. Kitner, attorneys for Defendants and they indicated no objection to the filing of Plaintiff's Second Amended Complaint.

MIGUEL A. SALDANA

## CERTIFICATE OF CONFERENCE

I certify that a true and correct copy of the above foregoing instrument was forwarded on this the __12th__ day of September, 2000, to:

David N. Kitner, Esq.
Strasburger & Price, L.L.P.
901 Main Street, Ste. 4300
Dallas, Texas 75202-3792

Raymond A. Cowley, Esq.
Rodriguez, colvin & chaney
4900 North 10th Street
McAllen, Texas 78504

MIGUEL A. SALDANA